1  GLENN D. POMERANTZ (SBN 112503)
   *Glenn.Pomerantz@mto.com*
2  KELLY M. KLAUS (SBN 161091)
   *Kelly.Klaus@mto.com*
3  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue, Thirty-Fifth Floor
4  Los Angeles, CA  90071-1560
   Tel: (213) 683-9100; Fax: (213) 687-3702
5
   DANIEL E. ROBBINS (SBN 156934)
6  *Dan_Robbins@mpaa.org*
   BENJAMIN S. SHEFFNER (SBN 212629)
7  *Ben_Sheffner@mpaa.org*
   15301 Ventura Boulevard, Building E
8  Sherman Oaks, California  91403-3102
   Tel: (818) 995-6600; Fax: (818) 285-4403
9
   Attorneys for
10 Motion Picture Studio Plaintiffs

11                UNITED STATES DISTRICT COURT

12                CENTRAL DISTRICT OF CALIFORNIA

13                     WESTERN DIVISION

14

15 | WARNER BROS. | CASE NO.  2:11-cv-02817-JFW-E |
   | ENTERMENT INC., | |
16 | ENTERTAINMENT INC., | **NOTICE OF MOTION AND** |
   | COLUMBIA PICTURES | **MOTION OF MOTION PICTURE** |
17 | INDUSTRIES, INC., DISNEY | **STUDIO PLAINTIFFS FOR** |
   | ENTERPRISES, INC., PARAMOUNT | **PRELIMINARY INJUNCTION;** |
18 | PICTURES CORPORATION, | **MEMORANDUM OF POINTS AND** |
   | TWENTIETH CENTURY FOX FILM | **AUTHORITIES IN SUPPORT** |
   | CORPORATION, and UNIVERSAL | **THEREOF** |
19 | CITY STUDIOS PRODUCTIONS | |
   | LLLP, | Date:     July 25, 2011 |
20 | | Time:     1:30 p.m. |
   |                    Plaintiffs, | Judge:    Hon. John F. Walter |
21 | | Ctrm:     16 |
   |          vs. | |
22 | | Filed concurrently herewith: |
   | WTV SYSTEMS, INC. and WTV | (1)  Declaration Of Thomas Gewecke; |
23 | SYSTEMS, LLC d/b/a ZEDIVA, and | (2)  Declaration Of Carolyn Hoecker |
   | VENKATESH SRINIVASAN, | Luedtke; |
24 | | (3)  Declaration Of Kelly M. Klaus; |
   |                    Defendants. | (4)  [Proposed] Order |
25

26

27

28

1  TO ALL PARTIES AND THEIR COUNSEL OF RECORD

2        PLEASE TAKE NOTICE that on July 25, 2011, at 1:30 p.m. or as soon

3  thereafter as counsel may be heard in Courtroom 16 of the above-captioned Court,

4  located at 312 North Spring Street, Los Angeles, California, Plaintiffs Warner Bros.

5  Entertainment Inc., Columbia Pictures Industries, Inc., Disney Enterprises, Inc.,

6  Paramount Pictures Corporation, Twentieth Century Fox Film Corporation, and

7  Universal City Studios Productions LLLP (collectively the "Plaintiffs" or the

8  "Studios") will and hereby do move for a preliminary injunction restraining and

9  enjoining WTV Systems, Inc. and WTV Systems, LLC d/b/a Zediva, and

10  Venkatesh Srinivasan (collectively "Zediva" or "Defendants") and all of their

11  officers, agents, servants, employees, and attorneys, and those persons in active

12  concert or participation or privity with any of them, from infringing by any means,

13  directly or indirectly, Plaintiffs' exclusive rights under Section 106 of the Copyright

14  Act, 17 U.S.C. § 106, by publicly performing or otherwise infringing Plaintiffs'

15  copyrighted works, including but not limited to by transmitting those works to

16  members of the public without Plaintiffs' authorization.

17        Good cause exists for the requested Preliminary Injunction Order.  As

18  demonstrated in detail in the accompanying Memorandum of Points and Authorities

19  and supporting papers, Defendants have violated, are violating and unless restrained

20  will continue to violate 17 U.S.C. §§ 106 and 501 by streaming Plaintiffs'

21  copyrighted works over the Internet without authorization through their Zediva

22  service, which Defendants offer through the web site www.zediva.com.  Unless

23  restrained, Defendants' operation of this service will cause immediate and

24  irreparable harm to the Studios.  The balance of hardships on this motion weighs

25  decisively for the Studios.  And the requested injunction will further the public

26  interest.

27        This Motion is based on this Notice of Motion and Motion; the attached

28  Memorandum of Points and Authorities; the contemporaneously filed Declarations

1  of Thomas Gewecke, Carolyn Hoecker Luedtke and Kelly M. Klaus; the pleadings

2  on file in this action; and such other and further materials or argument as may be

3  presented to the Court at or before the hearing on this Motion.

4

5  DATED: May 26, 2011                          MUNGER, TOLLES & OLSON LLP

6

7

8  By: _____/s/ Kelly M. Klaus_____
                                                      KELLY M. KLAUS

9  Attorneys for Motion Picture Studio
10  Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14061332

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  BACKGROUND .................................................................................. 4

    A.  The Studios And Their Copyrighted Works .............................. 4

    B.  Defendants' Business:  Streaming Performances Of The Studios' Movies Without Permission Or Payment ..................... 6

    C.  Plaintiffs' Lawsuit And The Parties' Agreement On Presenting This Motion ................................................................ 9

III.  ARGUMENT ..................................................................................... 10

    A.  The Studios Are Likely To Succeed On The Merits Of Their Copyright Infringement Claim ...................................... 10

        1.  The Studios Own Or Control Valid Copyrights In Works That Defendants Exploit ...................................... 11

        2.  Defendants Infringe The Studios' Exclusive Right To Publicly Perform Their Works By Transmitting Those Works Over The Internet To Multiple Users .......................... 11

        3.  The *Cablevision* Decision Does Not Help Defendants' Argument, And In Fact Undermines It ..................................... 16

    B.  The Studios Will Suffer Irreparable Injury Absent An Injunction ..... 18

        1.  The Zediva Service Harms The Studios' Right To Exclusive Control Over Their Copyrighted Works ................. 19

        2.  The Zediva Service Risks Taking Customers Away From Authorized Distributors Who Comply With The Law ............ 20

        3.  The Zediva Service Threatens The Success Of The Video On Demand Market ................................................................. 21

    C.  The Balance Of Hardships Sharply Tips In The Studios' Favor ........ 23

    D.  Public Policy Weighs In Favor Of Issuing The Preliminary Injunction ................................................................. 24

    E.  Minimal Security Should Be Required ............................................. 25

IV.  CONCLUSION .................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A&M Records, Inc. v. Napster, Inc.*,
  114 F. Supp. 2d 896 (N.D. Cal. 2000), aff'd in relevant part, 239 F.3d
  1004 (9th Cir. 2001) ....................................................................................... 21

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) .................................................................. 10, 21

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ........................................................................ 10

*Apple Computer, Inc. v. Franklin Computer Corp.*,
  714 F.2d 1240 (3d Cir. 1983) ......................................................................... 24

*Apple Inc. v. Psystar Corp.*,
  673 F. Supp. 2d 943 (N.D. Cal. 2009) ............................................................ 23

*Cadence Design Sys., Inc. v. Avant! Corp.*,
  125 F.3d 824 (9th Cir. 1997) .......................................................................... 23

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008) .............................................................. 16, 17, 18

