1  GLENN D. POMERANTZ (SBN 112503)
   Glenn.Pomerantz@mto.com
2  KELLY M. KLAUS (SBN 161091)
   Kelly.Klaus@mto.com
3  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue, Thirty-Fifth Floor
4  Los Angeles, CA 90071-1560
   Tel: (213) 683-9100; Fax: (213) 687-3702
5
   DANIEL E. ROBBINS (SBN 156934)
6  Dan_Robbins@mpaa.org
   BENJAMIN S. SHEFFNER (SBN 212629)
7  Ben_Sheffner@mpaa.org
   15301 Ventura Boulevard, Building E
8  Sherman Oaks, California 91403-3102
   Tel: (818) 995-6600; Fax: (818) 285-4403
9
   Attorneys for
10 Motion Picture Studios Plaintiffs

11                UNITED STATES DISTRICT COURT
12                CENTRAL DISTRICT OF CALIFORNIA
13                      WESTERN DIVISION
14

| | |
|---|---|
| 15 WARNER BROS. ENTERTAINMENT INC., | CASE NO. 2:11-cv-02817-JFW-E |
| 16 COLUMBIA PICTURES INDUSTRIES, INC., DISNEY | **DECLARATION OF THOMAS GEWECKE IN SUPPORT OF** |
| 17 ENTERPRISES, INC., PARAMOUNT PICTURES CORPORATION, | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| 18 TWENTIETH CENTURY FOX FILM CORPORATION, and UNIVERSAL | Date:   July 25, 2011 |
| 19 CITY STUDIOS PRODUCTIONS LLLP, | Time:   1:30 p.m. |
| 20 | Judge:  Hon. John F. Walter |
|    Plaintiffs, | Ctrm:   16 |
| 21 | [Filed concurrently herewith: |
|    vs. | (1) Notice of Motion and Motion and |
| 22 | Memorandum of Points and |
|    WTV SYSTEMS, INC. and WTV | Authorities; |
| 23 SYSTEMS, LLC d/b/a ZEDIVA, and | (2) Declaration Of Carolyn Hoecker |
|    VENKATESH SRINIVASAN, | Luedtke; |
| 24 | (3) Declaration Of Kelly M. Klaus; and |
|    Defendants. | (4) [Proposed] Order] |
| 25 | |

26
27
28

I, Thomas Gewecke, declare as follows:

1. I am the President of Warner Bros. Digital Distribution ("WBDD"), a position I have held since January 2008. WBDD is a division of Warner Bros. Home Entertainment Inc., which in turn is a wholly owned subsidiary of Warner Bros. Entertainment Inc. ("Warner"). WBDD oversees the digital distribution of Warner's content. I submit this declaration in support of the application by the Motion Picture Studio Plaintiffs in this action (collectively, the "Studios") for a preliminary injunction to prevent the Defendants from operating their Zediva service. Except as expressly noted, the facts stated herein are known to me personally. If called upon and sworn as a witness, I could and would testify competently to the contents of this Declaration.

2. As President of WBDD, I have become thoroughly familiar with Warner's efforts to provide consumers with various means of accessing entertainment content – primarily movies and television shows – for viewing at home and on portable devices. WBDD, among other activities, makes content available to view for a fixed period ("transactional video on demand" or "VOD"), sale ("electronic sell through"), and through subscription video on demand models ("subscription VOD"). WBDD is primarily in the business of licensing the rights to engage in such digital distribution of Warner content to third party distributors, including multichannel video programming distributors ("MVPD") such as cable, satellite, and telecommunications companies (*e.g.*, Comcast, DirecTV, Verizon); online retailers who deliver directly over broadband internet connections (e.g. Apple iTunes, Amazon, Netflix, Sony's Playstation Network, Microsoft's XBOX 360 platform); providers of in-room hotel entertainment (e.g. LodgeNet); and wireless operators (e.g. Sprint) who deliver directly to mobile phones. WBDD also makes content available directly to consumers in select cases (e.g. through Facebook, the Apple iOS "App" platform, and Warner's own web sites). Warner also licenses certain digital on demand rights as part of its pay and linear television

licensing arrangements (e.g. HBO Go, or bundled on demand rights licensed to cable networks).

