DURIE TANGRI LLP
MICHAEL H. PAGE (SBN 154913)
mpage@durietangri.com
MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
JOSEPH C. GRATZ (SBN 240676)
jgratz@durietangri.com
217 Leidesdorff Street
San Francisco, CA 94111
Telephone:   415-362-6666
Facsimile:   415-236-6300

Attorneys for Defendants
WTV SYSTEMS, INC. f/k/a WTV
SYSTEMS, LLC and VENKATESH
SRINIVASAN

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| WARNER BROS. ENTERTAINMENT INC., COLUMBIA PICTURES INDUSTRIES, INC., DISNEY ENTERPRISES, INC., PARAMOUNT PICTURES CORPORATION, TWENTIETH CENTURY FOX FILM CORPORATION, and UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP, <br><br> Plaintiffs, <br><br> v. <br><br> WTV SYSTEMS, INC. and WTV SYSTEMS, LLC d/b/a ZEDIVA, and VENKATESH SRINIVASAN, <br><br> Defendants. | Case No. 2:11-cv-02817-JFW-E <br><br> **OPPOSITION TO MOTION PICTURE STUDIOS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:  July 25, 2011 <br> Time:  1:30 p.m. <br> Ctrm:  16 <br> Judge: Honorable John F. Walter |
| WTV SYSTEMS, INC. and WTV SYSTEMS, LLC d/b/a ZEDIVA, and VENKATESH SRINIVASAN, <br><br> Counterclaimants, <br><br> v. <br><br> WARNER BROS. ENTERTAINMENT | |

INC., COLUMBIA PICTURES
INDUSTRIES, INC., DISNEY
ENTERPRISES, INC., PARAMOUNT
PICTURES CORPORATION,
TWENTIETH CENTURY FOX FILM
CORPORATION, and UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,

Counterdefendants.

## TABLE OF CONTENTS

**Page No.**

I.      INTRODUCTION .......................................................................................... 1

II.     FACTUAL BACKGROUND ....................................................................... 3

III.    ARGUMENT ................................................................................................ 4

    A.     The Preliminary Injunction Standard ................................................. 4

    B.     The Studios are unlikely to succeed on the merits. ............................ 5

        1.     Zediva involves only private performances, not public performances. ............................................................................ 5

        2.     The Studios have chosen to avoid questions of fair use and secondary liability by alleging only direct infringement by Zediva, but Zediva's users initiate the transmissions, not Zediva. ...... 12

    C.     The Studios cannot demonstrate irreparable harm. .......................... 16

    D.     Granting the motion would put Zediva out of business, so the balance of hardships tilts against the Studios. ............................................. 21

    E.     The public interest is in equipoise, and does not favor the Studios. ............. 23

IV.     CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

**Page No.**

<u>Cases</u>

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ......................................................................... 4

*Arista Records LLC v. Myxer Inc.,*
  No. 2:08-cv-03935 GAF (JCx) (C.D. Cal. Apr. 1, 2011) .............................. 14

*Cadence Design Systems, Inc. v. Avant! Corp.,*
  125 F.3d 824 (9th Cir. 1997) ......................................................................... 23

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.,*
  536 F.3d 121 (2d Cir. 2008),
  *cert. denied,* 129 S. Ct. 2890, 174 L.Ed.2d 595 (2009)........................... passim

*Citibank, N.A. v. Citytrust,*
  756 F.2d 273 (2d Cir. 1985) .......................................................................... 20

*Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.,*
  866 F.2d 278 (9th Cir. 1989) ....................................................................passim

*Columbia Pictures Indus., Inc. v. Aveco, Inc.,*
  800 F.2d 59 (3d Cir. 1986) ...................................................................... 10, 15

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.,*
  749 F.2d 154 (3d Cir. 1984) .......................................................................... 10

*CoStar Group, Inc. v. LoopNet, Inc.,*
  373 F.3d 544 (4th Cir. 2004) ......................................................................... 14

*Cotter v. Desert Palace, Inc.,*
  880 F.2d 1142 (9th Cir. 1989) ....................................................................... 16

*Dotster, Inc. v. ICANN,*
  296 F. Supp. 2d 1159 (C.D. Cal. 2003) ......................................................... 17

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388, 129 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) ....................... 5, 23

*ECRI v. McGraw-Hill, Inc.,*
  809 F.2d 223 (3d Cir. 1987) .......................................................................... 17

*Field v. Google Inc.,*
  412 F. Supp. 2d 1106 (D. Nev. 2006).......................................................13, 14

*Fogerty v. Fantasy, Inc.,*
  510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994) ............................ 24

*Fox Film Corp. v. Doyal,*
  286 U.S. 123, 52 S. Ct. 546, 76 L. Ed. 1010 (1932)..................................... 24

TABLE OF AUTHORITIES (CONT'D)

**Page No.**

*Givemepower Corp. v. Pace Compumetrics, Inc.*,
No. 07cv157-WQH-RBB, 2007 WL 951350 (S.D. Cal. Mar. 23, 2007) ..................... 20

*In re Cellco P'ship*,
663 F. Supp. 2d 363 (S.D.N.Y. 2009) ............................................... 7, 10, 14

*In re Palmer*,
207 F.3d 566 (9th Cir. 2000) ............................................................... 7

*Kerr Corp. v. N. Am. Dental Wholesalers, Inc.*,
No. SACV 11-0313 DOC CWx, 2011 WL 2269991
(C.D. Cal. June 9, 2011) ................................................................. 20

*Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs.*,
983 F. Supp. 1167 (N.D. Ill. 1997) ...................................................... 14

*MGM Studios, Inc. v. Grokster, Ltd.*,
545 U.S. 913, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005) ......................... 15

*Munaf v. Geren*,
553 U.S. 674, 128 S. Ct. 2207, 171 L. Ed. 2d 1 (2008) .................................. 4

*Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*,
762 F.2d 1374 (9th Cir. 1985) ........................................................... 20

*On Command Video Corp. v. Columbia Pictures Industries, Inc.*,
777 F. Supp. 787 (N.D. Cal. 1991) .................................................. 11, 12

*Random House, Inc. v. Rosetta Books LLC*,
283 F.3d 490 (2d Cir. 2002) ............................................................. 22

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
907 F. Supp. 1361 (N.D. Cal. 1995) ................................................ 13, 14

*Rosen v. Hosting Servs., Inc.*,
No. CV10-2186-CAS-FMOx, 2010 WL 5630637
(C.D. Cal. Aug. 16, 2010) ............................................................ 13, 14

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) ................................................................ 5

*Sega Enters. Ltd. v. MAPHIA*,
948 F. Supp. 923 (N.D. Cal. 1996) .................................................. 13, 14

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984) ................................. 1

*United States v. ASCAP*
627 F.3d 64 (2d Cir. 2010) ............................................................... 10

iii

## TABLE OF AUTHORITIES (CONT'D)

Page No.

