GLENN D. POMERANTZ (SBN 112503)
Glenn.Pomerantz@mto.com
KELLY M. KLAUS (SBN 161091)
Kelly.Klaus@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Tel: (213) 683-9100; Fax: (213) 687-3702

DANIEL E. ROBBINS (SBN 156934)
Dan_Robbins@mpaa.org
BENJAMIN S. SHEFFNER (SBN 212629)
Ben_Sheffner@mpaa.org
15301 Ventura Boulevard, Building E
Sherman Oaks, California 91403-3102
Tel: (818) 995-6600; Fax: (818) 285-4403

Attorneys for
Motion Picture Studio Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| WARNER BROS. ENTERTAINMENT INC., COLUMBIA PICTURES INDUSTRIES, INC., DISNEY ENTERPRISES, INC., PARAMOUNT PICTURES CORPORATION, TWENTIETH CENTURY FOX FILM CORPORATION, and UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,<br><br>        Plaintiffs,<br><br>    vs.<br><br>WTV SYSTEMS, INC. and WTV SYSTEMS, LLC d/b/a ZEDIVA, and VENKATESH SRINIVASAN,<br><br>        Defendants. | **CASE NO. 2:11-cv-02817-JFW-E**<br><br>**REPLY OF MOTION PICTURE STUDIO PLAINTIFFS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    July 25, 2011<br>Time:   1:30 p.m.<br>Judge:  Hon. John F. Walter<br>Ctrm:   16 |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................. 1

II.  THE STUDIOS ARE LIKELY TO SUCCEED ON THE MERITS .............. 2

    A.   Zediva Performs The Studios' Works To "The Public" ....................... 2

    B.   Zediva, Not Its Customers, Transmits And Performs The Works ........ 7

III. THE STUDIOS HAVE DEMONSTRATED IRREPARABLE
     INJURY ................................................................... 9

IV.  THE BALANCE OF HARMS WEIGHS FOR THE STUDIOS .................. 12

V.   THE PUBLIC INTEREST FAVORS AN INJUNCTION ........................... 12

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**FEDERAL CASES**

4

*Abend v. MCA, Inc.,*
5    863 F.2d 1465 (9th Cir. 1988), aff'd on other grounds, 495 U.S. 207, 110
6    S. Ct. 1750, 109 L. Ed. 2d 184 (1990) ................................................................. 9

7    *Cadence Design Systems, Inc. v. Avant! Corp.,*
        125 F.3d 824 (9th Cir. 1997) ............................................................................... 12
8

*Capitol Records, LLC v. BlueBeat, Inc.,*
9        No. CV 09-8030-JST, 2010 WL 6442438 (C.D. Cal. Dec. 8, 2010) .................. 6

10
*Cartoon Network LP, LLLP v. CSC Holdings, Inc.,*
11       536 F.3d 121 (2d Cir. 2008) ....................................................................... passim

12
*Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc.,*
13       866 F.2d 278 (9th Cir. 1989) ............................................................................ 3, 4

14   *Columbia Pictures Indus., Inc. v. Aveco, Inc.,*
        800 F.2d 59 (3d Cir. 1986) .................................................................................. 8
15

16   *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.,*
        749 F.2d 154 (1984) ................................................................................... passim
17

18   *In re Cellco Partnership,*
        663 F. Supp. 2d 363 (S.D.N.Y. 2009) ......................................................... 5, 6, 8
19

20   *Lotus Dev. Corp. v. Paperback Software Int'l.,*
        740 F. Supp. 37 (D. Mass. 1990) ....................................................................... 11
21

22   *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
        518 F. Supp. 2d 1197 (C.D. Cal. 2007) .................................................... 9, 10, 12
23

*On Command Video Corp. v. Columbia Pictures Indus.,*
24       777 F. Supp. 787 (N.D. Cal. 1991) ................................................................ passim

25   *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.,*
        907 F. Supp. 1361 (N.D. Cal. 1995) .................................................................... 8
26

27   *Salinger v. Colting,*
        607 F.3d 68 (2d Cir. 2010) ................................................................................... 2
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Am. Soc'y of Composers, Authors, Publishers*,
  627 F.3d 64 (2d Cir. 2010) .......................................................................... 1, 5, 6

*WPIX, Inc. v. ivi, Inc.*,
  No. 10 Civ. 7415 (NRB), 2011 WL 607111
  (S.D.N.Y. Feb. 22, 2011).............................................................................. 2, 10

