COPY

1  MOLO LAMKEN LLP
   JEFFREY A. LAMKEN (CA Bar # 154217)
2  ROBERT K. KRY
   600 New Hampshire Ave., Suite 660
3  Washington, D.C. 20037
   Telephone: (202) 556-2000
4  Facsimile: (202) 556-2001

5  LAW OFFICES OF BECKY WALKER JAMES
   BECKY WALKER JAMES (CA Bar # 151419)
6  1990 South Bundy Drive, Suite 705
   Los Angeles, California 90025
7  Telephone: (310) 492-5104
   Facsimile: (310) 492-5026
8  E-mail: becky@walkerjameslaw.com

9  *Counsel for Amicus Curiae*
   CABLEVISION SYSTEMS CORPORATION
10

11              UNITED STATES DISTRICT COURT
12
          FOR THE CENTRAL DISTRICT OF CALIFORNIA
13
                   WESTERN DIVISION
14

15  WARNER BROS.                    Case No.  2:11-cv-02817-JFW-E
    ENTERTAINMENT INC.,
16  COLUMBIA PICTURES               **MEMORANDUM OF LAW OF**
    INDUSTRIES, INC., DISNEY        ***AMICUS CURIAE***
17  ENTERPRISES, INC.,              **CABLEVISION SYSTEMS**
    PARAMOUNT PICTURES              **CORPORATION**
18  CORPORATION, TWENTIETH
    CENTURY FOX FILM                Date:  July 25, 2011
19  CORPORATION, and UNIVERSAL      Time:  1:30 p.m.
    CITY STUDIOS PRODUCTIONS        Courtroom: 16
20  LLLP,                           Hon. John F. Walter,
                                    United States District Judge
21       Plaintiffs/Counter-defendants,

22       v.

23  WTV SYSTEMS, INC. and WTV
    SYSTEMS, LLC d/b/a ZEDIVA,
24  and VENKATESH SRINIVASAN,

25       Defendants/Counterclaimants.

26

27

28

   ──────────────────────────────────────────────────────
   MEMORANDUM OF LAW OF *AMICUS CURIAE* CABLEVISION SYSTEMS CORPORATION

# **TABLE OF CONTENTS**

INTEREST OF *AMICUS CURIAE* .......................................................................... 1

ARGUMENT .......................................................................................................... 2

I.   Zediva's System Renders Public Performances ............................................. 2

II.  Zediva's Volitional Conduct Is Substantially Different from
     Cablevision's ................................................................................................. 6

CONCLUSION ....................................................................................................... 9

MEMORANDUM OF LAW OF *AMICUS CURIAE* CABLEVISION SYSTEMS CORPORATION

1

# TABLE OF AUTHORITIES

2

## CASES

3

*Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121
    (2d Cir. 2008) ................................................................................*passim*

4

5

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154
    (3d Cir. 1984) ........................................................................................ 5

6

*CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004) .................. 6, 7

7

*Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006) .......................... 7

8

*In re Cellco P'ship*, 663 F. Supp. 2d 363 (S.D.N.Y. 2009) ............................ 6

9

10

*Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs.*, 983 F. Supp.
    1167 (N.D. Ill. 1997) ............................................................................ 7

11

12

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
    907 F. Supp. 1361 (N.D. Cal. 1995) ....................................................... 6, 7

## STATUTES AND RULES

13

14

17 U.S.C. § 101 .................................................................................... 2, 7

15

17 U.S.C. § 106 .................................................................................... 6, 7

16

17 U.S.C. § 106(4) ................................................................................... 2

17

17 U.S.C. § 106(5) ................................................................................... 7

18

Fed. R. App. P. 29(c)(5) ............................................................................ 1

19

## OTHER AUTHORITIES

20

H.R. Rep. No. 94-1476 (1976) .................................................................... 2

21

2 *Nimmer on Copyright* § 8.14[C][2] (2008) ................................................. 2

22

2 *Nimmer on Copyright* § 8.14[C][3] (2008) ................................................. 5

23

24

25

26

27

28

1    Cablevision Systems Corporation ("Cablevision") respectfully submits the
2    following memorandum of law as *amicus curiae* in this case.[1]

3

4                    **INTEREST OF *AMICUS CURIAE***

5    Cablevision provides cable television service in the New York metropolitan
6    area and elsewhere.  It developed the Remote Storage Digital Video Recorder ("RS-
7    DVR") that the Second Circuit upheld against a copyright challenge in *Cartoon
8    Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*").
9    The RS-DVR allows each subscriber to record television programs he could have
10   watched as they aired—just like a VCR or traditional set-top DVR.  Each sub-
11   scriber can then play back his own personal recordings for private viewing—again
12   just like a VCR or set-top DVR.  Unlike those earlier technologies, however, the
13   RS-DVR stores the subscriber's recordings on Cablevision's premises.  Cablevision
14   began offering the RS-DVR to its subscribers in January 2011.