*Columbia Pictures Indus., Inc. v. Aveco, Inc.*,
  800 F.2d 59 (3d Cir. 1986) ............................................................................. 14

*Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc.*,
  866 F.2d 278 (9th Cir. 1989) .................................................................... 13, 14

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*,
  749 F.2d 154 (3d Cir. 1984) ..................................................................... passim

*Eldred v. Ashcroft*,
  537 U.S. 186, 123 S. Ct. 769, 154 L. Ed. 2d 683 (2005) ............................... 24

*Gable-Leigh, Inc. v. N. Am. Miss*,
  No. CV 01-01019 MMM, 2001 WL 521695 (C.D. Cal. Apr. 13, 2001) .......... 24

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) ............................... 19

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

3

4

*L.A. Printex Indus., Inc. v. Aeropostale*,
 No. CV 08-07085 DDP, 2010 WL 2813800 (C.D. Cal. May 5, 2010) ............. 11

5

6

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
 545 U.S. 913, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005) ................................ 21

7

8

*Micro Star v. Formgen Inc.*,
 154 F.3d 1107 (9th Cir. 1998) .......................................................................... 11

9

*MySpace, Inc. v. Wallace*,
 498 F. Supp. 2d 1293 (C.D. Cal. 2007) ........................................................... 23

10

11

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
 16 F.3d 1032 (9th Cir. 1994) ........................................................................... 24

12

13

*On Command Video Corp. v. Columbia Pictures Indus., Inc.*,
 777 F. Supp. 787 (N.D. Cal. 1991) ............................................................ passim

14

15

*Salinger v. Colting*,
 607 F.3d 68 (2d Cir. 2010) ............................................................................... 23

16

17

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
 240 F.3d 832 (9th Cir. 2001) ........................................................................... 23

18

19

*Ticketmaster LLC v. RMG Techs., Inc.*,
 507 F. Supp. 2d 1096 (C.D. Cal. 2007) ........................................................... 23

20

21

22

*Triad Sys. Corp. v. Se. Express Co.*,
 64 F.3d 1330 (9th Cir. 1995), overruled on other grounds, *Cunningham v.
 Hamilton County, Ohio*, 527 U.S. 198, 119 S. Ct. 1915, 144 L. Ed. 2d 184
 (1999) ................................................................................................................ 23

23

24

*Twentieth Century Fox Film Corp. v. iCraveTV*,
 Nos. Civ.A. 00-121, Civ.A. 00-120, 2000 WL 255989 (W.D. Pa. Feb. 8,
 2000) ................................................................................................................. 14

25

26

*United States v. Am. Soc'y of Composers, Authors & Publishers*,
 627 F.3d 64 (2d Cir. 2010) ............................................................................... 12

27

28

*Universal City Studios, Inc. v. Reimerdes*,
 111 F. Supp. 2d 294 (S.D.N.Y. 2000) ............................................................... 4

MEMO. OF POINTS AND AUTHORITIES FOR
MOTION FOR PRELIMINARY INJUNCTION
2:11-CV-02817-JFW-E

1
2

# TABLE OF AUTHORITIES
## (continued)

Page(s)

3
4

*Valve Corp. v. Sierra Entm't Inc.*,
  431 F. Supp. 2d 1091 (W.D. Wash. 2004) ........................................ 15

5
6

*Vernor v. Autodesk, Inc.*,
  621 F.3d 1102 (9th Cir. 2010) ............................................. 14

7
8

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
  192 F. Supp. 2d 321 (D.N.J. 2002), *aff'd* 342 F.3d 191 (3d Cir. 2003) ............. 14

9

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ................................... 3, 10

10
11

**FEDERAL STATUTES**

12

17 U.S.C. § 101 ............................................................. 1, 12, 17, 18

13

17 U.S.C. § 106(3) ........................................................... 14

14

17 U.S.C. § 106(4) ....................................................... 1, 2, 11, 14

15

17 U.S.C. § 109(a) ........................................................... 14

16

17 U.S.C. § 410(c) ........................................................... 11

17
18

**FEDERAL RULES**

19

Fed. R. Civ. P. 65(c) .......................................................... 25

20
21
22
23
24
25
26
27
28

1        **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **I.      INTRODUCTION**

3         Defendants are blatantly violating the Studios' exclusive right to publicly

4   perform their copyrighted works.  Defendants use Internet streaming technology to

5   transmit performances of the Studios' movies from DVD players at their data center

6   to their customers around the country.  The Copyright Act, however, gives the

7   Studios — not Defendants, and not anyone else — the exclusive right to publicly

8   perform their works.  17 U.S.C. § 106(4).  Defendants do not have authorization

9   from any Studio to publicly perform their movies.  Their service infringes

10  copyright, pure and simple.  This Court can and should enjoin it.

11        The Studios' likely success on the merits is clear and follows from the

12  Copyright Act's plain language and decades of precedent.  The Copyright Act

13  provides that, "[t]o perform or display a work 'publicly' means[,]" *inter alia*:

14        (2) to transmit or otherwise communicate a performance or display of

15        the work . . . to the public, by means of any device or process, whether

16        the members of the public capable of receiving the performance or

17        display receive it in the same place or in separate places and at the

18        same time or at different times.

19  *Id*. § 101.

20        Defendants do not and cannot dispute that their Internet streams "transmit"

21  performances under the Act.[1]  Defendants do not and cannot dispute that the

22  "performance[s]" they "transmit" are of the Studios' "work[s]."  Defendants instead

23  have suggested that these performances are private, and not "to the public," because

24  Defendants transmit them to individual customers, whom Defendants call "renters."

25  But the Act's plain language forecloses this argument.  Under the Copyright Act,

26

---

27  [1] "To 'transmit' a performance . . . is to communicate it *by any device or process*
    whereby images or sounds are received beyond the place from which they are sent."
28  17 U.S.C. § 101 (emphasis added).

MEMO. OF POINTS AND AUTHORITIES FOR
MOTION FOR PRELIMINARY INJUNCTION
2:11-CV-02817-JFW-E

Defendants transmit "to the public" because they transmit the same performance of the same movie (and from the same DVD, to boot) countless times to an audience of customers that are "members of the public."  The fact that Defendants' customers view the performances "in separate places and . . . at different times" makes no difference:  the statute makes crystal clear that the performances still are "to the public."  *Id*.  The case law likewise is clear that such "transmi[ssions]" are public performances that the copyright holder has the exclusive right to authorize.  *See Columbia Pictures Indus., Inc. v. Redd Horne, Inc*., 749 F.2d 154 (3d Cir. 1984); *On Command Video Corp. v. Columbia Pictures Indus., Inc.*, 777 F. Supp. 787 (N.D. Cal. 1991).  *See generally* Section III(A)(2), *infra*.