3. Through these distribution relationships that I have described, Warner content is made available in digital form very widely, such that, for example, a "new release movie" from Warner (i.e. a movie that has just been made available on DVD) is generally available to view as a transactional VOD offering in approximately 87 million VOD-capable households in the US with digital cable, satellite, and Verizon FiOS / AT&T uVerse services, as well as to essentially every household with an active broadband connection. Through my position and knowledge of publicly available information about the analogous efforts of others in the marketplace, I also have knowledge about the general nature of the different means other Studios in the marketplace use to give consumers access to their content.

4. Through this declaration, I will describe Warner's digital distribution business and its specific strategies for the distribution of its copyrighted works, including the practice of making our content available to consumers through different business models at different points in each title's lifecycle, according to a carefully calibrated and finely tuned schedule of release plans and usage rules (a practice sometimes referred to as "windowing.") I am aware that the other Studios engage in forms of "windowing" their films, and that the windows vary by Studio and can even vary by film. Where I am aware of the actions of other Studios through market research and/or my own observations of the industry, I will offer observations more broadly about the Studios and the marketplace generally.

5. I understand that Defendants market a new service called Zediva through which a consumer can pay $1.00 to $1.99 to view a movie for 14 days, including movies from Warner like *The Dark Knight*, *Cop Out*, and *Invictus*. I further understand that Zediva claims that consumers "rent" a DVD and a DVD player in a Zediva facility, and that Zediva then transmits the contents of that DVD

by means of the Internet to consumers on their computers, televisions, and mobile devices. Zediva does not have a license agreement with Warner to distribute, transmit, or use any of Warner's copyrighted works.

6. As set forth in more detail below, Zediva's unlicensed presence in the marketplace threatens immediate and irreparable harm to Warner's business, and to the business of the other Studios.

## WARNER'S BUSINESS

7. Warner, like any other motion picture studio (indeed, like any other business trying to succeed in the marketplace), is intensely focused on developing and offering products and services to meet customers' existing and emerging choices — and doing so at price points tailored to those choices. To that end, Warner has observed that customers' lifestyles have changed as technology has evolved. We view these changes as opportunities, and we strive every day to anticipate and meet evolving consumer desires in ways that respect our ownership interest in movies that cost many millions of dollars to produce.

8. Currently, Warner and the other Studios – individually and through their affiliates and licensees – offer a wealth of options for how consumers can access movies: they can go to the theater, buy a copy of the movie (on DVD or Blu-ray Disc), rent a copy (at a bricks-and-mortar store or through a mail subscription service like Netflix), download and buy a permanent copy through a service like Amazon, access it on demand for a fixed period of time through a cable, satellite or Internet delivered VOD platform like Comcast, DirecTV, or Vudu, view it through subscription VOD streaming services like Netflix, watch it on a scheduled subscription cable television channel like HBO (or its own on demand service), or eventually watch it in an ad-supported format on network television.

9. According to IHS Screen Digest, in 2010 consumers worldwide spent a combined $55 billion watching movies. Less than 45 percent of that amount was

from the original theatrical distribution; more than 55 percent comes from home entertainment distribution. Within that home entertainment portion, there is an ongoing general shift in the industry from the physical (DVDs and Blu-ray Discs) to digital (electronic sell through, transactional VOD, and subscription VOD). Because revenue from the home entertainment segment is so significant, it plays an important role in the studio "green light" process that helps determine whether to produce or distribute any given movie. Thus, a threat to Warner's home entertainment revenues would also threaten our ability to continue to develop future movies. Consequently, growing the digital home entertainment business is a central strategic priority for Warner.