*United States v. Stauffer Chem. Co.*,
  464 U.S. 165, 104 S. Ct. 575, 78 L. Ed. 2d 388 (1984) ................................. 7

*Whitmill v. Warner Bros. Entertainment Inc.*,
  No. 4:11-cv-00752-CDP (E.D. Mo. filed May 20, 2011) ........................... 23

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ........................... 4, 23

**Statutes**

17 U.S.C. § 101 ............................................................................... 6, 10

17 U.S.C. § 106 ...................................................................................... 5

17 U.S.C. § 107 .................................................................................... 15

**Other Authorities**

H.R. 5707, 97th Cong. (1st Sess. 1982).......................................... 1, 17

H.R. Rep. No. 90-83 (1st Sess. 1967)................................................ 12

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 .............................. 9

David Pogue, *DVD Movies From Afar*,
  N.Y. TIMES, Mar. 17, 2011 ............................................................. 21

Hayley Tsukayama, *Zediva Offers New Approach to Online Movies*,
  WASH. POST, Mar. 16, 2011 ........................................................... 22

Jeremy W. Peters, *General Counsel of News Corp. Resigns in Wake of
  Settlement*, N.Y. TIMES, June 8, 2011 ........................................... 21

Martin Peers, *New Headache for Hollywood*,
  WALL ST. J., Mar. 16, 2011 ........................................................... 22

Peter S. Menell & David Nimmer, *Legal Realism in Action: Indirect
  Copyright Liability's Continuing Tort Framework and* Sony's *De Facto
  Demise*, 55 UCLA L. REV. 143, 157-60 (2007) ............................... 1

Scott Kirsner, *Indies Still Looking for Internet Equation*,
  VARIETY, Oct. 2, 2009 .................................................................... 16

*Unkind Unwind*, THE ECONOMIST,
  March 17, 2011 .............................................................................. 16

## I.     INTRODUCTION

Movie studios, including all of the Plaintiffs here, spent the better part of the 1970s and 1980s trying to persuade courts to declare video rentals illegal.  They sued Sony for making video cassette recorders (VCRs), taking the case to the Supreme Court.[1]  Even after the VCR itself was declared legal, they sued hotels for making videos available to their customers to watch in their hotel rooms.[2]  They even went to Congress in an unsuccessful effort to change the Copyright Act to make renting videos illegal without the payment of a royalty.[3]  More recently, they sued cable companies that provide remote digital video recorders (DVRs) that allow customers to record and replay shows from television.  *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), *cert. denied*, 129 S. Ct. 2890, 174 L. Ed. 2d 595 (2009) ("*Cablevision*").

The Studios lost.  It is not illegal to rent movies to others without the copyright holder's permission.  Blockbuster is free to rent the same movie to many different customers in its stores.  Netflix is free to mail DVDs to its rental customers.  They must buy the DVDs from the Studios, but once they do, the Studios have been paid, and they have no right to demand a share of the rental fee.  Only if a company goes beyond renting the disc they purchased, and actually broadcasts its one lawful copy to the public at large (by showing it on television, for instance), does the copyright owner have the right to be paid a second time.

That is the law, but the Studios would prefer it otherwise.  They have built a business model based on "windowing" the release of their films in a particular sequence,

---

[1] *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984).

[2] *See Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 866 F.2d 278 (9th Cir. 1989).

[3] H.R. 5707, 97th Cong. (1st Sess. 1982).  *See* Peter S. Menell & David Nimmer, *Legal Realism in Action: Indirect Copyright Liability's Continuing Tort Framework and* Sony*'s De Facto Demise*, 55 UCLA L. REV. 143, 157-60 (2007) (recounting history).

and complain that Zediva's[4] business model is at odds with their own.  Perhaps.  But a business model, no matter how large and powerful the business, cannot substitute for or alter the law.  And when that business model demands that the business be paid twice for a product it sells once, it must yield to the law.

Zediva purchases DVDs sold by the Studios and rents them to the public.  Like Blockbuster and Netflix, it rents those videos to one person at a time, for private enjoyment in their own home.  It does so not by requiring the customer to come to a physical store, but by bringing the store to the customer via the Internet.  Zediva gives its customers control over an actual DVD player containing an actual, purchased disc—not in their living room, but online.  During the period of that rental, the customer controls the DVD player, and only that customer can view the disc.  Only after the customer returns the disc can Zediva rent it out to someone else.

Plaintiffs want to prevent this rental, just as they have tried to prevent every other form of video rental before it.  Plaintiffs hope to create a loophole in the Copyright Act that would define playback of a single, authorized copy of a DVD to a single individual as "public"—the legal equivalent of a television broadcast to the world at large.

Neither the statutory language nor the case law supports the Studios' position.  Indeed, the Studios filed this case in hopes of persuading this Court to expressly reject the Second Circuit's ruling on a closely analogous service in *Cablevision*.  In furtherance of that effort, the Studios have deliberately chosen to forego claims of indirect copyright infringement, even though the law is clear that those who provide systems and facilities for challenged conduct are liable, if at all, only under theories of indirect infringement.  Finally, even were Zediva's service ultimately held illegal, the measure of harm is quite clear, and it can be compensated with money damages.

---

[4] Defendant WTV Systems, Inc. f/k/a WTV Systems, LLC markets its service under the name "Zediva."  *See* http://www.zediva.com.  Like the Studios, we refer to the Defendants collectively as "Zediva."

OPPOSITION TO MOTION PICTURE STUDIOS' MOTION FOR PRELIMINARY INJUNCTION / CASE NO. 2:11-CV-02817-JFW-E

1    This Court should not grant a preliminary injunction on a legal theory that has

2 already been tested and found wanting, in a case in which plaintiffs can show neither

3 irreparable injury nor hardship.

4 **II.    FACTUAL BACKGROUND**

5    Zediva allows its users to rent DVDs and DVD players, and to control those DVD

6 players over the Internet.  Declaration of Vivek Gupta ("Gupta Decl.") ¶ 3.  Zediva

7 maintains racks full of DVD players at its data center.  *Id*.  When a user has rented a DVD

8 and DVD player, that user has sole and exclusive control of that DVD and DVD player,

9 and the user is able to watch that DVD.  *Id*.  The video signal is encrypted so that only the

10 particular user who has rented the DVD can view the output of that DVD player.  *Id*. ¶

11 13(f).  While the movie is playing, the user's web browser displays buttons with which the

12 user can send commands to the DVD player.  *Id.* ¶ 14.  These buttons allow the user to

13 pause the DVD, to skip to another part of the DVD, to turn on or off subtitles, and so on.

14 *Id.*  The user watches the movie straight from the original DVD.  *Id.* ¶ 11.