FEDERAL STATUTES

17 U.S.C. § 101.............................................................................................. passim

17 U.S.C. § 115.................................................................................................... 9

18 U.S.C. § 2710(b) ........................................................................................... 11

OTHER AUTHORITIES

Mark A. Lemley,
  *Dealing With Overlapping Copyrights on the Internet*,
  22 U. DAYTON L. REV. 547 (1997) ...................................................................... 7

Michael J. Mellis,
  *Protecting Live Television Programming in Cyberspace*,
  1001 PLI/Pat 313 (April-May 2010) ................................................................... 6

REPLY IN SUPP. OF PRELIM. INJUNCT. MOT.
2:11-CV-02817-JFW-E

# I.   INTRODUCTION

Zediva is clearly violating the Studios' public performance right under settled law.  The statute's plain language, as consistently construed for decades, makes it clear that the thousands of separate transmissions of the Studios' films that Zediva sends to users "in separate places" and "at different times" constitute performances "to the public."  17 U.S.C. § 101; *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 159 (1984); *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787, 790 (N.D. Cal. 1991).  The only difference between the transmissions in *Redd Horne* and *On Command*, and those here, is that Zediva uses the Internet instead of its own cable wires to transmit the Studios' films.  But the Internet does not make Zediva any less liable than the services in those cases. Zediva itself admits that the Internet simply functions as "a very long cable" for its transmissions.  Opp. at 8:14.  And the cases are clear that streams over the Internet are public performances, even where (as is common) each stream is sent separately to an individual user.  *See United States v. Am. Soc'y of Composers, Authors, Publishers*, 627 F.3d 64, 74 (2d Cir. 2010) ("*ASCAP*").  The rule Zediva advocates would eviscerate protection for a wide range of works streamed over the Internet.

Zediva's near-total reliance on *Cartoon Network LP, LLLP v. CSC Holdings, Inc.,* 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), in arguing that its performances are private, is misplaced.  *Cablevision* repeatedly said that its holding applied only to a service that transmitted from one "unique copy" made at the direction of a unique user to that same user.  *Id*. at 135, 138, 139.  Zediva concedes that the facts of its service are different than those that were critical to the *Cablevision* court's holding.  Opp. at 9.  The case does not assist Zediva.

The equities cry out for an injunction.  Video-on-demand ("VOD") over the Internet is an important and fast-growing market.  Legitimate participants recognize they have to respect the rights that Congress created and obtain licenses to exploit the Studios' public performance right.  Zediva is just the latest in a line of

companies that have tried to jump-start a business by violating copyright owners'
rights.  Notwithstanding the oft-repeated cries of "we're small," and "an injunction
will destroy our business," courts have not hesitated to issue injunctions to protect
the rights of content owners and licensees who play by the rules that Congress
established.  The Court should grant the Studios' Motion.

## II.   THE STUDIOS ARE LIKELY TO SUCCEED ON THE MERITS[1]

### A.   Zediva Performs The Studios' Works To "The Public"

The crux of Zediva's argument is that a "transmission that by definition goes
to one and only one recipient cannot be a transmission 'to the public.'"  Opp. at 12.
Zediva's argument ignores the plain language of the transmit clause, which
provides that transmitting performances of a work to multiple members of the
public is a "public" performance *regardless* of "whether the members of the public
capable of receiving the performance or display receive it *in the same place or in
separate places and at the same time or at different times*."  17 U.S.C. § 101
(emphasis added).  Zediva's overarching reliance on the fact that it transmits the
same performances to different users in different locations and at different times
reads the italicized language right out of the definition of a public performance.[2]

Given the statute's plain language, it is unsurprising that the two cases most
directly on point held that transmissions of performances were "to the public,"
notwithstanding the fact that, just like Zediva, each particular "transmission" was
sent separately to separate viewers, and during the performance each viewer had

---

[1] Zediva's blanket assertion that it is difficult to assess the merits of copyright
claims at the preliminary injunction stage, Opp. at 5, is unfounded.  The caution in
*Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010), which Zediva cites, concerned
the "often 'sophisticated and fact-intensive' nature of common copyright law
disputes such as whether one work is 'substantially similar' to or a 'fair use' of
another," neither of which is implicated here.  *WPIX, Inc. v. ivi, Inc.*, No. 10 Civ.
7415 (NRB), 2011 WL 607111, at *22 n.8 (S.D.N.Y. Feb. 22, 2011).  There are no
complex fact issues, and Zediva does not dispute *any* fact relevant to this Motion.