15   Cablevision has a strong interest in this case.  Both parties invoke the *Cable-
16   vision* decision as authority for their positions.  Because Cablevision currently op-
17   erates the system the Second Circuit upheld, it has a direct interest in the proper in-
18   terpretation of that decision.  Moreover, this case implicates a complex marketplace
19   with rapidly evolving technologies.  Cablevision acts as both a provider of cutting
20   edge technologies in that market and a distributor of content licensed from copy-
21   right holders—including through "video on demand" systems, separate from its RS-
22   DVR, that compete with Zediva's service.  For that reason, Cablevision has a
23   unique—and uniquely balanced—perspective.

24

25

26

[1] No counsel for any party authored this memorandum in whole or part; no such
27 party or counsel made a monetary contribution intended to fund its preparation or
submission; and no person other than Cablevision made such a contribution.  *Cf.*
28 Fed. R. App. P. 29(c)(5).

1

**ARGUMENT**

This case implicates two questions that also arose in *Cablevision*. The first is whether the accused system transmits performances "to the public." With respect to Zediva's service, the answer is "yes." The second question is whether the defendant is the one "doing" the transmitting. On that point, neither party's arguments are entirely satisfactory. Plaintiffs err in proposing overbroad tests for direct infringement. But Zediva errs in suggesting that its volitional conduct is no different from Cablevision's with respect to the RS-DVR.

## I.     *Zediva's System Renders Public Performances*

A.     The Copyright Act grants owners the exclusive right to "perform the copyrighted work publicly," including the right to "transmit . . . a performance . . . of the work . . . to the public." 17 U.S.C. §§ 101, 106(4). As the Second Circuit recognized in *Cablevision*, the key limitation there is "to the public": Unlicensed transmissions "to the public" are infringing; unlicensed private transmissions are not. 536 F.3d at 134. To determine whether a transmission is "to the public," the court held, one must examine its "potential audience"—*i.e.*, who is " 'capable of receiving' a particular transmission of a performance." *Id.* at 135 (citing 17 U.S.C. § 101; H.R. Rep. No. 94-1476, at 64-65 (1976)). "[I]f a transmission is only available to one person," for example, "then it clearly fails to qualify as 'public.'" 2 *Nimmer on Copyright* § 8.14[C][2] (2008).

A transmission may be "to the public" even though it is ***ultimately received*** by only one person. The statute expressly covers performances received in "separate places" and at "different times." 17 U.S.C. § 101. Zediva is thus wrong to suggest that "a transmission that by definition goes to one and only one recipient cannot be a transmission 'to the public.'" Opp. at 12. What matters is the transmission's ***potential audience***—for example, whether the provider's video library is held out generally for transmission to the public, even if transmissions from those

2

1 copies are made on a one-at-a-time basis, at different times and to separate places.

2     That is why conventional video-on-demand systems have always been under-
3 stood to require public performance licenses even though each individual transmis-
4 sion is ultimately received by only one subscriber. Because the video-on-demand
5 provider offers to transmit its library of movies to any subscriber willing to pay, the
6 "potential audience" of any given transmission is "the public." At the time of the
7 video-on-demand provider's open offer to transmit the recordings in its library, any
8 subscriber willing to pay is "capable of receiving" any given transmission from the
9 provider's library, even though only one person ultimately receives each particular
10 transmission. In that respect, video-on-demand services are no different from pub-
11 lic hotels: We all understand that hotels are "public accommodations" because
12 anyone willing to pay can get a room. The fact that rooms are used on a one-at-a-
13 time basis, and are not available to others once occupied by a guest, does not
14 change the fact that the hotel is opening its rooms "to the public."

15     By contrast, where a person uploads his own personal music collection to a
16 "cloud-based" remote server or "virtual locker" and plays back his music by
17 streaming it to himself over the Internet, there is no "public performance." The
18 music collection is not being held out or offered generally for transmission to the
19 public—the person can play back only his own songs to himself. So too with the
20 RS-DVR: The only subscriber who can play back a recording—the only "potential
21 audience" "capable of receiving" the transmission generated from a recording—is
22 the one who made the recording. *Cablevision*, 536 F.3d at 135.