Defendants claim that the statute and precedent do not control because the Zediva service functions like a DVD rental store in cyberspace.  Defendants say the "only difference" between their service and a Blockbuster store is that Zediva provides "a very long cable between the user and the DVD player she has rented."  Defendants' Counterclaim ¶ 68 (Dkt. No. 24).  That contention is meritless.  Defendants omit the fact that what they call a "very long cable" is in fact a *transmission* over the Internet, and not the handing over of a copy to a user.  The transmission is what makes Defendants' conduct a public performance under the statutory definition, quoted above.  Other copyright defendants — *including an actual rental store* — have tried and failed to convince courts that attaching a "rental" label to directly analogous transmission services makes their public performances private.  In the seminal *Redd Horne* case, for example, the defendant was a video rental store that, in addition to renting copies of movies for customers to take home (which was legal), rented booths in the store and then transmitted showings of the movies to the booths from equipment behind the front desk.  *Redd Horne*, 749 F.2d at 156-57.  The Third Circuit noted that the rental store "euphemistically refer[red] to" this offering as an "in-store rental."  The court looked right past the store's self-serving label and instead focused on what the store

1    actually was doing; the court held that "the transmission of a performance to

2    members of the public, even in private settings such as hotel rooms or [the

3    defendants'] viewing rooms, constitutes a public performance." *Id.* at 159. *Accord*

4    *On Command*, 777 F. Supp. at 789 (rejecting as "without merit" service's claim that

5    transmission of movies from hotel's front desk to individual guest rooms "involves

6    not 'transmissions' but 'electronic rentals' similar to patrons' physical borrowing of

7    videotapes[.]"). The result must be the same where Defendants use the Internet,

8    rather than an internal wiring system, to transmit performances of the Studios'

9    movies.

10        Defendants' continuing unauthorized exploitation of the Studios' works is

11   likely to cause irreparable harm. Defendants are providing a video on demand

12   ("VOD") service over the Internet, which is a distribution channel the Studios

13   currently exploit through legitimate, authorized partners like Amazon and iTunes.

14   The main difference, of course, is that these entities license the Studios' works

15   whereas Defendants exploit those same works for their own profit in total disregard

16   of the Studios' rights. In so doing, Defendants steal customers from these

17   licensees, injuring both the licensees and the Studios, and harming each Studio's

18   relationship with its licensees. Defendants' unauthorized performance of the

19   Studios' works thus deprives each Studio of its exclusive right under federal law to

20   determine how, when, and to whom its copyrighted works are publicly performed.

21   Each Studio has expended considerable resources to develop its own strategy for

22   releasing its works in a way that maximizes value both to that Studio and the

23   consuming public. Defendants have helped themselves to the exploitation of the

24   Studios' works; in so doing, Defendants upend the Studios' lawful exercise of the

25   rights that Congress granted to them and interfere with each Studio's separate

26   relationships with its authorized distributors. The remaining factors under *Winter v.*

27   *Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d

28   249 (2008) (balance of hardships and public interest), also weigh decisively in the

1   Studios' favor.  The Court should enjoin Defendants illegal activities.

2   **II.    BACKGROUND**

3        **A.    The Studios And Their Copyrighted Works**

4        The Studios, either directly or through affiliates and/or licensees, distribute

5   copies of and publicly perform their copyrighted motion pictures, and motion

6   pictures to which they have exclusive rights.  Each Studio independently strives to

7   develop and offer products and services to satisfy customer preferences while

8   maximizing its own revenues.  *See* Declaration of Thomas Gewecke ("Gewecke

9   Decl.") ¶ 14.  Each Studio, either itself or through affiliates and licensees, offers a

10  wealth of options to customers to view movies:  they can go to the theater; buy a

11  copy of the movie (on DVD or Blu-ray Disc); rent a copy (at a bricks-and-mortar

12  store or through a mail subscription service like Netflix); download and license a

13  permanent copy through a service like Amazon; access it on demand for a fixed

14  period of time through a cable, satellite, or Internet delivered VOD platform, like

15  Comcast, DirecTV, or Vudu; view it through subscription VOD streaming services

16  like Netflix; watch it on a scheduled subscription cable television channel like HBO

17  (or its own on demand service); or eventually watch it for free on network

18  television.  *See id.* ¶ 8.

19       Each of these different modes of exhibition and distribution represents a

20  different customer offering, varying as to, among other things, when (on first

21  release or later), where (in a theater, at home, on a mobile device), how (on demand

22  or according to a set schedule, transactional or through a subscription), and for how

23  much (a variety of price points) the consumer may view or obtain a copy of the

24  Studios' content.  These separate channels are commonly structured through

25  distribution "windows," and the ability to "window" has significant value to each

26  Studio.  *See* Gewecke Decl. ¶¶ 4, 12, 14; *Universal City Studios, Inc. v. Reimerdes*,

27  111 F. Supp. 2d 294, 309 (S.D.N.Y. 2000) (discussing significance of

28  "windowing").

1    Each Studio implements its own strategy for "windowing" to try to maximize
2    the Studio's return on its considerable investment in motion picture content.  To
3    take a very general example, the "window" for a current release in the home video
4    market may begin with the sale of content on DVD, Blu-ray Disc, or the license of
5    a downloadable copy.  Gewecke Decl. ¶ 13.  At that same time, a customer could
6    view the movie through a cable, satellite, or Internet VOD service, or could rent it
7    at a brick-and-mortar rental store.  *See id*.  Some Studios choose not to make their
8    copyrighted works available through rental DVD-by-mail subscription services like
9    Netflix or kiosks like Redbox until 28 days after the initial home video release date.
10   *See id.*  Then, months after the home video release, the movie may appear
11   exclusively on a paid cable television channel which paid for that exclusivity, and
12   during that time it is often unavailable through VOD.  *See id.*  In what is typically
13   the last window, the movie may appear on network television.  *See id*. ¶ 11.

14   The details of "windowing" vary from Studio to Studio; even within Studios,
15   the "windows" can vary among different titles.  The critical economic point of the
16   "windowing" process is that it enables a Studio to try to match different customer
17   offerings with the willingness of customers to pay for those offerings.  In general,
18   the sooner the movie is available for viewing, the higher the price a Studio can
19   charge for that offering.  *See* Gewecke Decl. ¶ 14.  This structure allows each
20   Studio to maximize the overall value of its movies, and thereby cover the enormous
21   costs and risks that the Studio takes in developing and producing movies.  *See id.*

22   A Studio can only realize value for its considerable investment in a
23   copyrighted work because of copyright protection.  Third parties that wish to
24   exercise an exclusive right vested in the Studio must negotiate and pay for that
25   right.  Hence, a Studio's "windows" are a function of negotiations with third parties
26   over how, when, where, and for how much those third parties can exercise the right
27   to publicly perform a Studio's copyrighted work.  Some third parties in the earlier
28   "windows" may pay more for the right to distribute a movie because that movie

- 5 -

1  will be new, or newer, to the movie-watching public, while third parties in later

2  "windows" may pay less for the right to distribute a movie because that movie has

3  had more exposure to the movie-watching public by that point.  *See* Gewecke Decl.

4  ¶ 12.  Relatedly, third parties in later "windows" may negotiate restrictions on a

5  Studio aimed at limiting or controlling how much exposure the movie gets in earlier

6  periods before their exhibition window begins.  Still other distributors, such as

7  subscription cable television channels, pay more for the *exclusive* right to perform a

8  movie during a particular time period, and thus a Studio must respect that

9  restriction when it licenses to others.  *See id.*  The money obtained via these

10  negotiated agreements is critical to pay for the creation of the movies being

11  performed; calculations based on prior experience with revenues from movies in

12  various "windows" drive the green-lighting process for new movies.  *See id.* ¶ 9.

### B.  Defendants' Business:  Streaming Performances Of The Studios' Movies Without Permission Or Payment

13
14  Defendants have purchased hundreds of DVD players and installed them in

15  cabinets at a data center they lease in Santa Clara, California.  Declaration of

16  Carolyn Hoecker Luedtke ("Luedtke Decl."), Ex. O at 69:11-70:2, 75:13-17

17  (Deposition of Vivek Gupta, Defendants' 30(b)(6) designee ("Gupta Depo.")).