10. Among the many options within the home entertainment category, transactional VOD is an important and rapidly growing segment. Consumers can access movies using VOD from many different providers, including virtually every significant provider of multichannel video services, and from many online providers (e.g. Apple iTunes, Sony, Microsoft, Amazon, Walmart (Vudu), Best Buy (CinemaNow), and others). Consumers navigate to the movie of their choice through an interface on their television, a desktop software client, or a web browser, select the movie, pay, and then the movie can be streamed or downloaded to a computer, handheld device, or television for a fixed period of time for a fixed price. Authorized transactional VOD options are continuing to grow and evolve. For example, starting in March 2011, Warner began to make selected movies available on demand on Facebook. Upon payment, the movie was available to the customer for a fixed period of time to view at their convenience.

11. In addition to transactional VOD, Warner also makes its titles available through other means of distribution, months or years after it has made them available through transactional VOD. For example, after a title has been available through transactional VOD for approximately 5 months, it is generally then made available through subscription pay television services like HBO. Several

years after a title has been available through VOD, it may be made available for linear broadcast on network television. Going in the other direction, Warner and several other studios are currently conducting a test with DirecTV for video on demand films that will be available, for a premium price, 60 days after the theatrical release (i.e. often 1 or 2 months before they are made available for sale on DVD). These separate means of viewing movies are commonly called distribution "windows."

12.   While the specific implementation of a "window" distribution strategy will vary from Studio to Studio, the fact is that a Studio's ability to "window" its releases is a fundamental component of any Studio's distribution strategy. Warner has implemented its own individual "windowed" distribution strategy through our licensing and distribution agreements with third parties. Specifically, Warner negotiates with each third party how much the third party will pay for the right to distribute our copyrighted works to its customers, when it will have those rights, and what if any conditions will be imposed on the distribution rights. Some distributors in the earlier windows may pay more for the right to distribute a movie earlier because that movie will be new, or newer, to the movie-watching public. Other distributors in later windows may pay less for the right to distribute a movie because that movie has had more exposure to the movie-watching public by that point. Relatedly, third parties in later windows often negotiate restrictions on Warner aimed at limiting how much exposure the movie will get in earlier periods. These restrictions, then, influence our negotiations with third parties for rights to distribute our movies in earlier windows. Still other distributors, such as subscription pay television providers, pay more for the *exclusive* right to transmit a copyrighted work during a particular time period. As a result, Warner then negotiates restrictions on third parties in earlier windows to prevent transmission during the exclusivity periods.

13.   Traditionally, these "windows" for the home entertainment market that

are negotiated with third parties begin with the right to sell a DVD or Blu-ray Disc, or to license and download an electronic sell through copy on the initial post-theatrical home video release day. On the same day that the movie is released on DVD and electronic sell through (often called "day and date"), Warner licenses it for availability on transactional VOD, and it appears for DVD rental in bricks and mortar rental stores. The retail price for a new release VOD movie through a licensed distributor like Amazon or Vudu ranges from $3.99 to $5.99. Then, 28 days after the initial home video release date, Warner makes the movie available through DVD rental subscription mail services like Netflix or kiosks like Redbox. Approximately five months after the home video release, Warner licenses films to appear exclusively on subscription pay television.

14. To create these "windows," Warner studied consumer preferences, negotiated with third parties, and worked to provide a variety of choices at different times and different price points to meet consumer preferences. The critical economic point of the "windowing" process is that it enables a Studio, like Warner, to try to match different customer offerings with the willingness of customers to pay for those offerings. In general, the sooner the movie is available for viewing, the higher the price premium a Studio can charge for that offering. This structure allows each Studio to maximize the overall value of its movies, and thereby cover the enormous costs and risks that the Studio takes in making movies.

15. In Warner's agreements with distributors and licensees, those parties agree to pay Warner certain fees for the rights granted (e.g. a percentage of the revenue received from consumers with a minimum fixed fee per transaction). Moreover, Warner's agreements contain various provisions that govern the distribution of the content. Examples include the following: (a) detailed provisions requiring technological measures to protect the security of the transmission of the movie to ensure against unlawful access, copying and piracy, (b) provisions requiring a certain level of quality for the movie's display, to ensure that consumers

are receiving appropriate value, (c) restrictions on making the movie available during certain blackout periods where other licensees have paid for exclusive rights, and (d) limitations on the duration of the viewing period for any single VOD transaction (e.g. 48 hours) along with various other usage rules, terms, and conditions.