15    Each DVD player holds a single DVD, and the DVDs are generally removed from

16 the player only when a DVD is removed from the rental inventory.  *Id.*  The following

17 photograph shows one cabinet of Zediva's DVD players, with three discs ejected to show

18 the contents of the DVD players:



OPPOSITION TO MOTION PICTURE STUDIOS' MOTION FOR PRELIMINARY
INJUNCTION / CASE NO. 2:11-CV-02817-JFW-E

Gupta Decl. ¶ 4.  The Zediva service allows users to rent movies for $1.99 per rental, or $9.99 for a "pack" of 10 rentals.  *Id.* ¶ 12.  Each rental lasts for four hours, and users are permitted to re-rent the same DVD without paying an additional fee for 14 days.  *Id.*  In addition to its remote DVD rental offering, Zediva permits users to rent the same DVDs by mail for the same price.  *Id.* ¶ 12.

As with any other DVD rental business, if a DVD is rented out, nobody else can rent that DVD.  *Id.* ¶ 3.  The only way for Zediva to increase capacity to meet demand is to do the same thing any other DVD rental business would have to do—buy lots and lots of DVDs.  *Id.*

## III.   ARGUMENT

### A.   The Preliminary Injunction Standard

A "preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 676, 128 S. Ct. 2207, 171 L. Ed. 2d 1 (2008). Thus, a district court may enter a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id*. at 374.  In the alternative, a showing of "'serious questions going to the merits' and a balance of hardships that tips *sharply* towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (emphasis added).

The plaintiff bears the burden of proving that each of the four *Winter* requirements is met.  None of those four requirements may be presumed, even in an intellectual property case.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 129 S. Ct. 1837,

1839, 164 L. Ed. 2d 641 (2006) (holding, in the context of a patent case, that "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction"); *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010) ("*eBay* applies with equal force (a) to preliminary injunctions (b) that are issued for alleged copyright infringement.").  As the Court explained in *eBay,* drawing from principles of copyright law, the four-factor test must be applied case-by-case, without reliance on presumptions of irreparable injury, balance of the hardships, or the public interest.  *eBay*, 547 U.S. at 391.  Courts have recognized that adjudicating a motion for preliminary judgment in a copyright case is a particularly difficult task.  *Salinger*, 607 F.3d at 80 ("courts should be particularly cognizant of the difficulty of predicting the merits of a copyright claim at a preliminary injunction hearing").

> **B.     The Studios are unlikely to succeed on the merits.**

Using Zediva, a customer gets full remote control of a DVD and DVD player in a data center, and only that customer can watch that DVD over the Internet.  Zediva does not infringe the Studios' right of public performance by making this system available to its users, for two principal reasons: the system permits only *private* transmissions, not public ones, and those transmissions are made as a direct result of the *user's* volitional conduct, not Zediva's.

> **1.     Zediva involves only private performances, not public performances.**

The Studios allege that Zediva has infringed one of the exclusive rights granted by the Copyright Act: the right "to perform the copyrighted work publicly."  17 U.S.C. § 106(4).  Notably, and critically, the Copyright Act does not grant to copyright holders the exclusive right to perform the copyrighted work *privately*.

To be sure, the Zediva service permits its users to play back DVDs, and that playback constitutes a "performance," as the term is defined in the Copyright Act. "To 'perform' a work means . . . in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible." 17 U.S.C. § 101. The Zediva service unquestionably involves watching movies; each time a user presses "Play," that user is causing the work to be shown to him by way of an Internet transmission, thereby "performing" the movie which is recorded on the DVD.

But is the user performing the work "publicly?" The Copyright Act defines the term:

> To perform or display a work "publicly" means—
>
> (1) to perform or display it *at a place open to the public* or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or
>
> (2) to *transmit* or otherwise communicate a performance or display of the work to a place specified by clause (1) or *to the public*, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101 (emphasis added). The second clause of this definition, dealing with performance through transmission of a work, is referred to as the "transmit clause." The Studios do not contend that there have been any performances in public places; instead, they contend that Zediva makes a public performance when a user watches a DVD by transmitting the output of his rented DVD player to his computer so he (and he alone) can watch it.

Zediva's service involves only private performances, not public performances. Each playback (or "performance") of a DVD can be viewed only by the user who has full and exclusive control of that DVD and DVD player. Multiple people cannot watch the same particular DVD at the same time. There can be no broadcasting. Indeed, Zediva

encrypts its transmissions to make sure there is no opportunity to copy or share the performance with others.  Gupta Decl. ¶ 13(f).  The system permits a point-to-point transmission of the output of a DVD player only to the person who has rented that DVD player and the DVD it contains.  That is not a transmission "to the public;" it is a transmission to the single person who has rented a particular copy of the movie being transmitted.  "Because only one subscriber is capable of receiving this transmission or performance, the transmission is not made to the public and is not covered by the Transmission Clause, at least when considered by itself."  *In re Cellco P'ship*, 663 F. Supp. 2d 363, 371 (S.D.N.Y. 2009).

In a case brought by the very Studios before this Court in the present case, the Second Circuit faced precisely the question presented here, and resolved it squarely in favor of Zediva.  That case was *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), *cert. denied*, 129 S.Ct. 2890, 174 L.Ed.2d 595 (2009) which is known as the "*Cablevision*" case.  Plaintiffs Twentieth Century Fox Film Corporation, Universal City Studios Productions, LLLP, Paramount Pictures Corporation, and Disney Enterprises Inc. were also plaintiffs in *Cablevision*.[5]

Where this case deals with remote DVD playback, *Cablevision* dealt with remote

---

[5] The Studios argue that *Cablevision* was wrongly decided, but they are precluded from doing so by collateral estoppel.  "[T]he doctrine of collateral estoppel can apply to preclude relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action."  *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170-71, 104 S. Ct. 575, 578, 78 L. Ed. 2d 388 (1984). "Collateral estoppel is appropriate when the following elements are met: (1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party or in privity with a party in the previous action."  *In re Palmer*, 207 F.3d 566, 568 (9th Cir. 2000).  The interpretation of the "transmit clause" in the context of one-to-one transmissions was fully, fairly, and actually litigated in *Cablevision*; the Plaintiffs lost as a result of a final judgment in that action; and Fox, Universal, Paramount, and Disney were parties in *Cablevision*.  As such, they should not be heard to challenge the *Cablevision* holding.