[2] Zediva suggests that because the words "at different times" appear in a House
Report from 1967, and the Copyright Act was enacted in 1976, the Court should
disregard the House Report.  Opp. at 12.  Zediva's argument ignores the fact that
the "at different times" language is incorporated right into the statute's text.

1   exclusive "control" over the copy of the movie.  *See Redd Horne,* 749 F.2d at 157

2   (defendant "places the cassette of the motion picture chosen by the viewer into one

3   of the video cassette machines in the front of the store and the picture is transmitted

4   to the patron's viewing room"); *On Command*, 777 F. Supp. at 788 ("video is seen

5   only in the room where it was selected by the guest").  That fact did not make the

6   performances "private":  "[T]he fact that members of the public view the

7   performance at different times does not alter this legal consequence," namely, that

8   the performances are "public" under the transmit clause.  *Redd Horne*, 749 F.2d at

9   159; *On Command*, 777 F. Supp. at 788.  The result is no different with Zediva:  it

10  transmits the same performances of the same films (and from the same DVDs) to

11  numerous different users.  The fact that those users receive those transmissions in

12  different places and at different times does not change the fact that Zediva is

13  transmitting "to the public."

14        Zediva urges the Court to disregard *Redd Horne* and *On Command* on two

15  grounds, neither of which withstands scrutiny.  *First*, Zediva argues that the Ninth

16  Circuit "considered and rejected" *Redd Horne's* analysis in *Columbia Pictures*

17  *Indus., Inc. v. Professional Real Estate Investors, Inc.*, 866 F.2d 278 (9th Cir. 1989)

18  ("*PRE*").  Opp. at 10-11.  Zediva has mis-described the Ninth Circuit's opinion.

19  *PRE* involved a hotel service that rented videodiscs to guests, who carried the discs

20  to their rooms to watch them on in-room players.  866 F.2d at 279.  The Ninth

21  Circuit considered whether this was a public performance under *either* the "public

22  place" clause[3] or the "transmit" clause.  *Redd Horne* had found that the video-store

23  operator was publicly performing works under both clauses.  *See* 749 F.2d at 157-

24  59.  In *PRE*, the court held the facts before it were distinguishable because

25  individual hotel rooms were not public places, and (as to the transmit clause) a

26  ─────────────
    [3]  *See* 17 U.S.C. § 101 (definition of "[t]o perform . . . a work 'publicly,'" clause

27  (1):  "to perform [a work] at a place open to the public or at any place where a
    substantial number of persons outside of a normal circle of a family and its social

28  acquaintances is gathered.").  The issue here concerns the transmit clause.

REPLY IN SUPP. OF PRELIM. INJUNCT. MOT.
                                                      2:11-CV-02817-JFW-E

guest watching a disc with an in-room machine did not receive any transmission from beyond any place a transmission was sent. *Id*. at 281-82.

PRE did not reject *Redd Horne's* analysis of the "at different times" language in the transmit clause. Nor did *PRE* hold (or even imply) that using separate transmission streams would make each performance "private." Far from it. The Ninth Circuit expressly stated that amicus Spectradyne's "closed circuit" system, in which transmissions traveled from a central location to individual hotel rooms (akin to Zediva), "falls squarely within the transmit clause of the Act." 866 F.2d at 282 n.7.[4] *On Command*, which followed *PRE*, held that while the "hotel guest rooms" were "not public places" for purposes of the public place clause, the service was transmitting movies "beyond the place from which they are sent" (also akin to Zediva) and thus was publicly performing them. 777 F. Supp. at 789-90. *PRE* thus is fully consistent with *Redd Horne* and supports the Studios' position.