23     Under those principles, Zediva's system is transmitting performances "to the
24 public." Indeed, there is no meaningful difference between Zediva's system and
25 conventional video on demand. To deliver its service, Zediva itself selects and ob-
26 tains its own copies of DVDs for the sole purpose of offering transmissions from its
27 DVD library to anyone willing to pay. Zediva then loads that library of DVDs into
28 its system and offers to make transmissions from its DVD library to the public.

3

1    Any number of individuals can receive transmissions from one of Zediva's DVDs

2    on a sequential basis, simply by becoming subscribers and signing up to receive a

3    transmission.   The "potential audience"—those "capable of receiving" any given

4    transmission from one of Zediva's DVDs—is the public at large.

5        B.    Zediva attempts to distinguish its system from traditional video on

6    demand by nominally "renting" its DVDs to subscribers before they are played.

7    Opp. at 6-7.  That limits the "potential audience," Zediva asserts, because, at the

8    moment playback begins, only one person—the one who previously "rented" the

9    DVD—is capable of playing that particular DVD.  *Id.*  That argument is unpersua-

10   sive for multiple reasons.

11       As an initial matter, Zediva's use of the term "rental" is a stretch.  Zediva's

12   "rental" period is extremely short: only four hours.  Zediva Gupta Decl. ¶ 12.  Even

13   within that four-hour period, Zediva will reclaim a DVD—the rented DVD effec-

14   tively "returns" itself—if a customer pauses it or leaves the session inactive for

15   more than an hour, whether or not the customer has finished watching the movie.

16   *Id.* ¶ 15.  After the four-hour "rental" period ends, moreover, Zediva will allow the

17   customer to "re-rent" the "same movie" for up to 14 days for free—apparently,

18   even if the particular copy of the movie the customer had previously "rented" is

19   now in use by someone else, so that the customer has to watch the movie from a

20   different DVD.  *Id.* ¶ 12; Pls.' Mem. at 8.  In reality, therefore, a Zediva customer

21   is not "renting" a particular DVD copy of a movie for four hours, but rather pur-

22   chasing the largely non-exclusive right to watch any of Zediva's multiple copies of

23   that movie for 14 days.  Further compounding the notional quality of the "rental" is

24   the fact that Zediva purportedly "rents" its DVD players as well, even though the

25   customer can use the player for no purpose other than to watch the one DVD that

26   Zediva owns and loaded inside it.  Zediva Gupta Decl. ¶¶ 3, 11, 13(b).

27       In any event, Zediva's "rental" construct cannot alter the fundamental nature

28   of the video-on-demand service the company is providing.  Zediva holds out each

1   of the DVDs in the video library that it selected, procured, and owns for transmis-

2   sion to anyone willing to pay.  The fact that only one subscriber may be able to ac-

3   cess a particular DVD during each nominal four-hour "rental" period does not

4   change the fact that the potential audience for any transmission from that DVD

5   right before (and right after) each successive "rental" period is the public at large.

6        The *Cablevision* decision thus does not support Zediva's position in this case.

7   With the RS-DVR, there is ***no*** point at which any customer's recordings are ***ever***

8   held out to the public for transmission.  Because a subscriber can watch only the re-

9   cordings he made using the RS-DVR, the only subscriber ***ever*** "capable of receiv-

10   ing" a transmission generated from a recording is the subscriber who made it.

11        The Second Circuit's reliance on *Columbia Pictures Industries, Inc. v. Redd*

12   *Horne, Inc.*, 749 F.2d 154 (3d Cir. 1984), and 2 *Nimmer on Copyright* § 8.14[C][3]

13   (2008), further confirms that the court did not intend to exempt systems like Ze-

14   diva's from the public performance right.  Those authorities, the court noted, found

15   transmissions to be "to the public" where particular video-on-demand-type system

16   providers, which had previously selected and procured a copy of a particular work,

17   played that "same copy" of the work over and over for different customers.  536

18   F.3d at 138.  Zediva's theory, however, would ***allow*** any video-on-demand provider

19   to procure and offer to play the "same copy" of a work over and over for its cus-

20   tomers without a license, simply by engaging in a notional "rental" arrangement.  If

21   the Second Circuit had intended to authorize that result, it would not have relied on

22   *Redd Horne* and Nimmer as support for its analysis.

23        There may be difficult cases on the spectrum between clearly "public" per-

24   formances like video on demand and clearly "private" performances like a customer

25   playing back his own recordings on the RS-DVR or listening to his own music col-

26   lection stored on a remote server on the Internet.  But because Zediva's system is

27   not meaningfully distinguishable from traditional video on demand, this is not one

28   of them.