18  Defendants also have purchased DVDs and placed them in their players; each disc

19  remains in the player and is transmitted to Defendants' customers multiple times

20  over.  *Id.* at 28:6-31:7, 108:13-109:10.  When a customer requests that a particular

21  title be transmitted to him, Defendants, through the systems they own and have

22  implemented, (1) start the play process on a particular DVD player holding the title,

23  (2) use a video adapter to convert the analog video signal from the DVD player into

24  a digital signal, (3) feed that digital signal into a DVD control server which

25  converts the digital signal to make it suitable for streaming across the Internet,

26  (4) use another server to convert that digital signal to a format that can be viewed in

27  the player created by Zediva, (5) transmit the performance via the Internet to a user,

28

- 6 -

1   and (6) provide the user with a custom viewer in which to watch the video stream.

2   *See generally id.* at 55:1-66:15.  It is simply incorrect to state that a Zediva user

3   turns on a remote DVD player by pressing play.  Instead, a Zediva user presses a

4   button on a webpage that Zediva designed, Zediva's system then sends a request to

5   the Zediva control server, and this sets in motion a series of actions on various

6   servers created and controlled by Defendants.

7        Defendants' customers never have physical access to the DVDs:  they do not

8   see or touch them or the machines that play the discs.  *See id*. at 69:11-70:2.

9   Indeed, the user does not know which particular DVD player or DVD Zediva is

10  using to transmit the requested movie to him.  The customers also cannot access all

11  the additional features available on the DVD, like deleted and extra scenes, and

12  other special DVD additions.  *See id.* at 99:7-100:21.  And the customers never

13  have any control over the conversion of the analog signal to a digital signal or the

14  various servers that Defendants use to direct traffic among their stacks and stacks of

15  DVD players.  Defendants always have exclusive control of their servers.

16       Defendants use the misleading metaphor of a DVD "rental" service to

17  describe the access their customers get to Zediva's DVDs and DVD players.  But

18  "rental" is just a self-serving label Defendants have chosen in an attempt to avoid

19  legal exposure; of course, that label does not control the legal analysis of what

20  Defendants are doing.  And, what is more, the metaphor does not even accord with

21  the facts.  Defendants' litigation posture is that a customer "rents" a particular DVD

22  and DVD player for 14 days.  That nomenclature is intended to invoke the idea of a

23  customer walking out of the Zediva store with a DVD player and DVD disc "in

24  hand," much like someone leaving Blockbuster with the same items.  But that is not

25  how the streaming Zediva service works.  The customer does *not* have access to or

26  control over a specific DVD or DVD player for the entire period.  Instead,

27  Defendants will stream the content of the DVD to a customer over a period of only

28  4 hours, so long as the customer does not pause it for more than an hour during that

MEMO. OF POINTS AND AUTHORITIES FOR
MOTION FOR PRELIMINARY INJUNCTION
2:11-CV-02817-JFW-E

1   time.  *See* Luedtke Decl., Ex. D at 0019; Gupta Depo. at 117:21-118:3.  After four

2   hours of total "rental" time — or an hour-long pause (whichever comes first) —

3   Defendants allocate the DVD player containing the same disc to another customer.

4   When the first customer makes a request to resume viewing, the transmission may

5   be sent from a different DVD than the one used to transmit the title earlier in the

6   rental period.  Defendants' web site says: "if all of the copies of the movie you

7   wanted are rented out, you can request to be notified, via email, when it becomes

8   available."  *See* Luedtke Decl., Ex. D at 0019; Gupta Depo. at 157:20-158:7

9   (explaining that it happens "a lot" that "users come to the service and they are

10  unable to rent because all the copies are rented out").

11      Defendants' business is built on the repeated, unauthorized performance of

12  the Studios' copyrighted works.  Defendants' advertising — which uses images

13  from the Studios' movies without permission — shows that they offer Internet-

14  streaming performances of the Studios' popular motion picture releases.  Luedtke

15  Decl. ¶ 5 & Ex. D (movies watched on Defendants' service); Declaration of Kelly

16  M. Klaus ("Klaus Decl."), Exs. 1-46 (sample of Studios' copyright registrations

17  corresponding with movies available on Zediva).  Defendants are not licensed or

18  otherwise authorized by the Studios to distribute or perform any of their

19  copyrighted works.  *See* Defendants' Answer ¶ 20 (Dkt. No. 24).

20      Because they operate without a license from any Studio, Defendants

21  improperly benefit from multiple unfair advantages that licensed distributors do not

22  have and for which Defendants have not paid.  First, Defendants tout Zediva's

23  below-market prices:  $1.99 per movie, or 10 for $10.  *See* Luedtke Decl. ¶ 5, Exs.

24  D, E, K.  In contrast, legitimate Internet VOD services like Amazon or Vudu

25  currently charge between $3.99 and $5.99 to watch new releases.  *See* Gewecke

26  Decl. ¶¶ 13, 21; Luedtke Decl., Ex. A.  As *Time* magazine noted on its "Techland"

27  blog, the reason that Zediva can "shave[] down" its pricing is because it "cut[s]

28  movie studios out of the equation" and does not "negotiat[e] streaming rights."

Luedtke Decl., Ex. I at 0047.  Similarly, Defendant Srinivasan has promoted the Zediva service as allowing users to avoid "pay[ing] premium prices" for online streaming because "we are not party" to those "contractual agreement[s]" that the Studios have with authorized streaming services.  *Id.*, Exs. J, K.  Defendants also claim an availability advantage over licensed Internet VOD providers, who must take certain products off the market during exclusivity periods that certain Studios have granted to subscription cable television channels.  *See* Gewecke Decl. ¶¶ 12, 15, 18.  Further, Defendants have claimed a durational access advantage in that they offer a movie for 14 days per transaction, whereas licensed VOD providers may be limited by license to offering a more limited period for viewing, *e.g.*, 48 hours.  *See id.* ¶ 15

### C.   Plaintiffs' Lawsuit And The Parties' Agreement On Presenting This Motion

Defendants started "beta" testing their service in mid-2010; at the time they opened the service up to users without an invitation, they had only five dozen (or fewer) DVDs playing movies for fewer than 2,000 "invitation only" users.  Gupta Depo. at 23:15-24:5.  Defendants officially launched their current web site on March 16, 2011.  Luedtke Decl. ¶ 13, Exs. G, L; Defendants' Answer ¶ 23 (Dkt. No. 24).  Upon launch, the business apparently became so popular that its servers crashed with the increased traffic and Defendants had to close the site to new subscribers until they could add capacity.  *See* Luedtke Decl. ¶ 13, Ex. L; Gupta Depo. at 136:17-138:14.  Defendants presently have approximately 24,000 active accounts.  *See id.* at 24:18-19.  Defendants have added server capacity and are inviting customers off the 40,000-person waiting list.  *See id.* at 24:20-25:10.  Further, Defendants boast that their technology is capable of being scaled "to support millions of customers."  *Id.* at 164:9-165:4.

On April 4, 2011, less than three weeks after Zediva's official launch, the Studios filed this suit and asked Defendants to stop infringing the Studios'

1   copyrights.  Luedtke Decl. ¶ 17.  Defendants have not done so.  *See id.*  Defendants

2   announced they had counsel within a few days, and the Studios informed counsel of

3   their intent to file this motion.  Counsel for both sides thereafter worked

4   cooperatively to stipulate to a mutually agreeable schedule for targeted discovery

5   regarding the operation of Defendants' service, and for the briefing and

6   presentation of this motion.  *See id.*  The Studios took an expedited Rule 30(b)(6)

7   deposition of Defendants and obtained an early document production.  *See id.*  This

8   motion, with the agreed-upon schedule, followed.