## ZEDIVA'S SERVICE CREATES IMMEDIATE RISKS OF IRREPARABLE HARM TO WARNER AND TO ALL SIMILARLY SITUATED COPYRIGHT OWNERS

16. Zediva threatens a variety of serious and irreparable harms to Warner and the other Studios if it is not shut down.

17. *First*, Zediva's practices deprive Warner and the other Studios of their exclusive rights to exploit their copyrighted works. The Zediva service takes away the Studios' exclusive right to determine how, when, and to whom their copyrighted works are distributed. Warner has expended enormous amounts of time and money to develop its own individual strategy through which it is able to provide customers choices of different ways to view its copyrighted work at different locations, times, and price points to maximize value to both consumers and Warner. Further, in implementing its strategy, Warner has made agreements with third party licensees about when, where, and how its copyrighted works will be distributed by Warner and other licensees, and Zediva's unauthorized transmission of Warner's movies threatens to harm the relationships Warner has built with those third parties.

18. Let me provide an example of how Zediva harms the Studios' exclusive rights to control how, where, when, and for how much consumers access their copyrighted works. Warner sells to subscription paid television the *exclusive* rights to transmit certain copyrighted work for a fixed period of time in certain windows.[1] The price for those deals is based, in part, on the grant of exclusivity.

---

[1] I do not believe Warner is unique in having exclusivity arrangements  I am

1   During the exclusivity period, Warner restricts other VOD providers from offering
2   the particular movie. However, since Zediva operates illegally without any license
3   from Warner, it risks making our copyrighted works available during exclusivity
4   periods, thus interfering with Warner's contractual commitments, its relationship
5   with its licensees, its ability to negotiate similar deals in the future, and its overall
6   efforts to control its copyrighted works in a manner that maximizes value for
7   Warner and consumers.
8        19.   Similarly, Zediva takes away Warner and the other Studios' right to
9   control the security with which their copyrighted works are transmitted to the
10  public and the steps that are taken to prevent unauthorized access, copying, and
11  piracy. Internet transmissions of digital content can be insecure. This is what has
12  given rise to the elaborate digital rights management ("DRM") technology. Before
13  Warner licenses any third party to transmit our copyrighted works, we do a
14  thorough and detailed review of its security protocols. After investigating these
15  security measures, we negotiate stringent copy protection requirements through our
16  license agreements prior to authorizing dissemination of our copyrighted works.
17  Our agreements also contain provisions for steps a licensee must take if there is a
18  breach of that security. Because Zediva's transmission of Warner's copyrighted
19  works is unauthorized, Warner has no ability to ensure that appropriate steps are
20  taken to protect security. Relatedly, Warner imposes restrictions on how
21  copyrighted works are transferred by a customer between different devices (i.e.,
22  between an i-Pad and a computer). Our license agreements with VOD providers
23  include limitations on how many devices can receive a particular VOD purchase,
24  how the authorized provider must track the transfer of a VOD movie between a
25  consumer's devices, and how the clock is maintained during those transfers. We
26  put these restrictions in our agreements with VOD providers to protect Warner's

---

generally aware from press reports and market observation that other Studios have licensing deals with some exclusivity provisions.

1  copyrighted works from massive illegal copying and piracy, a problem that
2  threatens serious harm to our ability to control our copyrighted works.

3      20.    *Second*, Zediva's practices threaten the VOD market. This presents a
4  threat of harm to Warner and the Studios given the growing importance of VOD
5  within the home entertainment industry. Zediva threatens VOD in several ways.