1    DVR playback—playback from a Remote Storage Digital Video Recorder ("RS-DVR")

2    which, much like a TiVo, allowed users to record and play back television shows.  The

3    Second Circuit observed that "the RS-DVR is not a single piece of equipment, but rather a

4    complex system requiring numerous computers, processes, networks of cables, and

5    facilities staffed by personnel twenty-four hours a day and seven days a week." *Id.* at 125

6    (internal quotations omitted).  But the complexity of Cablevision's back-end systems did

7    not figure in the Second Circuit's analysis; instead, the court emphasized that the

8    customer could do no more with the remote DVR than they could with a standard set-top

9    DVR: "To the customer, however, the processes of recording and playback on the RS-

10    DVR are similar to that of a standard set-top DVR." *Id.*  "The principal difference in

11    operation is that, instead of sending signals from the remote to an on-set box, the viewer

12    sends signals from the remote, through the cable, to the Arroyo Server at Cablevision's

13    central facility." *Id.*  The system in *Cablevision* operated, from the user's perspective,

14    like playing a movie back from a DVR with a very long cable attached.  Likewise, the

15    Zediva system operates, from the user's perspective, like playing back a movie from a

16    DVD with a very long cable attached.

17         The question in *Cablevision* was whether the transmission of those shows during

18    playback from the cable company's data center to the user's home constituted a

19    performance "to the public."  The Second Circuit held that "under the transmit clause, we

20    must examine the potential audience of a given transmission by an alleged infringer to

21    determine whether that transmission is 'to the public.'" *Cablevision*, 536 F.3d at 137.  In

22    other words, "it is relevant, in determining whether a transmission is made to the public,

23    to discern who is 'capable of receiving' the performance being transmitted." *Id.* at 134.

24    In so holding, the court found support in the House Report on the 1976 Copyright Act,

25    which states that "a performance made available *by transmission to the public at large* is

26    'public' even though the recipients are not gathered in a single place, and even if there is

27    no proof that any of the *potential recipients* was operating his receiving apparatus at the

28

time of the transmission." *Id.* at 135 (citing H.R. Rep. No. 94-1476, at 64-65 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5678) (emphasis in opinion).  Accordingly, the Second Circuit held that "[b]ecause each RS-DVR playback transmission is made to a single subscriber using a single unique copy produced by that subscriber, we conclude that such transmissions are not performances 'to the public,' and therefore do not infringe any exclusive right of public performance." *Id.* at 139.

Zediva presents a virtually identical set of facts to *Cablevision*, and leads to the same conclusion.  Because each remote DVD playback transmission is made to a single subscriber using a single copy in the exclusive control of that subscriber, such transmissions are not public performances.

It is true, as the Studios point out, that the *Cablevision* case involved the making of many copies of the copyrighted work, and that the transmissions at issue were made from those unauthorized copies.  Zediva's service, by contrast, involves transmissions made directly from authorized, store-bought copies of movies sold by the Studios on DVD.  But to the extent that difference matters at all, it matters in a way that favors Zediva.  Cablevision's customers made copies without permission, and transmitted movies from the data center to their television sets.  Nonetheless, the court held the transmission of those copies to be lawful because the unauthorized copy was transmitted only to one individual at a time.  It would be bizarre indeed to hold that Zediva was engaged in an infringing public performance because it used the actual disk it purchased from the Studios in its system, but that Zediva, like Cablevision, would be acting lawfully if each of its users were to make an intermediate copy of each disk and transmit from that intermediate copy.[6]  We agree with what the Studio Plaintiffs told the *Cablevision* court: that "[i]t is wholly irrelevant, in determining the existence of a public performance,

---

[6] Nonetheless, should this Court conclude that *Cablevision* applies only to services that make such an intermediate copy, Zediva requests that any injunction should be tailored to the specific facts of this case, so that Zediva, like Cablevision, will remain free to implement such a system.

whether 'unique' *copies* of the same work are used to make the transmissions."  Brief of Appellees Twentieth Century Fox Film Corp. *et al.* in *Cablevision*, No. 07-1480-cv, at 27 (2d Cir. filed June 20, 2007), *available at* 2007 WL 6101619 (emphasis in original).

Subsequent opinions have sharpened some of *Cablevision*'s holdings in ways that are instructive to the analysis here.  For example, *In re Cellco Partnership*, 663 F. Supp. 2d 363 (S.D.N.Y. 2009), dealt with the question whether the transmission of ringtones from a cellular telephone company to a subscriber's telephone constituted a public performance.  The *Cellco* court emphasized that "[i]n analyzing whether the transmission to a cellular telephone qualifies as a transmission of the work to the public, the focus is on the transmission itself and its potential recipients, and not on the potential audience of the underlying work . . . ."  *Cellco*, 663 F. Supp. 2d at 371.  And in *United States v. ASCAP*, the Second Circuit further clarified that "when Congress speaks of transmitting a performance to the public, it refers to the performance created by the act of transmission, not simply to transmitting a recording of a performance."  627 F.3d 64, 73 (2d Cir. 2010) (internal quotation omitted).  Applying that principle here, the focus of the public-performance analysis is on that particular transmission itself and its potential recipients, not on the potential audience of the underlying movie.  Under the statute, the question is whether a particular playback—"a performance"—of the work is transmitted to multiple members of "the public."  17 U.S.C. § 101.  It is not, as Plaintiffs seem to argue, whether a series of *different* performances of a particular work are transmitted to multiple different members of the public.

Plaintiffs cite to a number of cases in an effort to avoid the effect of *Cablevision*. They put primarily reliance on the Third Circuit decisions in *Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*, 749 F.2d 154 (3d Cir. 1984) and *Columbia Pictures Industries, Inc. v. Aveco, Inc.*, 800 F.2d 59 (3d Cir. 1986), discussing them no fewer than seven times in their brief and quoting from *Redd Horne* at length.  Plaintiffs fail to mention that the rationale of those cases was considered and rejected by the Ninth Circuit

in *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.*, 866 F.2d 278 (9th Cir. 1989).[7]  *Professional Real Estate Investors* held that a hotel room was not a place "open to the public" and so performances from rented videos in those rooms were not public performances.  *Id.* at 280.  That conclusion applies with even more force to the private homes in which Zediva customers view their rented videos.  And that conclusion disposes of *On Command Video Corp. v. Columbia Pictures Industries, Inc.*, 777 F. Supp. 787 (N.D. Cal. 1991), the pre-*Cablevision* district court case on which Plaintiffs place primary reliance.  *On Command* held that transmitting a video from a video player to a hotel room was a transmission to the public, even though the hotel room had been held a private place.  *On Command* held that every commercial transmission is a "public performance" because "the relationship between the transmitter of the performance, On Command, and the audience, hotel guests, is a commercial, 'public' one regardless of where the viewing takes place."  *On Command*, 777 F. Supp. at 790.  But that conclusion simply cannot be squared with *Cablevision* or with *Professional Real Estate Investors*, which (unlike *On Command*) is binding law in this Circuit.[8]  As *Cablevision* explained in rejecting *On Command*:

> Thus, according to the *On Command* court, any commercial transmission is a transmission "to the public." We find this interpretation untenable, as it completely rewrites the language

---

[7] All six Plaintiffs here were also plaintiffs in *Professional Real Estate Investors*.