*Second*, Zediva insists that its performances are private under *Cablevision*. Opp. at 7-9. *Cablevision's* actual holding, however, undermines Zediva's position. In *Cablevision,* the court found the transmissions were not "to the public" "[b]ecause each RS-DVR playback transmission is made to a single subscriber using a *single unique copy* produced by that subscriber." 536 F.3d at 139 (emphasis added). "Given that each RS-DVR transmission is made to a given subscriber using a copy made by that subscriber, we conclude that such a transmission is not 'to the public.'" *Id*. at 138. The Second Circuit said that *Redd Horne* — which Zediva insists is inapposite — supported its holding, because the *Redd Horne* defendant had "only *one copy* of each film" and (like Zediva) showed that copy "repeatedly to different members of the public." *Id*. (emphasis added) (quotation omitted). *Cablevision* likewise said that its holding was consistent with

---

[4] The fact that Spectradyne filed an amicus brief in support of the *PRE* plaintiffs is irrelevant. *See* Opp. at 11 n.8. What matters is what the Ninth Circuit said about Spectradyne's system, namely, that it was making public performances.

REPLY IN SUPP. OF PRELIM. INJUNCT. MOT.
2:11-CV-02817-JFW-E

*On Command*, because "*successive transmissions* to different viewers in that case could be made using a *single copy* of a given work." *Id.* at 139 (emphases added).

Zediva claims that its service "presents a *virtually* identical set of facts to *Cablevision*." Opp. at 9 (emphasis added). But a crucial difference between the two services is that Zediva (unlike in *Cablevision* but as in *Redd Horne* and *On Command*) transmits performances over and over from the same copy of the same film to multiple members of the public. The difference between the two services involves a fact that was critical in *Cablevision*, and that difference is fatal to Zediva's reliance on that case.[5] Zediva says it would be "bizarre" for that difference to control *Cablevision's* applicability here, because this case involves purchased DVDs while *Cablevision* involved "unauthorized copies." *Id.* This argument appeals to first-sale principles, which do not apply to the public performance right. *See* Mot. at 14 n.6 (citing authorities). And in all events, Zediva's argument boils down to the proposition that it wishes the Second Circuit had reached a different holding. While Zediva is correct that the Studios believe that even the performances in *Cablevision* were "to the public," Opp. at 9-10, the bottom line is that *Cablevision's* contrary holding, by the express terms of that decision, does not apply to a service like Zediva's.

Neither *ASCAP* nor *In re Cellco Partnership*, 663 F. Supp. 2d 363 (S.D.N.Y. 2009), "sharpen[s]" *Cablevision's* actual holding to Zediva's benefit. Opp. at 10:4. Both cases held only that an Internet *download* (which is not a stream) of a music file does not transmit a performance of the musical composition embodied in that file "to the public." The reason, the Second Circuit explained, is that "[t]he downloads at issue . . . are not musical performances that are contemporaneously perceived by the listener," *i.e.*, the download did not transmit a performance of the

---

[5] Because the Court does not have to reject *Cablevision* to find Zediva liable, there is no merit to Zediva's assertion that the Studios filed this case to set up a Circuit split with *Cablevision*. Opp. at 2.

1  work *at all*.  *ASCAP*, 627 F.3d at 73.  By contrast, *ASCAP* held that Internet

2  "stream transmissions," just like Zediva's, "constitute public performances" and

3  "illustrate why a download is not a public performance. . . . This [streaming]

4  transmission, like a television or radio broadcast, is a performance because there is

5  a playing of the song that is perceived simultaneously with the transmission."  *Id*. at

6  74.  *Accord In re Cellco Partnership*, 663 F. Supp. 2d at 373-74.  Neither case

7  helps Zediva:  Zediva concedes that the playback of a DVD transmitted through its

8  service "constitutes a 'performance.'"  Opp. at 6.

9      Zediva's argument that its separate transmission streams result in private

10  performances, if accepted, would render the public performance right a dead letter

11  on most Internet streaming services.  Nearly every time a user clicks "play" to

12  stream a film or song on the Internet, a service sends a unique transmission of the

13  performance to the user.[6]  Zediva's rule would render these non-simultaneous

14  performances "private" and would contradict unbroken authority recognizing that

15  streams sent individually to multiple users *are* public performances.  *See ASCAP*,

16  627 F.3d at 74; *Capitol Records, LLC v. BlueBeat, Inc.*, No. CV 09-8030-JST, 2010

17  WL 6442438, at *4 (C.D. Cal. Dec. 8, 2010) (defendant "publicly performed"

18  works through with "on-demand streaming transmissions"); Mot. at 14 n.5.