5

1

2   **II.   *Zediva's Volitional Conduct Is Substantially Different from Cablevision's***

3          On the second issue—who is "doing" the transmitting—neither side's analy-

4   sis is wholly satisfactory.

5          A.     The Copyright Act reserves the right "to do" specific things to copy-

6   right holders—"to reproduce the copyrighted work in copies," "to perform the

7   copyrighted work publicly," etc.  17 U.S.C. § 106.  Those who "do" an enumerated

8   infringing act are direct infringers; those who merely set up a system that others can

9   use to "do" that act are at most secondarily liable under doctrines such as contribu-

10  tory infringement.  *See CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549-50

11  (4th Cir. 2004).  In determining who "does" the infringing act, courts have over-

12  whelmingly followed the "volition" standard first articulated in *Religious Technol-*

13  *ogy Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361

14  (N.D. Cal. 1995).  Courts have thus refused to extend liability for direct infringe-

15  ment beyond the person who engages in the "volitional conduct that causes the

16  copy to be made"—in other words, the "human employee" who "volitionally oper-

17  ates the copying system to make the copy." *Cablevision*, 536 F.3d at 131.

18         Plaintiffs err in suggesting (Reply at 8) that *Netcom*'s volition standard does

19  not apply to the public performance right.  Precedent is to the contrary:  In *CoStar*,

20  the Fourth Circuit held that "the automatic . . . ***transmission*** of copyrighted materi-

21  als, when instigated by others, does not render" a defendant directly liable.   373

22  F.3d at 555 (emphasis added).  And in *In re Cellco Partnership*, 663 F. Supp. 2d

23  363 (S.D.N.Y. 2009), the court held that a wireless service provider did not directly

24  infringe the public performance right when customers used its phones to play ring-

25  tones, because it did not engage in any "volitional conduct . . . 'sufficiently close

26  and causal' to its customer's decision to activate the ringtone." *Id.* at 376-79.

27  Other cases have applied the volition standard to the public display right, which in-

28  corporates the exact same definition covering transmissions "to the public." *See* 17

1   U.S.C. §§ 101, 106(5); *Netcom*, 907 F. Supp. at 1371-72; *Marobie-FL, Inc. v. Nat'l*
2   *Ass'n of Fire Equip. Distribs.*, 983 F. Supp. 1167, 1178 (N.D. Ill. 1997); *cf. Field v.*
3   *Google, Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006) (public distribution). Fi-
4   nally, there is no logical reason to apply the volition standard to certain exclusive
5   rights listed in 17 U.S.C. § 106 but not others. Regardless of the right at issue, the
6   question remains which person is "doing" the enumerated infringing act.

7        Plaintiffs urge that a different approach is appropriate because the Act de-
8   fines "perform" but not "reproduce." Reply at 7-8 (citing *Cablevision*, 536 F.3d at
9   134). But that definition merely clarifies that the person "doing" the performing is
10  the person "doing" the transmitting. The question remains who *does* the transmit-
11  ting—not *whose facility* the transmission is coming *from*. Moreover, it is not
12  "'silly' to speak of a customer 'transmit[ting] a movie to himself.'" Reply at 8
13  (emphasis omitted). When a customer downloads his own files from a remote
14  server, he is transmitting data to himself; when he plays back his music from a
15  cloud-based virtual locker, he is transmitting music to himself; and when he plays
16  back his recordings with the RS-DVR, he is transmitting the recordings to himself.
17  There is nothing linguistically "silly" about any of those statements.

18       Plaintiffs further err by suggesting that Zediva satisfies the "volition" stan-
19  dard merely because it "purchased and installed hundreds of DVD players" and
20  "designed the user interface." Reply at 8. That may be volitional conduct, but it is
21  not volition *in the act of transmission*. It shows that Zediva was the one who set
22  up the system, not that Zediva is the one "doing" the transmitting when a customer
23  uses that system. If a library set up and made available a self-service photocopier,
24  no one would say that the library "does" the copying when a patron walks up,
25  places a book on the platen, and presses "copy"—clearly, the patron is the one "do-
26  ing" the copying. Volition in "designing, housing, and maintaining a system" that
27  *others* use to make copies or transmit data does not make the provider the one who
28  "does" the copying or transmitting. *See Cablevision*, 536 F.3d at 131; *CoStar*, 373

7

1   F.3d at 555. Even further afield are plaintiffs' claims about what Zediva's "system"
2   or "servers" do. Reply at 8-9. Things done by a defendant's hardware "system"—
3   as opposed to the defendant itself—cannot establish the necessary volition. *See*
4   *Cablevision*, 536 F.3d at 131-32.