9   **III.   ARGUMENT**

10          "A plaintiff seeking a preliminary injunction must establish that he is likely

11   to succeed on the merits, that he is likely to suffer irreparable harm in the absence

12   of preliminary relief, that the balance of equities tips in his favor, and that an

13   injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555

14   U.S. 7, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008).[2]

15          **A.     The Studios Are Likely To Succeed On The Merits Of Their**
                      **Copyright Infringement Claim**

16

17          The Studios are likely to succeed on their copyright infringement claim, and

18   at the very least raise serious questions going to the merits.

19          "Plaintiffs must satisfy two requirements to present a prima facie case of

20   direct infringement: (1) they must show ownership of the allegedly infringed

21   material and (2) they must demonstrate that the alleged infringers violate at least

22   one exclusive right granted to copyright holders under 17 U.S.C. § 106."  *A&M*

23   *Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).  The Studios

24   satisfy both of these requirements.

25   [2] In the Ninth Circuit, the "'serious questions' version of the sliding scale test for
     preliminary injunctions remains viable after the Supreme Court's decision in
26   *Winter*."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir.
     2011).  Thus, "'serious questions going to the merits' and a balance of hardships
27   that tips sharply towards the plaintiff can support issuance of a preliminary
     injunction, so long as the plaintiff also shows that there is a likelihood of
28   irreparable injury and that the injunction is in the public interest."  *Id*. at 1135.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.   The Studios Own Or Control Valid Copyrights In Works That Defendants Exploit

Certificates of registration issued by the Copyright Office to each Studio for copyrighted works identified in the Complaint are attached as Exhibits 1-46 to the accompanying Klaus Declaration.[3]  It is undisputed that Defendants have offered, and unless restrained will continue to offer, each of those works (and other future releases) through their Zediva service.  Luedtke Decl. ¶¶ 4-5 & Ex. D.

A registration certificate creates a "presumption of copyright validity and ownership." *L.A. Printex Indus., Inc. v. Aeropostale*, No. CV 08-07085 DDP, 2010 WL 2813800, at *2 (C.D. Cal. May 5, 2010) (citing *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998)).  *See also* 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.").  The Studios have established a presumption that they own or control valid copyrights.

### 2.   Defendants Infringe The Studios' Exclusive Right To Publicly Perform Their Works By Transmitting Those Works Over The Internet To Multiple Users

Section 106(4) of the Copyright Act grants a copyright owner the exclusive right "in the case of . . . motion pictures and other audiovisual works, to perform the copyrighted work publicly."  17 U.S.C. §106(4).  Defendants violate this right by transmitting performances of the Studios' works to multiple members of the public.  The "transmit" clause — subsection (2) of the definition of a public performance, is at issue on this motion:

(2) to transmit or otherwise communicate a performance or display of

the work . . . to the public, by means of any device or process, whether

---

[3] The Studios have separately contracted for the exclusive right at issue in this case with respect to other films the Complaint identifies, and for some motion pictures the copyright registration is pending.  If the Court would like, the Studios can and will submit declarations establishing their right to enforce the copyright to each of these other works.

the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Id.* § 101.

The transmit clause makes clear that a performance remains public when it is transmitted by "any device or process" "to the public," *regardless* of whether the potential audience for the transmission is gathered in one location to receive the transmission or whether the audience is dispersed in numerous, otherwise "private" places. This is exactly what Defendants are doing: they are transmitting performances of the same works from the same DVDs to thousands (and, potentially, one day) millions of customers.[4] *See* Gupta Depo. at 28:6-31:7, 108:13-109:10. Those customers are "the public." Defendants cannot transform their public audience into thousands (or even millions) of "private" performances simply because the transmissions go to different end-users at different times.

For decades, courts have held that separate, on-demand transmissions of performances of the same work to different users at different times and in different places are public performances. The leading case in this line is the Third Circuit's opinion in *Redd Horne,* 749 F.2d 154. The defendant there was a movie rental store, which offered a service for customers to view videos in on-site private viewing booths. The proprietor would simply place videocassettes into a playback machine at the front desk and then transmit the performance to the private booth. *Id.* at 157. The proprietor argued that the performances were private because they were transmitted to private viewing booths, rather than being shown in public theaters. *Id.* at 159. The Third Circuit rejected this argument and held that "the

---

[4] Defendants do not and cannot dispute that their Internet streams are "transmi[ssions]" under the Act. *See* 17 U.S.C. § 101 (definition of "transmit"); *United States v. Am. Soc'y of Composers, Authors & Publishers*, 627 F.3d 64, 74 (2d Cir. 2010) (Internet streams are transmissions and, if they meet the definition of public performance under the Act, public performances).

1   transmission of a performance to members of the public, even in private settings . . .

2   constitutes a public performance . . . . [T]he fact that members of the public view

3   the performance at different times does not alter this legal consequence." *Id.*

4        The district court in *On Command Video Corp. v. Columbia Pictures Indus.*,

5   777 F. Supp. 787 (N.D. Cal. 1991), followed the same analysis, and reached the

6   same result, in evaluating a purported "electronic rental[]" system remarkably

7   similar to the Zediva service.  There, a hotel maintained a central bank of video

8   cassette players, each holding a single copy of a particular movie.  *See id.* at 788.

9   As with the Zediva service, a customer could access a movie by using a remote

10  control from a private location (there, a hotel room), and then the service

11  (analogous to Zediva) would transmit the movie from the central bank of machines

12  to the customer.  The service there (like Zediva here) used the "rental" label to try

13  to legitimize these public performances; it said that only one guest could "rent" a

14  particular movie in a particular VCR; and that when a guest finished watching a

15  "rented" movie, the movie would be "returned" and available for other customers.

16  *Id*. at 788-89.  The court disregarded the service's self-serving "rental" label and

17  instead looked at what it actually was doing.  And, relying on the facts that hotel

18  guests comprised "the public," and that the service was transmitting performances

19  of the movies to those guests (albeit in different rooms and at different times), the

20  court held that the service violated the public performance right.  *Id*. at 789-90.

21       The Ninth Circuit's opinion in *Columbia Pictures Indus., Inc. v. Professional*

22  *Real Estate Investors, Inc.*, 866 F.2d 278 (9th Cir. 1989), is also highly relevant

23  here.  In that case, the hotel actually rented guests a physical disc, which the guest

24  could take back to her or his room and watch on an in-room player.  The Ninth

25  Circuit held that the "transmit" clause did not apply because *the hotel did not*

26  *transmit anything*.  *Id*. at 281-82.  Importantly, however, the Ninth Circuit

27  expressly rejected an argument by *amicus curiae* Spectradyne which *did* transmit

28  movies within hotels on a pay-per-view basis, and which essentially asked the court

- 13 -

1   to hold that its activities were not public performances.  *Id.* at 282 n.7.  The Ninth

2   Circuit "*reject[ed]* all of Spectradyne's arguments," and said that its system, which

3   "uses wires to transmit a signal, employs a central transmission device, and [where]

4   the signal is received at places beyond the place from which it is sent," "falls

5   squarely within the transmit clause."  *Id.* (emphasis added).  That conclusion

6   applies equally here.[5]

7         Defendants cannot avoid the statute's clear language or the case law applying

8   that language by using a self-serving (and inaccurate) "rental" label to describe

9   their service.[6]  The cases, in fact, reject near-identical attempts by defendants to

10  characterize their public performances as "rentals" to avoid liability under § 106(4).