6      21.    To begin, by making our copyrighted works available through the
7  Internet early in the distribution cycle, without a license to do so and without
8  paying for the right, Zediva directly undermines the entire ecosystem of legitimate
9  video on demand. Based on its website, the primary value proposition that Zediva
10 purports to deliver to consumers is the ability to "Watch the latest DVDs over the
11 Internet right now" "for $1.00" for "14 days". By contrast, legitimate, authorized,
12 licensed VOD providers during this same "window" generally offer those same
13 titles for a higher price (for example, on iTunes, new release movies are generally
14 available for $3.99 or $4.99 per rental), and often only enable a 24 or 48 hour
15 viewing period. The commercial terms set by such legitimate, authorized retailers
16 reflect the terms of the licensing arrangements those providers have negotiated with
17 Warner and other content owners. By making available an unauthorized service
18 with a consumer proposition that is seemingly superior, though only by virtue of
19 Zediva's misappropriation of Warner's content, Zediva threatens the business of all
20 those distributors who have negotiated legal, authorized licenses with Warner and
21 other studios, and creates confusion among consumers, who will not understand
22 why their current provider (e.g. Comcast, Apple iTunes, Walmart, Amazon) cannot
23 provide a VOD offering on similar terms during the same time period.

24     22.    Note that Warner does make its titles available in physical disc form to
25 discount rental retailers (e.g. Redbox and Netflix) who generally charge a lower
26 price to consumers (e.g. Redbox charges consumers $1 per night for DVD rentals
27 from its stand-alone kiosks). However, these providers generally operate in a later
28 window than VOD retailers (Netflix and Redbox make Warner new release movies

available 28 days after they are made available through VOD services, and do not have the right to transmit new release movies from Warner in VOD form at all). Zediva appears to be seeking explicitly to contrast its offering with that of Redbox and Netflix, asserting on its home page that titles are available "before Netflix and Redbox," albeit at a similar price. Thus, again, Zediva threatens to undermine the carefully constructed and individually negotiated commercial arrangements that Warner has put in place with its distributors and licensees, and to sow confusion amongst consumers who will not understand why other VOD providers cannot offer similar terms.

23. In addition, I am very concerned that Zediva will irreparably harm the legitimate development of the VOD market by providing a sub-optimal consumer experience, thereby tarnishing consumer perception of VOD generally. We are expending significant time and resources to provide the best possible consumer experience for each distribution channel. Because of the premium nature of the VOD market (*i.e.*, it commands a higher price per rental) and the newness of that market, we are working particularly hard to educate consumers about their VOD options and to ensure a positive consumer experience for VOD users. For example, in 2010 the Cable and Telecommunications Association for Marketing (CTAM) organized and administered a VOD awareness marketing program, funded by many MSOs and studios, that invested more than $25 million in national advertising efforts to raise awareness about the convenience and quality of video on demand as a movie rental option. In addition, Warner invests significant amounts of money to market and promote the availability of each of its movie titles on VOD, both in VOD-specific advertising and through the promotion of VOD as a rental option in its DVD marketing.

24. One significant problem Zediva presents for the VOD consumer experience is that the availability of any particular title is limited by the number of physical DVDs and DVD players it has available at any given time. Therefore, I

understand from looking at Zediva's website that a Zediva consumer may be told that the movie he wants is out-of-stock, even during the 14-day access period. This message of unavailability is inconsistent with the idea of video "on demand" and risks causing consumer frustration and confusion, thereby hurting the broader VOD market. This is of particular significance since the "always available, never out of stock" character of VOD is one of the essential differentiating characteristics of the VOD experience from that of traditional, physical DVD rental.

25. Zediva also threatens to provide a sub-optimal viewing experience for its customers, further undermining VOD. For instance, before licensing a third party to transmit our movies, Warner vets that entity to ensure that it will provide a high quality movie experience to customers. In contrast, Warner has no control over the quality of the transmission of the movies from Zediva and thus I worry that poor quality transmissions could lead to consumer dissatisfaction and damage to consumer perception of VOD.

26. It is my strong belief that these harms to the VOD market, though they are likely to be very significant, will be extremely hard to measure in dollar terms. It will be extraordinarily difficult to assess what impact Zediva has on the VOD market, and how much of that it is a result of negative consumer experiences with services like Zediva, and even more difficult to assess the affect on Warner and the other Studios of the disruption of their relationships with legitimate licensees.

27. For these reasons, Warner and the other Studios will suffer immediate and irreparable injury unless the Court acts to enjoin Zediva's service.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on May 26, 2011 at Burbank, California.

_____
Thomas Gewecke