[8] Curiously, the Studios do identify *Professional Real Estate Investors* as "highly relevant" to this case, but they ignore the court's actual holding in favor of badly mischaracterizing a footnote rejecting the argument of amicus Spectradyne.  Contrary to the Studios' claims in their brief that Spectradyne "essentially asked the court to hold that its activities were not public performances," Motion of Motion Picture Studio Plaintiffs for Preliminary Injunction ("Mot."), ECF No. 25, at 13-14, Spectradyne was an amicus *in support of the movie studios*.  It had a licensing arrangement with the Studios, and argued that it would be harmed if forced to compete with other, unlicensed means of video rental which, in its view, were tantamount to public performances.  The Ninth Circuit correctly "reject[ed] all of Spectradyne's arguments": "While it might be true that Spectradyne's system could be hurt by the arrangements at La Mancha, Congress, not the courts, has the constitutional authority and the institutional ability to accommodate this clash of economic interests."  *Prof'l Real Estate Investors*, 866 F.2d at 282 n.7.

of the statutory definition. If Congress had wished to make all commercial transmissions public performances, the transmit clause would read: "to perform a work publicly means . . . to transmit a performance for commercial purposes."

*Cablevision*, 536 F.3d at 139.

As the *Cablevision* court explained, the legislative history cited by the *On Command* court does not lead to a different outcome. *On Command* cited a 1967 House Report that referred in passing to public performance by means of transmissions "capable of reaching different recipients at different times, as in the case of sounds or images stored in an information system." H.R. Rep. No. 90-83 at 29 (1st Sess. 1967). But the Second Circuit found reason to "question how much deference this report deserves," having been "issued nearly a decade before the Act we are interpreting," and at any rate found that passage consistent with its holding that there had been no public performance. *Cablevision*, 536 F.3d at 135.

Put simply, as *Cablevision* and its progeny recognize, a transmission that by definition goes to one and only one recipient cannot be a transmission "to the public." It is true that the same DVD can later be viewed by others once it has been returned, just as it can be when it is rented by Blockbuster in a physical store, or mailed to a customer by Netflix, or rented to a hotel patron as in *Professional Real Estate Investors*. But those sequential acts are different performances by, and to, different people. Were it otherwise, Blockbuster, Netflix, and the hotel service held legal by the Ninth Circuit in *Professional Real Estate Investors* would all be infringing public performances. That has never been the law in the Ninth Circuit. It would allow plaintiffs to exploit a loophole in the law to get paid twice by Zediva when every analogous service needs pay only once.

**2.   The Studios have chosen to avoid questions of fair use and secondary liability by alleging only direct infringement by Zediva, but Zediva's users initiate the transmissions, not Zediva.**

Even were this Court to conclude that the act of viewing a lawfully-purchased DVD remotely by a single individual were a public performance, Plaintiffs would not have

12

shown that they are likely to succeed on the merits of the case they actually filed. For it is Zediva's customers, not Zediva itself, that control and therefore perform that DVD.

Plaintiffs have brought an action against Zediva for *direct* infringement of the performance right. Plaintiffs deliberately decided not to allege indirect infringement as an alternative theory. This was a strategic choice on their part. Plaintiffs hope to persuade this Court to reject the Second Circuit *Cablevision* case, which dealt only with direct infringement.

In determining whether a defendant has directly infringed copyright, courts look to whether that defendant undertook the volitional act that infringed the right. This requirement defines the boundary between direct infringement, which requires that the defendant has himself done an act through his own volition which directly infringes one of the copyright holder's exclusive rights, and secondary infringement liability, which has different requirements. *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1369-70 (N.D. Cal. 1995) (those who "do no more than operate or implement a system" by which allegedly infringing activity may occur are not direct infringers, because "[a]lthough copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party."); *id.* at 1368 (it is not direct infringement to run a system which "can operate without any human intervention"); *Rosen v. Hosting Servs., Inc.*, No. CV10-2186-CAS-FMOx, 2010 WL 5630637, at *2 (C.D. Cal. Aug. 16, 2010) (finding no direct infringement because "the automatic nature of [defendant's] servers forecloses a finding of volitional action as required under *Netcom* and its progeny"); *Sega Enters. Ltd. v. MAPHIA*, 948 F. Supp. 923, 932 (N.D. Cal. 1996) (where there is no showing that the defendant "himself uploaded or downloaded the files, or directly caused such uploading or downloading to occur," there is no direct infringement); *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006) (holding that "automated, non-volitional conduct by Google in response to a user's request does not

13

constitute direct infringement under the Copyright Act" because the defendant's "computers respond automatically to the user's request," and "[w]ithout the user's request, the copy would not be created and sent to the user, and the alleged infringement at issue in this case would not occur"); *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004) ("Agreeing with the analysis in *Netcom*, we hold that the automatic copying, storage, and transmission of copyrighted materials, when instigated by others, does not render an ISP strictly liable for copyright infringement under §§ 501 and 106 of the Copyright Act."); *In re Cellco P'ship*, 663 F. Supp. 2d at 370 ("To be held liable for direct infringement of the public performance right, a defendant must have engaged in conduct that is volitional or causally related to that purported infringement."); *Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs.*, 983 F. Supp. 1167, 1178 (N.D. Ill. 1997) (where the defendant "only provided the means to copy, distribute or display plaintiff's works," and "did not actually engage in any of these activities itself," the defendant "may not be held liable for direct infringement").[9]

No one at Zediva controls or operates the DVD players. When a customer rents a DVD, it is the customer who starts the disc playing, the customer who decides to fast-forward, pause, or rewind the disc, and the customer who decides when to stop playing the disc and return it. Zediva has no control over what the customer does with the disc during the period of rental. In fact, most of the time, no one from Zediva is even on the premises. Gupta Decl. ¶¶ 13, 17.

---

[9] Although the *Netcom*, *Rosen*, *Sega*, and *Field* opinions in this Circuit have applied the volition requirement, one unpublished district court opinion in this Circuit has expressly declined to apply the volition requirement, on the ground that the Ninth Circuit has (unlike the Second and Fourth Circuits) not decided the question whether that requirement applies. *See Arista Records LLC v. Myxer Inc.*, No. 2:08-cv-03935 GAF (JCx), ECF No. 548 (C.D. Cal. Apr. 1, 2011) ("the Court is not inclined to adopt a volitional conduct requirement without clear instruction from the Ninth Circuit"). This Court should follow the overwhelming weight of authority, in this circuit and out, and require some volitional infringing act before finding direct copyright infringement, as opposed to secondary infringement.