19  Zediva's own counsel has written that the transmit clause

20      easily encompasses the transmission to "the public" via e-mail or the

21      Web.  *While individuals may receive such electronic transmissions in*

22      *their own home or office, and not at the same time, neither of those*

23      *facts will prevent an electronic communication from being a public*

24      *performance or display.*

25

---

26  [6] *See, e.g.*, Michael J. Mellis, *Protecting Live Television Programming in Cyberspace*, 1001 PLI/Pat 313, 326 (April-May 2010) ("Unicast streaming

27  involves 'one-to-one' distribution of a media stream from a central server to an end user's computer" and is "the primary means for distribution of live video on the

28  Internet").

1   Mark A. Lemley, *Dealing With Overlapping Copyrights on the Internet*, 22 U.

2   Dayton L. Rev. 547, 560-61 (1997) (emphasis added) (footnotes omitted).

3       *Redd Horne* and *On Command* remain on-point and persuasive in

4   interpreting the transmit clause.  The Court should follow those cases and hold that

5   Zediva's performances of the Studios' works are "to the public."

6           **B.     Zediva, Not Its Customers, Transmits And Performs The Works**

7       Zediva's argument that its customers, and not Zediva, perform the Studios'

8   works, is baseless.  This case involves public performances by Internet

9   transmissions.  Under the Act, "[t]o 'transmit' a performance is to communicate it

10  by any device or process whereby images or sounds are received beyond the place

11  from which they are sent."  17 U.S.C. § 101.  Zediva' customers "receive" sounds

12  and images from the Studios' films "beyond the place from which [those sounds

13  and images] are sent," namely, from Zediva's data center.  Zediva is doing the

14  sending, the transmitting, and thus the performing.

15      Zediva's Opposition confuses the issue by claiming the Studios are trying to

16  set up a conflict with *Cablevision's* holding on "volitional" conduct.  Opp. at 13.

17  Once again, Zediva has mis-described *Cablevision* and its relevance here.  The

18  Second Circuit said that Cablevision's end-users, rather than Cablevision, engaged

19  in "volitional" copying, and that Cablevision therefore was not directly liable for

20  infringing the plaintiffs' *reproduction* right.  536 F.3d at 130-33.  The Studios'

21  disagreement with that holding (Mot. at 18 n.8) is inapposite.  The Second Circuit

22  expressly said it was not deciding whether Cablevision or one of its users was

23  "do[ing]" the performing.  The court explained that its conclusion as to the

24  *reproduction* right did not apply *a fortiori* to the separate *public performance* right,

25  because "[t]he definitions that delineate the contours of the reproduction and public

26  performance rights vary in significant ways," and in particular the "statute defines

27  the verb 'perform,'" but not "reproduce."  536 F.3d at 134.  The definition of

28  "perform" incorporates the definition of "transmit," which does not accord with the

sender and receiver of the transmission being the same person.  Zediva itself says it is "silly" to speak of a customer "transmit[ting] a movie *to himself*."  Opp. at 15:19.  That is because Zediva is doing the transmitting and thus the performing.

Zediva also offers a string cite of cases that it says support applying a "volitional" conduct requirement to the public performance right.  *See* Opp. at 13-14.  None of the cases involved a defendant who itself placed physical media in a player for viewers' consumption.  Only two of those cases involved the public performance right, and neither offers any analysis relevant to the application of the transmit clause to Zediva.  In *In re Cellco P'ship*, the court simply said there was a volitional conduct requirement without analyzing the issue — and without it making a difference to the outcome.  663 F. Supp. 2d at 370.  *Columbia Pictures Indus., Inc. v. Aveco, Inc.*, 800 F.2d 59 (3d Cir. 1986), concerned public performances under the "public place" clause.  This case involves public performances under the transmit clause, which includes the definition of "transmit."  The other cases Zediva cites involved the *reproduction* right, which is not at issue.[7]  Further, as Zediva acknowledges, the Ninth Circuit has not adopted a volitional test, and another court in this District has declined to apply it.  Opp. at 14 n.9.

Even if the transmit clause incorporated a volitional conduct element, Zediva would easily satisfy it.  Zediva purchased and installed hundreds of DVD players; and Zediva's employees fill those players with DVDs on a rotating basis.  Luedtke Decl., Ex. O at 28:6-31:7, 69:11-70:2, 75:13-17.  Zediva designed the user interface its customers use.  And Zediva's system sends the request to Zediva's control server, which sets in motion a series of actions on various servers created and controlled by Zediva, including converting the analog video signal from the DVD

---

[7] *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995), also involved the exclusive right of public display, which shares the same two clauses (public place and transmit) as the public performance right. *Id.* at 1371-72.  The court there did not discuss the definition of "transmit" or how that definition affected the "volitional" conduct issue.

player into a digital signal to stream across the Internet.  *Id.* at 55:1-66:15.  Zediva acts volitionally.