5           B.      On the other hand, Zediva errs in suggesting that its volitional conduct
6   is no different from Cablevision's in offering the RS-DVR. As plaintiffs note (Re-
7   ply at 8), there are significant distinctions: Zediva itself, through the volitional acts
8   of its human employees and without any customer involvement, selects and obtains
9   particular DVDs and manually loads those DVDs into its system for the sole pur-
10  pose of making transmissions from those DVDs to anyone willing to pay. In that
11  respect, Zediva's system again resembles a traditional video-on-demand system in
12  which the provider's human employees select and obtain a particular library of
13  video content and load copies of that content onto the provider's server for on-
14  demand transmission to the public.

15          Contrary to Zediva's claim, that volitional conduct bears no resemblance to
16  what Cablevision does in providing the RS-DVR. The only transmissions that can
17  be made using the RS-DVR occur when a customer plays back a television program
18  he previously recorded. Cablevision's employees do not choose what programs get
19  recorded or take any manual steps to make those recordings—its subscribers do.
20  To be sure, in its role as a provider of live cable television service, Cablevision has
21  some choice about which *channels* to carry on its cable system. But that conduct
22  is far removed from any decisions about what programs get recorded and played
23  back with the RS-DVR. Cablevision does not choose what programs air on the
24  channels it carries. Nor does Cablevision select particular shows from among those
25  programs to make available for recording: All scheduled programs on all broadcast
26  or cable channels to which a customer subscribes are equally available for customer
27  recording and playback, whether the subscriber uses a VCR, a TiVo, a Cablevision-
28  provided set-top DVR, or the RS-DVR.

8

1     As the Second Circuit explained, Cablevision's attenuated role in channel se-

2  lection is not "sufficiently proximate to the copying to displace the customer as the

3  person who 'makes' the copies."  536 F.3d at 132.  *A fortiori*, it is not sufficiently

4  proximate to the even later act of playing back a recording to make Cablevision the

5  one who "does" the transmitting.  Zediva's volitional conduct, however, is substan-

6  tially different from Cablevision's in relation to the RS-DVR.

7

8                        **CONCLUSION**

9     Plaintiffs' motion for a preliminary injunction should be decided consistently

10  with the principles set forth above.

11

12  Dated:      July 18, 2011

13

14  Jeffrey A. Lamken (CA Bar # 154217)  Becky Walker James (CA Bar # 151419)
    Robert K. Kry                         LAW OFFICES OF BECKY WALKER

15  MOLO LAMKEN LLP            JAMES

16

17       *Counsel for Amicus Curiae Cablevision Systems Corporation*

18

19

20

21

22

23

24

25

26

27

28

9

MEMORANDUM OF LAW OF *AMICUS CURIAE* CABLEVISION SYSTEMS CORPORATION

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1990 South Bundy Drive, Suite 705, Los Angeles, California 90025.

On July 18, 2011, I served the foregoing document described as **MEMORANDUM OF LAW OF *AMICUS CURIAE* CABLEVISION SYSTEMS CORPORATION** on each interested party, as follows:

GLENN D. POMERANTZ                        MICHAEL H. PAGE
KELLY M. KLAUS                            MARK A. LEMLEY
MUNGER, TOLLES & OLSON LLP                JOSEPH C. GRATZ
355 South Grand Avenue, Thirty-Fifth Floor DURIE TANGRI LLP
Los Angeles, CA 90071-1560                217 Leidesdorff Street
                                          San Francisco, CA 94111

DANIEL E. ROBBINS
BENJAMIN S. SHEFFNER                      Attorneys for Defendants/Counter-Claimants
MOTION PICTURE ASS'N OF AMERICA
15301 Ventura Boulevard, Building E
Sherman Oaks, California 91403-3102

Attorneys for Plaintiffs/Counter-Defendants

**X(BY MAIL)** I placed true copies of the foregoing document in a sealed envelope addressed to each interested party, as set forth above.  I placed each such envelope, with postage fully prepaid, for collection and mailing at the LAW OFFICES OF BECKY WALKER JAMES, Los Angeles, California.  I am readily familiar with processing of correspondence for mailing with the United States Postal Service.  Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

**X (BY E-MAIL)** By causing such document to be delivered by e-mail to the above counsel at the e-mail addresses on record with the Court.

I declare that I am a member of the bar of this court and that the foregoing is true and correct.

Executed on July 18, 2011, at Los Angeles, California.

Becky Walker James

**PROOF OF SERVICE**