11  In *Redd Horne*, the court saw through the defendant's attempt to portray its public

12  performances as "in-store rentals":

13         Maxwell's never disposed of the tapes in its showcasing operations,

14         nor did the tapes ever leave the store.  At all times, Maxwell's

15         maintained physical dominion and control over the tapes.  Its

16         employees actually played the cassettes on its machines.  The charges

17         or fees received for viewing the cassettes at Maxwell's facilities are

18  _____

19  [5] Courts repeatedly have applied the rational of these cases to the Internet context.
    *See Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321,

20  332 (D.N.J. 2002) ("Because transmission of the clip previews to individual
    customers occurs when any member of the public selects an icon that redirects him

21  or her to Video Pipeline's website, from which the video clips are then shown, such
    actions by Video Pipeline constitute a 'public performance.'"), *aff'd* 342 F.3d 191

22  (3d Cir. 2003); *Twentieth Century Fox Film Corp. v. iCraveTV*, Nos. Civ.A. 00-
    121, Civ.A. 00-120, 2000 WL 255989, at *7 (W.D. Pa. Feb. 8, 2000) (Internet

23  transmissions violated plaintiffs' public performance rights "by transmitting
    (through use of 'streaming' technology) performances of the works to the public by

24  means of the telephone lines and computers that make up the Internet.").

25  [6] Defendants' attempts to analogize themselves to a movie-rental store suggests a
    possible appeal to the "first sale" doctrine, codified at 17 U.S.C. § 109(a).  The first

26  sale doctrine, however, is an affirmative defense.  *See Vernor v. Autodesk, Inc.*, 621
    F.3d 1102, 1107 (9th Cir. 2010).  Defendants quite rightly did not raise that

27  defense, because § 109(a) only limits the copyright owner's exclusive right of
    *distribution*, 17 U.S.C. § 106(3), and does not limit the public performance right

28  under § 106(4).  *See, e.g., Columbia Pictures Indus., Inc. v. Aveco, Inc.*, 800 F.2d
    59 (3d Cir. 1986).

1      analytically indistinguishable from admission fees paid by patrons to

2      gain admission to any public theater.  Plainly, in their showcasing

3      operation, the appellants do not sell, rent, or otherwise dispose of the

4      video cassette.

5   *Redd Horne*, 749 F.2d at 160.  *See On Command*, 777 F. Supp. at 789 (arriving at

6   same result notwithstanding service's labeling of its transactions as "'electronic

7   rentals' similar to patrons' physical borrowing of videotapes[.]").  *Cf. Valve Corp.*

8   *v. Sierra Entm't Inc.*, 431 F. Supp. 2d 1091, 1096 (W.D. Wash. 2004) (rejecting

9   "cyber café's" attempt to label its customers' playing of videogames on café's

10  computers as "rental" transactions, and therefore within scope of parties' license;

11  analogizing to (and quoting from) *Redd Horne*, 749 F.2d at 160, the court said that

12  "[a] video store that charges patrons to watch movies in-store does not 'sell, rent, or

13  otherwise dispose of the video cassette'; similarly, a cyber café that charges for

14  pay-for-play entertainment does not 'rent' game software.").

15      The logic of these cases applies fully in this case.  Defendants' use of the

16  "rental" label does not change what is going on here, which is the transmission of

17  performances "to the public."  Indeed, the "rental" label does not even fit the facts,

18  but instead is being used in an attempt to avoid the legal consequences of

19  Defendants' actions.  Defendants never sell, rent, or otherwise dispose of any

20  DVDs while they are streaming to customers.  Defendants maintain physical

21  dominion and control over the DVDs, the DVD players, and their servers.  *See*

22  Gupta Depo. at 69:11-13, 129:16-20.  "[N]othing tangible changes hands" in a

23  Zediva transaction; users merely "pay for audiovisual entertainment."  *Valve Corp.,*

24  431 F. Supp. 2d at 1096.

25      The fact that the Zediva user chooses a movie (from among the titles that

26  Defendants have chosen to offer) and presses "play" using a metaphorical "remote

27  control" does not transform Zediva into a "rental" service or otherwise imply that

28  someone other than Zediva is "publicly performing" the work.  If this argument

were accepted, then nearly all streaming transmissions over the Internet would not be public performances because users always must tell the service in some fashion which work they wish to view, and when — typically by pressing a key on a computer.  In *On Command*, the users likewise had "remote controls" from which they selected and played movies.  The court, however, found that the service was transmitting performances of the motion pictures, and thus publicly performing them:

> The system "communicates" the motion picture "images and sounds"
> by a "device or process" — the equipment and wiring network — from
> a central console in a hotel to individual guest rooms, where the
> images and sounds are received "beyond the place from which they are
> sent." . . . . The fact that hotel guests initiate this transmission by
> turning on the television and choosing a video is immaterial.

*On Command*, 777 F. Supp. at 789-90 (internal citations omitted).[7]

The same is true in this case:  Defendants, not the end-users, transmit movies to users' devices, where they are received "beyond the place from which they are sent."  That is a public performance, and it requires the copyright holder's authorization.  Defendants do not have that authorization, and they are infringing the Studios' copyrights.

### 3.     The *Cablevision* Decision Does Not Help Defendants' Argument, And In Fact Undermines It

In public statements and patent filings, Defendants have asserted that the decision in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.,* 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), justifies their infringing service.  *Cablevision* is

---

[7] *On Command* cited a 1967 Report by the House of Representatives demonstrating that Congress intended for the transmit clause to cover precisely the sort of on-demand, single-viewer system offered by Zediva:  a "'performance made available by transmission to the public at large is 'public' even though'" it is "'performed or displayed at the initiative of individual members of the public.'"  *On Command*, 777 F. Supp. at 790 (quoting H. Rep. No. 83, 90th Cong., 1st Sess. at 29 (1967)).

1    factually distinguishable and if anything only undermines Defendants' arguments.

2    Cablevision is a subscription cable television service, duly licensed by

3    copyright owners to publicly perform their copyrighted works to its paying

4    subscribers.  The dispute in that case involved Cablevision's proposed "Remote

5    Storage DVR System" ("RS-DVR"), which involved making copies of television

6    programming at a Cablevision facility, and later transmitting performances of the

7    programs to subscribers.  *See Cablevision,* 536 F.3d at 124.  When a subscriber

8    wanted to watch a recorded program, he or she would press "play," and that

9    particular subscriber's unique copy would be transmitted solely to his or her set-top

10   box.  *Id.*  In other words, Cablevision's service created a closed transmission, from

11   a unique copy to a unique set-top box.

12   The Second Circuit held that the RS-DVR did not publicly perform the works

13   because the performances were not made "to the public" within the meaning of 17

14   U.S.C. § 101.  The court rested its public performance holding on its finding that

15   each "transmission is made using a single unique copy of a work, made by an

16   individual subscriber, one that can be decoded exclusively by that subscriber's

17   cable box."  *Id.* at 135; *see also generally id.* at 135-39 (repeatedly reiterating that

18   the holding was based on the specific facts of the case, in which a single copy was

19   made for and transmitted to a single user).  The Second Circuit held that "the use of

20   a unique copy may limit the potential audience of a transmission and is therefore

21   relevant to whether the transmission is made 'to the public.'"  *Id.* at 138.  It

22   distinguished *Redd Horne* and *On Command* on the ground that, unlike with the

23   RS-DVR, in each of those cases the courts found public performances where the

24   infringer made repeated transmissions from the same copy of the underlying work

25   to multiple users — exactly what Defendants do here.  *See id.* at 138-39 (explaining

26   that *Redd Horne* involved "only one copy of each film" and it "show[ed] each copy

27   repeatedly to different members of the public" and *On Command* involved

28   "successive transmissions to different viewers . . . using a single copy of a given

14061332

work").