14

In the context of the public performance right, "the ones performing the works" are those who "operate the controls," not those who provide the facilities and equipment for the performance. *Columbia Pictures Indus., Inc. v. Aveco, Inc.*, 800 F.2d 59, 62 (3d Cir. 1986). These very Studios argued that the one making the performance in *Aveco* was the consumer, and they won. *Id.* If there is a direct infringer in the Zediva system, it must be the only individual who actually controls a performance: the consumer.[10]

That Zediva is not a direct infringer does not mean it could never face liability if it set up an infringing system. The copyright law allows plaintiffs to sue those who induce, contribute to, or are vicariously liable for acts of direct infringement by another. *See, e.g.*, *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930-31, 125 S. Ct. 2764, 2776, 162 L. Ed. 2d 781 (2005). But compared to direct infringement, those indirect infringement doctrines are deliberately limited in their scope. They require evidence of knowledge or intent to encourage infringement, and they require proof that there was a direct infringement by another.

The Studios are no strangers to the law of indirect copyright infringement; they have brought many of the cases that established that law in the United States Supreme Court. But in this case, they made a deliberate choice not to allege indirect copyright infringement against Zediva. Perhaps they did that because they feared that accusing a consumer of making a "public performance" when he transmits a movie *to himself* would look rather silly. Perhaps they (rightly) feared that even if that individual customer's performance was deemed public, the customer would be making a fair use under 17 U.S.C. § 107. Perhaps they feared that they couldn't show that Zediva intended to encourage infringement because it acted in the good-faith belief that its conduct was lawful. But the reason doesn't matter. Zediva is not a direct copyright infringer, and the

---

[10]   Independently, this fact is a reason to deny any relief against named defendant Venkatesh Srinivasan, the CEO of Zediva. There is no claim in the case that Srinivasan himself engages in any act of performance, public or not. And since he is not charged with indirect infringement, no remedy against him is appropriate.

1   Studios have chosen not to sue on the theory that it is a secondary copyright infringer.

2   They are certainly not likely to succeed on the merits of a claim they haven't even

3   brought.

4       **C.    The Studios cannot demonstrate irreparable harm.**

5       Zediva rents out movies for $1.99.  Services like iTunes and Amazon make those

6   same movies available on demand for $3.99,[11] of which the Studios get 70%, or $2.80.[12]

7   Zediva, having purchased DVDs made and sold by the Studios, does not pay a per-rental

8   fee.  Similarly, video rental stores like Blockbuster or Netflix are free to purchase DVDs

9   at retail and rent them with no further payment to the copyright owner.  Gratz Decl. Ex. B

10  at 66:11-67:15 (Deposition of Thomas Gewecke, President of Warner Brothers Digital

11  Distribution ("Gewecke Dep.")).  Thus, if the Court ultimately decides that Zediva must

12  pay a per-rental fee, it is easy to calculate the maximum possible amount owed: $2.80 per

13  rental, minus the amount Zediva paid the Studios for its DVDs.  There are certainly

14  arguments, and good arguments, that Zediva would owe less; indeed, the Studios make

15  less than $1 from many DVD rentals.  *See, e.g.*, *Unkind Unwind*, THE ECONOMIST, March

16  17, 2011 (Gratz Decl. Ex. D) (rentals from DVD kiosks "are worth just $1 each to the

17  studio, and would be worth even less if people were more punctual about returning their

18  DVDs").  But for purposes of determining whether the Studios will suffer irreparable

19  harm during the pendency of this case, the precise number is not important.  The fact that

20  the Studios are accepting $2.80 per rental in exchange for a license to permit iTunes and

21  Amazon to do more than that which Zediva does disposes of the irreparable-harm

22  question.  *See, e.g.*, *Cotter v. Desert Palace, Inc.*, 880 F.2d 1142, 1145 (9th Cir. 1989)

23

24  [11] Declaration of Carolyn Luedtke ("Luedtke Decl.") Ex. A, ECF No. 28-1 (reflecting
    identical prices of $3.99 for online rentals from Amazon, Best Buy, YouTube, and Vudu
25  for films from different studios).

26  [12] Scott Kirsner, *Indies Still Looking for Internet Equation*, VARIETY, Oct. 2, 2009
    (Declaration of Joseph C. Gratz ("Gratz Decl.") Ex. C) ("Apple offers a fairly
27  straightforward 70/30 revenue split with most rights-holders (Apple keeps 30% of rentals
    and sales)[.]").

28
                                    16

(injuries compensable with money damages are not irreparable); *Dotster, Inc. v. ICANN*, 296 F. Supp. 2d 1159, 1163 (C.D. Cal. 2003) (loss of revenues is not irreparable harm).

So, the studios must answer the question, "Why is money not enough?"  Their attempts to answer fall flat.

*First*, the Studios argue that Zediva's service interferes with their "right to exclusive control over their copyrighted works."  Mot. at 19.  This argument proves too much: every alleged copyright infringement is regarded by the copyright holder as an infringement upon the exclusive rights granted by the Copyright Act.  Thus, if the Studios were correct that there is irreparable harm any time there is a diminution of a copyright holder's "exclusive right to control how, when, to whom, and for what price (if any) it will disseminate its copyrighted works," *id.*, there would be a finding of irreparable harm in every copyright case.  This is a result foreclosed by the Supreme Court in *eBay*.  And, at any rate, such an abstract theory of harm does not meet the preliminary injunction standard.  The Studios claim that Zediva's service "*risks* harming the relationships each Studio has built with these third parties," Mot. at 19 (emphasis added), but "[e]stablishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a clear showing of immediate irreparable injury."  *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (internal quotation omitted).  Indeed, Plaintiffs allege precisely the sort of harm from competition that the Ninth Circuit found inadequate in *Professional Real Estate Investors*:  "While it might be true that Spectradyne's system could be hurt by the arrangements at La Mancha, Congress, not the courts, has the constitutional authority and the institutional ability to accommodate this clash of economic interests."  *Prof'l Real Estate Investors*, 866 F.2d at 282 n.7.[13]

*Second*, the Studios argue that the Zediva service may take customers away from

---

[13] In this case the Studios have already taken their case to Congress, seeking to be paid when companies rent videos.  *See* H.R. 5707, 97th Cong. (1st Sess. 1982).  Congress said no.

17

other services like iTunes or Amazon.  The Studios assert that this harm "cannot be easily quantified."  Mot. at 20.  But, as explained above, this is an excellent example of *reparable* harm, and is easy to quantify: for every rental made by Zediva instead of iTunes, the Studios lose, at most, $2.80.  And this is not a case in which there is a risk of uncontrolled, uncompensated, "viral" copying; Zediva uses reliable technological measures to prevent the downloading or saving of movies.  Gupta Decl. ¶ 13(f); Gewecke Dep. 107:16-22 (no reason to believe Zediva is not secure).