### III.    THE STUDIOS HAVE DEMONSTRATED IRREPARABLE INJURY

Zediva argues that any damages would be "easy to calculate" at "$2.80 per rental, minus the amount Zediva paid the Studios for its DVDs."  Opp. at 16.  Zediva is not making an apples-to-apples comparison.  Zediva is giving its customers a 14-day VOD offering, without having to satisfy any of the conditions that a Studio has the right to and does demand of its licensees.  There is no comparable VOD offering and no basis for Zediva's hypothetical calculation.

More fundamentally, Zediva's argument that compensation is "easy to calculate" flouts fundamental principles of copyright law.  As the party that owns or controls the copyright interests in this case, each Studio has the exclusive right to decide when, where, to whom, and for how much to authorize the transmission of its works to the public.  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1218 (C.D. Cal. 2007).  Zediva's argument in essence is that the Court should grant it a compulsory license to stream the Studios' movies in exchange for a "per rental" fee.  But the law does not reward infringers with the right to exploit plaintiffs' copyrights.  Compulsory licenses are disfavored; to the extent they are granted at all, they generally are created by statute for specific uses and with detailed requirements.  *See, e.g.,* 17 U.S.C. § 115.  The Ninth Circuit has indicated that courts should consider compulsory licenses as judicial remedies only in cases where injunctive relief would cause "great public injury."  *See Abend v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988), *aff'd on other grounds*, 495 U.S. 207, 110 S. Ct. 1750, 109 L. Ed. 2d 184 (1990).  Zediva does not and cannot claim any "great" injury to the public from an injunction issuing here.

In responding to the Studios' demonstration of multiple harms they will suffer absent an injunction, Zediva offers plenty of sarcasm but little else to counter the Studios' evidence.  *See* Opp. at 17-20.  For example, Zediva scoffs that any

1  harm to the Studios' third-party relationships may be compensated easily with
2  readily quantifiable damages. *Id*. at 17-18. But, as demonstrated, damages cannot
3  be calculated as Zediva says they can, and in any event Zediva ignores the more
4  fundamental harm. Each Studio has its own licensees and contractual relationships
5  with third parties who decided to play by the rules. Authorized distributors already
6  have complained about the fact that Zediva is not competing lawfully. There is a
7  significant risk that, if Zediva is allowed to continue operating illegally, these
8  distributors and others will push their Studio-licensor to change their contractual
9  terms so these third parties are not disadvantaged by Zediva's illegal service. *See*
10 Supp. Klaus Decl., Ex. 47 (Gewecke Depo. at 99:2-101:25).

11         Zediva likewise dismisses the harm from authorized licensees losing
12 customers, but in the next breath says it is at risk of losing customers from an
13 injunction. *Compare* Opp. at 17:24-18:7 *with* Opp. at 22:8-10. Zediva cannot have
14 it both ways. The reality is that the VOD market is growing and evolving, and
15 customers are becoming accustomed to new ways of obtaining video content.
16 Zediva's illegal service creates a variety of risks that will be difficult or impossible
17 to reverse at the end of the case: that customers will switch from authorized to
18 unauthorized transmissions; that customers will be confused by what is and is not a
19 lawful service; or that customers will find Zediva's VOD offering to be of poor
20 quality, either in itself or in comparison to other offerings, and will mistakenly
21 attribute the faults of that offering to the legitimate VOD offerings. Zediva thus
22 threatens serious, significant, and irreparable harm to the entire legitimate VOD
23 ecosystem. *See* Supp. Klaus Decl., Ex. 47 (Gewecke Depo. at 82:3-85:1). Zediva
24 is no different than other illegal services that tried to gain an unfair advantage by
25 appropriating copyrighted content without paying for it. Courts have repeatedly
26 held that the harm these services cause to law-abiding content owners and their
27 licensees is manifest, irreparable, and properly remedied with an injunction. *See,*
28 *e.g.*, *ivi,* 2011 WL 607111, at *17-21; *Grokster*, 518 F. Supp. 2d at 1214-19.