The Ninth Circuit has not adopted any aspect of the *Cablevision* decision.[8] But even if the Ninth Circuit adopted *Cablevision's* interpretation of the transmit clause, Defendants' service would still be liable under it.  Defendants have admitted that they transmit performances from a single copy of a DVD to multiple different customers at different times.  *See* Gupta Depo. at 28:6-31:7, 108:13-109:10. Defendants do this both within the metaphorical 14-day "rental" period, when the same copy of a DVD is used to stream the movie to different "renters," *i.e.*, when the original user's four-hour period has expired or the original user has paused the movie for more than an hour.  And Defendants also transmit performances from the same copy to multiple users when a purportedly "rented" DVD has been returned to stock and is used for later customers.  *See id.* at 108:13-109:19, 119:11-20; *see also* Luedtke Decl., Ex. D at 0019 (acknowledging that Defendants rotate DVDs "out of consideration to other users who may be waiting to rent the DVD").  *Cablevision* does not help, and in fact undermines, Defendants' argument.

## B.   The Studios Will Suffer Irreparable Injury Absent An Injunction

It is clear the Studios are likely to suffer irreparable harm unless the Court

---

[8] The Studios disagree with *Cablevision's* interpretation of the public performance right.  The transmit clause is not limited to performances from *copies* of works, as the Second Circuit held on the facts there, but rather covers performances "of the work."  17 U.S.C. § 101.  Performances of the same work, even if from different copies, still trigger the public performance right.  As discussed in the text, that disagreement has no bearing on the outcome of this Motion, because Defendants transmit performances from the same DVD copies to multiple members of the public.  The Second Circuit separately held Cablevision did not *directly* infringe plaintiffs' exclusive right of *reproduction* through the RS-DVR copying.  *See Cablevision*, 536 F.3d at 130-33.  That holding, while wrong (we submit), is irrelevant here.  This case involves only the *public performance* right, not the *reproduction* right, and specifically performing through transmissions.  The definition of "transmit" makes it clear that a transmission is "communicate[d]" *from* some place (by a sender) *to* some other place (and a receiver).  17 U.S.C. § 101. Defendants, and not their end-users, "transmit" the streamed movies here.  *Cf. Cablevision*, 536 F.3d at 134 (declining to reach Cablevision's argument that the end-users in that case transmitted performances to themselves, and expressly noting that "[t]he definitions that delineate the contours of the reproduction and public performance rights *vary in significant ways*.") (emphasis added).

enjoins Defendants' illegal activities.

### 1.   The Zediva Service Harms The Studios' Right To Exclusive Control Over Their Copyrighted Works

The Copyright Act confers on the copyright holder the exclusive right to control how, when, to whom, and for what price (if any) it will disseminate its copyrighted works.  *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546, 105 S. Ct. 2218, 2223, 85 L. Ed. 2d 588 (1985) ("The rights conferred by copyright are designed to assure contributors to the store of knowledge a fair return for their labors.").  Many Studios sell subscription cable television services the *exclusive* right to perform a copyrighted work for a period of time.  The price for that deal is based, in part, on the promise and scope of exclusivity.  *See* Gewecke Decl. ¶ 18.  To accomplish this, a Studio might include in its license agreements with VOD providers a prohibition against offering certain movies during the exclusive window.  *See id.*  Through these negotiated agreements, the Studio exercises control over its copyrighted works.  Since Defendants operate illegally without any agreement, they will perform copyrighted works during these negotiated exclusivity periods, thus interfering with each Studio's grant of exclusivity, its ability to negotiate similar deals in the future, and its overall ability to control its copyrighted works in a manner that maximizes value for the Studio and for customers.  *See id.*  Defendants' interference risks harming the relationships each Studio has built with these third parties.  *See id.* ¶¶ 17-18, 22.

In an effort to control how, when, and where their copyrighted works are viewed by the public, each Studio has a rigorous process of evaluating each third party who will be licensed to transmit that Studio's movies.  During this process, a Studio may assess a potential licensee's ability to provide a high quality movie-watching experience for the customer and the security measures it will employ to protect against piracy and other forms of illegal copying.  *See* Gewecke Decl. ¶¶ 19, 25.  These efforts fall squarely within the copyright holder's right to control how its

copyrighted works are transmitted to customers.  Defendants ignore this exclusive right and handle the dissemination and transmission of copyrighted work as if it is something *Defendants* have the right to control, which is contrary to the law.

### 2. The Zediva Service Risks Taking Customers Away From Authorized Distributors Who Comply With The Law

By exploiting the Studios' works without payment, Defendants jeopardize the operation of lawfully-licensed entities and threaten to deprive the Studios of revenue to which they are entitled.  *See* Gewecke Decl. ¶¶ 20-22.  This harm, while very real, cannot be easily quantified.  A customer who views a movie through Zediva may forego watching the movie through authorized VOD providers, or choose not to purchase a DVD or Blu-ray Disc.  Satellite, Internet, and mobile VOD providers have license agreements through which they pay a Studio a percentage of revenue for each transaction.  *See id.* ¶¶ 15, 21.  Therefore, the more people who view a Studio's movie through authorized channels, the more revenue that Studio receives to offset the costs of making existing and future movies.

Defendants' aim is clearly to steal customers from authorized VOD services by undercutting them, offering works when they are not available to lawful channels, or both.  Defendants make no attempt to hide their strategy.  In a recent letter to the FCC, Defendant Srinivasan stated that Zediva "may be perceived to directly compete with the Video-on-Demand service, PayPerView or other PayTV services offered by cable providers and, in some cases, the providers of fiber networks and wireless networks."  Luedtke Decl., Ex. F at 0037; *see also* Ex. P at ZEDIVA0000006 (comparing Zediva's $1.99 price for 14 day viewing period with Blockbuster and Amazon's price of $3.99 for 24 to 48 hours).  Defendants can "compete" with authorized distributors at a lower price and with movies available for a longer duration because they operate illegally without a license.  The number of customers Defendants threaten to take away from licensed distributors is significant and threatens to grow much larger; Defendants have stated that their

- 20 -

technology is "scalable . . . to support millions of customers."  *Id.*, Ex. P at ZEDIVA00007.

### 3.   The Zediva Service Threatens The Success Of The Video On Demand Market

The continued operation of the Zediva service — and the message it sends to consumers and other potential operators of similar services — also threatens the success of the video on demand market.  *See* Gewecke Decl. ¶¶ 20-26.  VOD is an important and growing market segment.  In 2010, VOD increased 20.8% to $1.8 billion in sales.  *See* Luedtke Decl., Ex. B at 0016.  Within that category, Internet-based VOD increased even more dramatically, and is projected to be up more than 120% from 2010 to 2013.  *See id.,* Ex. C.  Demand is shifting away from DVD sales and bricks-and-mortar rentals to digital categories like VOD, so this market is an important one for customers and the Studios.  Defendants' illegal exploitation of the Studios' rights threatens the development of a lawful market for VOD services.