*Third*, the Studios argue that they might be harmed because Zediva might change consumers' perceptions about the available means of lawfully watching movies.  But the very question at issue in this case is whether remote DVD rental is a means of lawfully watching movies, and one litigant does not do irreparable harm to another litigant by arguing that its legal position is the correct one.  The Studios argue that "irreparable harm [] can stem from [] customer confusion about whether payment is required for access to copyrighted works," Mot. at 21, but this is a *non sequitur*.  Zediva charges $1.99 to rent out DVDs, and the Studios get some of that money when Zediva buys its hundreds of DVDs for rental.  Payment is required, both by customers to Zediva and by Zediva to the Studios.  The only question is price, and competition on price cannot support a finding of irreparable harm.  *Prof'l Real Estate Investors*, 866 F.2d at 282 n.7.

*Fourth*, the Studios argue that "the Zediva service threatens to provide a sub-optimal customer experience, thereby tarnishing customers' perception of VOD as an attractive channel for viewing the Studios' movies."  Mot. at 22.  Setting aside the question whether a mere "threat[]" of harm could ever meet the applicable standard, which requires probability of harm, the Studios provide no support for their conjecture.  The Studios express concerns about two aspects of the Zediva customer experience: picture quality and movie availability.

The Studios argue that they are concerned about "the quality of the transmission and the overall movie-watching experience."  Mot. at 22.  Zediva offers an excellent level

OPPOSITION TO MOTION PICTURE STUDIOS' MOTION FOR PRELIMINARY INJUNCTION / CASE NO. 2:11-CV-02817-JFW-E

of picture quality, which is comparable to the quality of the DVDs the Studios sell and meets or exceeds the quality of licensed video-on-demand services like iTunes and Amazon.  Gupta Decl. ¶ 13(c).  There is no evidence to the contrary.  The Studios cite a portion of the deposition transcript of Zediva's Chief Technical Officer for the proposition that "Zediva admits that it has received complaints about the quality of its product," Mot. at 22, but the complaints about quality were the result of skipping DVDs sold by the Studios or slow home internet connections, not any defect in the service provided by Zediva.  Luedtke Decl. Ex. O (Gupta Dep.) 150:6-151:21 (bad disks), 154:11-25 (home internet connections), ECF No. 28-15.  Indeed, the Studios' own declarant admitted that he had no basis to believe Zediva's service was of lower quality than existing movie services.  Gewecke Dep. 126:11-24 (Gratz Decl. Ex. B).

Finally, the Studios complain that "Defendants limit the number of consumers who can actually view a movie 'on demand,'" so "customers who expect to see a particular movie 'on demand' may be told that the movie they want is out-of-stock."  Mot. at 22. This may be the first time in history that a copyright owner claims that an alleged infringer has irreparably harmed it by not engaging in *enough* acts of supposed infringement.

Availability is a limitation inherent in any service which rents out physical DVDs, as Zediva does.  Movies are sometimes unavailable at the local video store; movies are sometimes unavailable to rent by mail; movies are sometimes unavailable for remote DVD rental via Zediva.  (Even theaters sell out.)  Zediva tries to solve this problem by buying many copies of popular DVDs, but, like any other DVD rental business, can't always keep up.  That does not mean that Blockbuster, Netflix, and Zediva have somehow injured the Plaintiffs when their popular movies are out of stock.

One solution to this problem would be for Zediva to copy the DVDs to hard disks and stream them to multiple users at once, as iTunes and Amazon do.  But the Studios would no doubt allege that making those copies would be copyright infringement.

OPPOSITION TO MOTION PICTURE STUDIOS' MOTION FOR PRELIMINARY INJUNCTION / CASE NO. 2:11-CV-02817-JFW-E

Amazon pays the Studios so that it many make as many copies as it wishes, to ensure that no movie is ever unavailable. Zediva does not make those copies, so movies are sometimes unavailable. The Studios will not be irreparably harmed if a Zediva customer occasionally has to wait a little while in order to watch *Vampires Suck*. Indeed, if anything, we would expect Plaintiffs to be happy about that limitation, since their other arguments are all premised on the opposite idea: that Zediva is *too good* a competitor.

In addition, the Studios' delay in bringing suit demonstrates that irreparable harm is unlikely. "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). In *Citibank*, the fact that the plaintiff waited nine weeks before filing suit "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Id.* at 277 (internal citation omitted). *See Givemepower Corp. v. Pace Compumetrics, Inc.*, No. 07cv157-WQH-RBB, 2007 WL 951350, at *7 (S.D. Cal. Mar. 23, 2007) (plaintiff's two-month delay "undercuts its current argument of immediate, irreparable harm"); *Kerr Corp. v. N. Am. Dental Wholesalers, Inc.*, No. SACV 11-0313 DOC CWx, 2011 WL 2269991, at *3 (C.D. Cal. June 9, 2011) ("Kerr cannot plausibly assert that it faces irreparable injury because of NAD when it demonstrated little urgency in its seeking a preliminary injunction."); *Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").

Here, the Studios had actual notice of the nature of Zediva's service as early as November 22, 2010, and waited more than 18 weeks before filing suit on April 4, 2011. Zediva's server logs indicate that starting on November 22, 2010, the zediva.com website was browsed by a computer with IP address 216.205.243.145. Gupta Decl. ¶ 20. That IP

20

address belongs to Plaintiff Twentieth Century Fox.  *Id.* ¶ 22.  Similarly, Zediva's logs indicate that Disney browsed its site starting on November 26, 2010; that Universal browsed its site starting on November 29, 2010; that Paramount browsed its site starting on December 8, 2010; and that Plaintiffs' counsel Munger Tolles & Olson browsed its site starting on December 9, 2010.  *Id.* ¶¶ 23-30.  There can be no question but that the Studios knew how the service worked; an IP address belonging to Disney watched a movie using the Zediva service on November 30, 2010.  *Id.*  ¶¶ 31-32.  Nor is this a case in which the employees with knowledge were low-level functionaries.  On December 7, 2010, an account was created on Zediva by a user with email address LJacobs@newscorp.com.  *Id.* ¶ 33.  That is the email address of Lawrence Jacobs, General Counsel of News Corporation, the parent company of Twentieth Century Fox.[14]

The Studios did not promptly seek preliminary relief.  Indeed, they did not tell Zediva they objected to its service at all.  The first contact they made with Zediva was the service of their complaint on April 4, 2011.  When companies face urgent problems necessitating immediate relief to avoid irreparable harm, they do not sit silent for months before even broaching the issue.  The Studios' delay confirms that their claim does not justify drastic, preliminary relief, but instead can be adjudicated in an orderly fashion, and any remedies determined following a final determination regarding liability.

### D.   Granting the motion would put Zediva out of business, so the balance of hardships tilts against the Studios.

A grant of preliminary injunction in this case would put Defendants out of business. Defendants have invested millions of dollars of resources in their business, and have garnered favorable national media coverage from the New York Times,[15] the Washington

---

[14] Mr. Jacobs was General Counsel of News Corporation from 2004 until June 8, 2011. *See* Jeremy W. Peters, *General Counsel of News Corp. Resigns in Wake of Settlement*, N.Y. TIMES, June 8, 2011, at B4.