1    Finally, Zediva argues that the Studios delayed suing Zediva or seeking an

2    injunction, and therefore their showing of irreparable harm should be disregarded.

3    Opp. at 20-21.  Zediva includes in its Opposition and supporting declaration a

4    string of "gotcha" citations showing that IP addresses belonging to the Studios and

5    their counsel accessed the Zediva site in November and December.[8]  But Zediva

6    does not contest that this access occurred during Zediva's "beta" period, *i.e.*, when

7    the service had limited reach and it was unclear it would ever launch.  *See* Mot. at

8    9:13-10:8.  Zediva launched its official offering — complete with a full-court

9    public relations blitz — on March 16, 2011.  *See id.;* Luedtke Decl. ¶ 13, Exs. G &

10   L.  Upon launch, the business apparently became so popular that its servers crashed

11   from the increased traffic and Zediva had to close the site to new subscribers until it

12   could add capacity.  *See* Luedtke Decl. ¶ 13, Ex. L; Ex. O (Gupta Depo. at 136:17-

13   138:14).  The Studios sued Zediva and the parties stipulated to the instant

14   preliminary injunction schedule immediately after that launch.

15   The Studios are not required to act immediately to sue and to seek to enjoin

16   every potential infringer when it is in start-up or beta testing mode.  A rule that

17   required a copyright holder to pursue every possible threat — no matter how

18   nascent — would compel a rash of litigation and motion practice, which would not

19   serve the Courts, the parties or the public interest.  *See, e.g., Lotus Dev. Corp. v.*

20   *Paperback Software Int'l.*, 740 F. Supp. 37, 82 (D. Mass. 1990) ("[p]rudent

21   business judgment, Rule 11 and basic common sense required Lotus first to

22   ascertain that the threat to its intellectual property interest was serious and that its

23   legal position was sound before filing suit") (internal quotations omitted).  The

24   
---

[8] In disclosing this information, Zediva apparently has no compunction about
possibly violating the federal Video Privacy Protection Act, 18 U.S.C. § 2710(b).
That statute prohibits one who rents, sells or delivers videocassettes "or similar
audio visual materials" from "knowingly disclos[ing], to any person personally
identifiable information concerning any consumer of such provider."  Zediva,
which styles itself a video "rental" service, discloses the name of a specific
individual and the particular title Zediva says he requested through the service.  *See*
Opp. at 21; Gupta Decl. ¶ 33.

REPLY IN SUPP. OF PRELIM. INJUNCT. MOT.
2:11-CV-02817-JFW-E

1  Studios promptly sought injunctive relief after Zediva's official launch.  There is no

2  merit to Zediva's claim that an injunction should be denied because the Studios did

3  not run into Court and ask for an injunction before Zediva launched.

4  **IV.    THE BALANCE OF HARMS WEIGHS FOR THE STUDIOS**

5         Zediva concedes that under controlling Ninth Circuit law, *Cadence Design*

6  *Systems, Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997), a defendant

7  cannot claim hardship from the inability to continue its infringing business.  Opp. at

8  23.  Zediva claims the Court should disregard *Cadence* because this case presents a

9  "question of first impression" whose outcome will not be known until after trial.

10  *Id.*  That is baseless.  There are no factual disputes.  While Zediva's particular

11  means of violating the public performance right may be idiosyncratic, the violation

12  does not raise an issue of first impression but instead is clear under well-settled law.

13  *Cadence* controls, and the balance of harms weighs decisively for the Studios.

14  **V.     THE PUBLIC INTEREST FAVORS AN INJUNCTION**

15         This case is not about protecting high prices or entrenched business models.

16  It is about enforcing a well-established and valuable right.  Congress created that

17  right (showing where the public interest lies); protecting that right promotes the

18  Studios' ability to invest in the creation and distribution of content that the Act is

19  centrally concerned with fostering.  *See Grokster*, 518 F. Supp. 2d at 1222.  The

20  public interest is not "in equipoise," Opp. at 23, but weighs in favor of enjoining

21  Zediva's illegal service.  The Court should grant the Studios' Motion.

22  DATED: June 27, 2011                    MUNGER, TOLLES & OLSON LLP

24                                          By:  */s/ Kelly M. Klaus*
                                                  KELLY M. KLAUS

26                                          Attorneys for Motion Picture Studio
                                                 Plaintiffs