First, Zediva's presence threatens to confuse customers about VOD offerings, and to create incorrect (but lasting) consumer perceptions about what is lawful VOD exploitation of the Studios' works.  *See* Gewecke Decl. ¶¶ 21-26.  Defendants erroneously characterize Zediva as "fully compliant with the law."  Luedtke Decl., Exs. M, N.  This threatens to confuse consumers and drive up adoption of the Zediva service by numerous additional end users, causing even greater immediate and irreparable injury to the Studios.  The experience of content owners over the last decade demonstrates the irreparable harm that can stem from this customer confusion about whether payment is required for access to copyrighted works.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929, 125 S. Ct. 2764, 2775, 162 L. Ed. 2d 781 (2005) ("the indications are that the ease of copying songs or movies using software like Grokster's and Napster's is fostering disdain for copyright protection"); *A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 910-11 (N.D. Cal. 2000) ("[Napster] has

MEMO. OF POINTS AND AUTHORITIES FOR MOTION FOR PRELIMINARY INJUNCTION 2:11-CV-02817-JFW-E

1   contributed to a new attitude that digitally-downloaded songs ought to be free – an

2   attitude that creates formidable hurdles for the establishment of a commercial

3   downloading market"), *aff'd in relevant part*, 239 F.3d 1004 (9th Cir. 2001).

4        Second, the Zediva service threatens to provide a sub-optimal customer

5   experience, thereby tarnishing customers' perception of VOD as an attractive

6   channel for viewing the Studios' movies.  A Studio expends significant resources to

7   provide an optimal consumer experience for each distribution channel.  *See*

8   Gewecke Decl. ¶ 23.  Because VOD can command a higher price per rental, and the

9   market is new, a Studio must work hard to ensure a positive customer experience

10  for VOD users.  *See id.* ¶¶ 23-25.  For example, some Studios require in their

11  license agreements with VOD providers that the copyrighted work is transmitted at

12  the highest level of quality.  *See id.* ¶ 15, 25.

13       Defendants threaten to thwart these efforts by offering a negative VOD

14  experience.  Because Defendants use a technological gimmick to try to end-run the

15  public performance right (namely, transmitting performances from DVDs in floor-

16  to-ceiling racks of players), Defendants limit the number of consumers who can

17  actually view a movie "on demand."  That means that customers who expect to see

18  a particular movie "on demand" may be told that the movie they want is out-of-

19  stock.  *See* Luedtke Decl. ¶ 5 & Ex. D.  Defendants admit this problem happens "a

20  lot" with their service.  Gupta Depo. at 157:20-158:7.  This message of

21  unavailability is inconsistent with the idea of video "on demand" always being

22  available and risks causing customer frustration and confusion, thus hurting the

23  broader VOD experience.  *See* Gewecke Decl. ¶ 24.  What is more, each Studio

24  separately imposes its own vetting process on that Studio's licensees for the quality

25  of the transmission and the overall movie-watching experience.  *See id*.  Defendants

26  exploit each Studio's works without having to meet any quality control standard.

27  This is a concern, particularly where Zediva admits that it has received complaints

28  about the quality of its product.  *See* Gupta Depo. at 150:6-151:21, 154:11-25,

MEMO. OF POINTS AND AUTHORITIES FOR
MOTION FOR PRELIMINARY INJUNCTION
2:11-CV-02817-JFW-E

1   159:4-15.

2        Courts assessing irreparable harm have recognized that some losses are

3   "difficult to replace or difficult to measure" while others are "a loss that one should

4   not be expected to suffer."  *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010).

5   Being forced to suffer the risk of intangible injuries — including the loss of

6   customer goodwill, damage to consumer perceptions about the VOD market, the

7   loss of control over one's copyrighted works, and injury to a Studio's reputation

8   with its licensees — is irreparable harm.  *See, e.g., Ticketmaster LLC v. RMG*

9   *Techs., Inc.*, 507 F. Supp. 2d 1096, 1115 (C.D. Cal. 2007).[9]

10      **C.**    **The Balance Of Hardships Sharply Tips In The Studios' Favor**

11        The threat of harm to the Studios, as demonstrated above, is substantial.  In

12   contrast, Defendants "cannot complain of the harm that will befall [them] when

13   properly forced to desist from [their] infringing activities."  *Triad Sys. Corp. v. Se.*

14   *Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995), *overruled on other grounds by*

15   *Cunningham v. Hamilton County, Ohio*, 527 U.S. 198, 119 S. Ct. 1915, 144 L. Ed.

16   2d 184 (1999); *see also Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824,

17   830 (9th Cir. 1997) ("[w]here the only hardship that the defendant will suffer is lost

18   profits from an activity which has been shown likely to be infringing, such an

19   argument in defense merits little equitable consideration. . . .") (quotations and

20   citations omitted); *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 950 (N.D. Cal.

21   2009) ("Since [small start-up defendant] does not (and cannot) claim any *legitimate*

22   hardships as a result of being enjoined from committing unlawful activities, and

23   Apple would suffer irreparable and immeasurable harms if an injunction were not

24   issued, this factor weighs strongly in favor of Apple's motion.").

25   _____

26   [9] *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *MySpace, Inc. v.*

27   *Wallace*, 498 F. Supp. 2d 1293, 1305-06 (C.D. Cal. 2007) (noting that defendants' action "impacts the quality of MySpace.com users' experiences with Plaintiff's

28   services" and finding this contributes to a showing of irreparable harm).

### D. Public Policy Weighs In Favor Of Issuing The Preliminary Injunction

The Supreme Court has made clear that upholding copyright protection is in the public interest. *See*, *e.g.*, *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18, 123 S. Ct. 769, 785 n.18, 154 L. Ed. 2d 683 (2005) ("[t]he economic philosophy behind the [Copyright] [C]lause . . . is the conviction that encouragement of individual effort by personal gain is the best way *to advance public welfare* through the talents of authors and inventors") (emphasis added); *see also Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1038 (9th Cir. 1994) ("public policy favors the issuance of injunctions in intellectual property infringement lawsuits"); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) ("it is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work"); *Gable-Leigh, Inc. v. N. Am. Miss*, No. CV 01-01019 MMM, 2001 WL 521695, at *14 (C.D. Cal. Apr. 13, 2001) (issuing preliminary injunction and explaining "copyrighted works must be protected as an incentive for people to create new works").

Here, allowing Defendants to usurp the critical VOD market with their unauthorized transmissions of the Studios' movies is contrary to Congress's intent in creating the public performance right and granting it exclusively to the copyright holder. Congress realized that the public performance of copyrighted works is a significant means of exploitation. The public performance right is an extremely valuable means of reward and recoupment for the copyright holder's investment and risk in bringing the creative work to fruition. The importance of that right is all the more significant today, given the mounting cost of feature film production, the advent of Internet technology, and increasing consumer demand for the public performance of creative works on demand through streaming technology.

14061332

1  Defendants' unauthorized exploitation of this important right flies in the face of

2  Congress's express intent and irreparably damages the Studios and their exclusive

3  right to publicly perform their works.

4       **E.**  **Minimal Security Should Be Required**

5       The security required under Federal Rule of Civil Procedure 65(c) need not

6  be substantial.  As discussed above, any harm Defendants face from an injunction

7  results from their voluntary decision to start a business based on violating the

8  Studios' rights.  Moreover, Defendants only recently launched their official service

9  and do not appear to face any risk of significant monetary loss.  The Studios

10  respectfully submit that security in the amount of $10,000 is appropriate.

11  **IV.**  **CONCLUSION**

12       The Studios respectfully request the Court enter the proposed injunction.

13

14  DATED: May 26, 2011         MUNGER, TOLLES & OLSON LLP

15

16           By:      */s/ Kelly M. Klaus*

17                 KELLY M. KLAUS

18           Attorneys for Motion Picture Studio
         Plaintiffs

19

20

21

22

23

24

25

26

27

28

14061332