[15] David Pogue, *DVD Movies From Afar*, N.Y. TIMES, Mar. 17, 2011, at B1.

OPPOSITION TO MOTION PICTURE STUDIOS' MOTION FOR PRELIMINARY INJUNCTION / CASE NO. 2:11-CV-02817-JFW-E

Post,[16] and the Wall Street Journal.[17]  Tens of thousands of movie lovers have signed up for the service, and tens of thousands more are on the waiting list.  Zediva is a business with real value which brings enjoyment to a wide range of consumers.

If an injunction is granted, all of that value will be destroyed.  DVD rental is Zediva's only business, and remote DVD rental makes up the lion's share of that business. If enjoined, all of the attention and goodwill that Zediva has garnered since it began operations in 2010 will be lost.  Its customers will be disappointed, and will turn to competitors' services.  Even if an injunction were later dissolved, the damage would be done: Zediva has put millions of dollars of resources into winning customers, and if they switch to one of the Studios' approved services, they are unlikely to come back.

The Studios, on the other hand, face no such risk.  This Court will ultimately determine whether remote DVD rental is lawful or whether it is an infringement of copyright.  When that determination is made, either Zediva will be able to continue buying hundreds of DVDs and renting them out to its customers, or it will be put out of business.  If it is put out of business, Zediva's customers are likely to switch to one of the Studios' approved services.  There is no chance of harmful "lock-in": either Zediva's service is lawful, and Zediva is permitted to continue serving its customers, or Zediva's service is not lawful, and the Studios will get those customers.  The converse is not true. If Zediva must shut down *pendente lite*, it will lose its entire customer base, and will have little hope of ever getting it back.  *See, e.g.*, *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 492 (2d Cir. 2002) (finding balance of hardships favored denial of injunction where "while Random House expresses fears about harm to its goodwill if Rosetta is allowed to proceed with its sale of ebooks, Rosetta, whose entire business is

---

[16] Hayley Tsukayama, *Zediva Offers New Approach to Online Movies*, WASH. POST, Mar. 16, 2011, *at* http://www.washingtonpost.com/blogs/faster-forward/post/zediva-offers-new-approach-to-online-movies/2011/03/16/AB3sX6e_blog.html.

[17] Martin Peers, *New Headache for Hollywood*, WALL ST. J., Mar. 16, 2011, *at* http://online.wsj.com/article/SB10001424052748704662604576202994155182626.html.

OPPOSITION TO MOTION PICTURE STUDIOS' MOTION FOR PRELIMINARY
INJUNCTION / CASE NO. 2:11-CV-02817-JFW-E

based on the sale of ebooks, raises a reasonable concern that the proposed preliminary injunction will put it out of business or at least eliminate its business as to all authors who have executed similar contracts.").

The Studios argue that pre-*eBay* case law suggests that where there is a likelihood of success on the merits, this factor can be presumed in favor of the movant. But *eBay* makes clear that the Court must consider the balance of hardships in every case, and may not rely upon presumptions. *eBay*, 547 U.S. at 391. Indeed, Plaintiff Warner Brothers recently defeated a motion for preliminary injunction in a copyright case on this very ground. *See* Warner Brothers Entertainment Inc.'s Opposition to Motion for Preliminary Injunction, ECF No. 29, in *Whitmill v. Warner Bros. Entertainment Inc.*, No. 4:11-cv-00752-CDP (E.D. Mo. filed May 20, 2011) at 37 (Gratz Decl. Ex. A) (arguing that threat of serious harm to the accused infringer "justifies the denial of preliminary injunctive relief" and must be analyzed independently of likelihood of success on the merits).

And it is notable that this is not a case in which the outcome is clear. At a bare minimum, this is a question of first impression in which Plaintiffs hope to establish law in the Ninth Circuit that is contrary to the rule in the Second Circuit. Accordingly, the traditional rule that it is no hardship to be stopped from infringing, *Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997), should not apply here. Zediva did not build its business on infringement; like Blockbuster, Netflix, TiVo, Sling Media, and a host of other now-established companies, it identified a new market opportunity, one the Plaintiffs would now like to block.

The harm to Plaintiffs if the motion is denied is, at most, $2.80 per rental. The harm to Defendants if the motion is granted is total destruction of their business. The balance of hardships tilts sharply in favor of Defendants.

### E.   The public interest is in equipoise, and does not favor the Studios.

For a preliminary injunction to be granted, the movant must show "that an injunction is in the public interest." *Winter*, 129 S. Ct. at 374. But here, where the

23

question is one of greater availability of copyrighted works to the public with adequate remuneration to the copyright holder, the public interest does not favor an injunction. "The sole interest of the United States and the primary object in conferring the [copyright] monopoly lie in the general benefits derived by the public from the labors of authors." *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127, 52 S. Ct. 546, 547, 76 L. Ed. 1010 (1932). Here, those public benefits are best achieved by the wide availability of the Studios' movies, through all lawful channels, whether or not they are the channels that achieve the most profits for the Studios.  The public interest does not benefit from the availability of copyrighted works only at a high price, or only from pre-approved sources, so long as the copyright holder receives full value, through the purchase of DVDs, for those copyrighted works.

Zediva also benefits the public interest by the very act of setting out the limits of the copyright monopoly:

> [T]he policies served by the Copyright Act are more complex, more measured, than simply maximizing the number of meritorious suits for copyright infringement. . . . Because copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible.  To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement.

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526, 114 S. Ct. 1023, 1029, 127 L. Ed. 2d 455 (1994).

///

///

///

///

///

1

## IV.     CONCLUSION

2

As they have so many times before, the Studios seek here to put a new and

3

innovative competitor out of business before a final determination on the merits is

4

reached.  They should not be permitted to do so.  Zediva does not make "public

5

performances" of the Studios' movies, and certainly does not do irreparable harm.

6

7

Dated:  June 17, 2011                                DURIE TANGRI LLP

8
                                                                      /s/ Joseph C. Gratz
                                                            By: _____
9                                                                        JOSEPH C. GRATZ

10                                                          Attorneys for Defendants and
                                                             Counterclaimants
11                                                          WTV SYSTEMS, INC. f/k/a WTV
                                                             SYSTEMS, LLC and VENKATESH
12                                                          SRINIVASAN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION PICTURE STUDIOS' MOTION FOR PRELIMINARY
INJUNCTION / CASE NO. 2:11-CV-02817-JFW-E

## CERTIFICATE OF SERVICE

I certify that all counsel of record are being served on June 17, 2011, with a copy of this document via the Court's CM/ECF system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 17, 2011, at San Francisco, California.

_/s/ Joseph C. Gratz_
Joseph C. Gratz

OPPOSITION TO MOTION PICTURE STUDIOS' MOTION FOR PRELIMINARY
INJUNCTION / CASE NO. 2:11-CV-02817-JFW-E