**UNITED STATES DISTRICT COURT**     **PRIORITY SEND**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

Case No.    **CV 11-2817-JFW (Ex)**                               Date: August 1, 2011

Title:      Warner Bros. Entertainment Inc., et al. -*v*- WTV Systems, Inc.

---

**PRESENT:**

      **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| Kendra Bradshaw | None Present |
|---|---|
| **Courtroom Deputy** | **Court Reporter** |

**ATTORNEYS PRESENT FOR PLAINTIFFS:**   **ATTORNEYS PRESENT FOR DEFENDANTS:**
      None                                                    None

**PROCEEDINGS (IN CHAMBERS):**    **ORDER GRANTING MOTION OF MOTION PICTURE STUDIO PLAINTIFFS FOR PRELIMINARY INJUNCTION [5/26/11; Docket No. 25]**

      On May 26, 2011, Plaintiffs Warner Bros. Entertainment Inc., Columbia Pictures Industries, Inc., Disney Enterprises, Inc., Paramount Pictures Corporation, Twentieth Century Fox Film Corporation, and Universal City Studios Productions, LLLP (collectively, "Plaintiffs") filed a Motion for Preliminary Injunction ("Motion").  On June 17, 2011, Defendants WTV Systems, Inc. f/k/a WTV Systems, LLC and Vekatesh Srinivasan (collectively, "Defendants") filed their Opposition.  On June 27, 2011, Plaintiffs filed a Reply.  On July 19, 2011, Cablevision Systems Corporation ("Cablevision") filed its Memorandum of Law as *Amicus Curiae* ("*Amicus Curiae* Brief").  On July 21, 2011, Plaintiffs filed their Response to Cablevision's *Amicus Curiae* Brief.  On July 22, 2011, Defendants filed their Response to Cablevision's *Amicus Curiae* Brief.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument.  The hearing calendared for August 8, 2011 is hereby vacated and the matter taken off calendar.  After considering the moving, opposing, and reply papers and the arguments therein, the Court rules as follows:

**I.    Factual and Procedural Background**

    **A.    Plaintiffs and Their Copyrighted Works**

      Plaintiffs are in the business of financing and producing copyrighted motion pictures.  Once these copyrighted motion pictures are produced, Plaintiffs, either directly or through their affiliates and/or licensees, distribute copies of and publicly perform their copyrighted motion pictures and

other motion pictures to which they have exclusive rights (the "Copyrighted Works").[1] These Copyrighted Works are distributed to and publicly performed in a variety of venues, which allow customers to view the Copyrighted Works in a variety of ways: by going to a movie theater; by buying a copy of the Copyrighted Work on DVD or Blu-ray Disc; by renting a copy of the Copyrighted Work on DVD or Blu-ray Disc at a bricks-and-mortar store or through a mail subscription service, such as Netflix; by downloading and licensing a permanent copy of the Copyrighted Work through a service, such as amazon.com; by accessing the Copyrighted Work "on demand" for a fixed period of time through a cable, satellite, or internet delivered video on demand platform, such as Comcast, DirecTV, or Vudo; by viewing the Copyrighted Work through a subscription video on demand streaming service, such as Netflix; by watching the Copyrighted Work on a scheduled subscription cable television channel, such as HBO; or by watching the Copyrighted Work for free on network television.  Each of these channels of distribution represents a different customer experience, varying as to, among other things, when the Copyrighted Work is viewed (when it is first released, or at some later time), where the Copyrighted Work is viewed (in a theater, at home, or on a mobile device), and how much the customer pays to view the Copyrighted Work.

      The period of time during which a Copyrighted Work is distributed or publicly performed in these different channels of distribution is commonly referred to as a distribution "window."  *See, e.g., Universal City Studios, Inc. v. Remerdes*, 111 F.Supp. 2d 294, 309 (S.D.N.Y. 2000) ("The major motion picture studios typically distribute films in a sequence of so-called windows, each window referring to a separate channel of distribution and thus to a separate source of revenue.  The first window generally is theatrical release, distribution, and exhibition.  Subsequently, films are distributed to airlines and hotels, then to the home market, then to pay television, cable, and, eventually, free television broadcast.").  Each of the Plaintiffs has its own strategy for structuring their respective distribution windows, and some of the Plaintiffs even structure unique distribution windows for each of its Copyrighted Works.  For example, for any given Copyrighted Work, Plaintiffs may open the home video market window with sales of that Copyrighted Work on DVD, Blu-ray Disc, and/or the licensing of a downloadable copy.  At the same time the home video market window opens, Plaintiffs may also make the Copyrighted Work available through a cable, satellite, or internet video on demand service, and the customer may be able to rent a DVD or Blu-ray Disc of the Copyrighted Work at a bricks-and-mortar rental store.  However, Plaintiffs may not make that Copyrighted Work available through rental DVD mail subscription services, such as Netflix, or rental kiosks, such at Redbox, until 28 days after the initial home video release date.  Plaintiffs may also have granted exclusive rights to a cable television channel to distribute the Copyrighted Work after the initial home video release, and, during that time, the Copyrighted Work is often not available through video on demand.  Typically, the last distribution window is network television.

      In general, the sooner a Copyrighted Work is available for viewing, the higher the price a Plaintiff can charge for that Copyrighted Work.  Thus, licensees that contract with Plaintiffs to distribute a Copyrighted Work in one of the earlier distribution windows may pay more for the right to distribute that Copyrighted Work because that work is new, or newer, to the movie-watching

---

[1] All the Copyrighted Works at issue are motion pictures.  Thus, the Copyrighted Works may occasionally be referred to as motion pictures or movies.

public, while licensees that contract with Plaintiffs to distribute a Copyrighted Work in later distribution windows may pay less for that same right because of the prior exposure of the Copyrighted Work to the movie-watching public.  Alternatively, licensees that contract with Plaintiffs to distribute a Copyrighted Work in later distribution windows may pay more in exchange for negotiated restrictions on Plaintiffs which are aimed at limiting or controlling exposure of the Copyrighted Work in earlier periods before their exhibition window begins or for the exclusive right to distribute or perform a Copyrighted Work during a particular time period.

### B.     The Service Provided by Defendants

Defendants provide what they describe as a DVD "rental" service known as Zediva, which is available at www.zediva.com.  Defendants provide their customers with access to DVDs purchased by Defendants containing the Copyrighted Works.  To operate their service, Defendants have purchased hundreds of DVD players and installed them in cabinets at a data center they lease in Santa Clara, California.  Defendants also have purchased copies of Plaintiffs' Copyrighted Works on DVD, and place those DVDs in their DVD players, with each DVD remaining in its respective DVD player while it is transmitted to Defendants' customers on multiple occasions.  When a customer requests a particular Copyrighted Work, Defendants, through their Zediva service: (1) start the play process on a particular DVD player holding the requested Copyrighted Work; (2) convert the analog video signal from the DVD player into a digital signal using a video adapter; (3) feed the digital signal into a DVD control server which converts the digital signal to a form suitable for streaming across the Internet; (4) convert the digital signal to a format that can be viewed in the player created by Defendants and used on their website; (5) transmit the performance via the internet to the customer; and (6) provide the customer with a custom viewer necessary to view the video stream.[2]

Defendants describe their service as allowing customers to "rent" a particular DVD and DVD player for 14 days.  However, Defendants' customers do not have access to or control over a specific DVD or DVD player.  Instead, Defendants stream the content of the DVD to a customer for a maximum period of four hours, provided that the customer does not pause it for more than one hour during that time.  After four hours of total "rental" time or an hour-long pause, whichever occurs first, Defendants use the DVD player containing the same DVD to transmit the Copyrighted Work to a different customer.  When the first customer makes a request to resume viewing, the transmission may be sent from a different DVD or a different DVD player than the one originally used to transmit the Copyrighted Work in the earlier "rental" period.  According to their website, if

---

[2] To begin this process, the customer "presses" a virtual button on Defendants' website that was designed by Defendants.  Defendants' system then sends a request to their control server, which then begins a series of actions on various servers created and controlled by Defendants.  Defendants' customers never have physical access to the DVDs or the DVD players.  In fact, the customers do not know which particular DVD player or DVD is used by Defendants to transmit the requested Copyrighted Work.  In addition, the customers cannot access all the other features available on the DVD, such as deleted and extra scenes, or other special DVD features.  Defendants maintain exclusive control of their servers, and the customers have no control whatsoever over the various servers that Defendants use to direct traffic among their stacks of DVD players.

all of the copies of a particular Copyrighted Work are "rented out" when a customer wants to view it, that customer "can request to be notified, via email, when it becomes available."

Defendants are not licensed or otherwise authorized by Plaintiffs to distribute or perform any of Plaintiffs' Copyrighted Works.[3]  Defendants derive several benefits from performing Plaintiffs' Copyrighted Works without a license.  For example, Defendants are able to offer performances of Plaintiffs' Copyrighted Works at below-market prices.  While most licensed internet video on demand services currently charge between $3.99 and $5.99 to watch new releases of Plaintiffs' Copyrighted Works, Defendants charge only $1.99 per movie, or 10 movies for $10.[4]  Defendants also have an availability advantage over licensed internet video on demand services because, unlike Defendants, those services must take certain Copyrighted Works off the market during exclusivity periods that certain Plaintiffs may have granted to subscription cable television channels while Defendants can continue to offer those Copyrighted Works during the exclusivity period.  In addition, Defendants have a durational access advantage in that they offer access to a particular copyrighted work for 14 days for a single fee, whereas licensed video on demand services may be required by contract to offer a more limited viewing period, such as 48 hours.

## II.     Legal Standard

Injunctive relief is "an extraordinary remedy that may only be issued upon a clear showing that plaintiff is entitled to such relief."  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 129 S. Ct. 365, 376 (2008). A plaintiff seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm absent a preliminary injunction; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public's interest. *Id.* at 374; *see also American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth Circuit recently confirmed that its "serious questions" approach survived *Winter* when applied as part of the four-element *Winter* test.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).  In other words, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

As explained below, Plaintiffs have established that all of these factors weigh in Plaintiffs' favor.

## III.    Discussion

---

[3]  In addition, Defendants use images from Plaintiffs' Copyrighted Works in their advertising without permission.

[4]  *Time* stated on its "Techland" blog that Zediva could "shave[] down" its pricing because it "cut[s] movie studios out of the equation" and does not "negotiat[e] streaming rights."  In fact, Defendant Srinivasan has promoted Zediva as allowing users to avoid "pay[ing] premium prices" for online streaming because "we are not party" to those "contractual agreement[s]" that Plaintiffs have with authorized streaming services.

### A. Plaintiffs Have Demonstrated A Likelihood of Success on the Merits.

A party seeking a preliminary injunction must make a clear showing of likelihood of success on the merits of its claim. *American Trucking Association*, 559 F.3d at 1052. In order to establish their copyright infringement claim, Plaintiffs must prove: (1) ownership of a valid copyright, and (2) "they must demonstrate that the alleged infringers violated at least one exclusive right granted to copyright holders under 17 U.S. C. § 106." *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001); *see, also, S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 n. 3 (9th Cir.1989) ("The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights...."). Because Defendants do not dispute the validity of Plaintiffs' copyrights, the only factor at issue in this case is whether Defendants violated at least one exclusive right granted to Plaintiffs as copyright holders.

One of the rights granted by Section 106 of the Copyright Act is the exclusive right "in the case of . . . motion pictures and other audiovisual works, to perform the copyrighted work publicly." 17 U.S.C. 106(4). What constitutes a public performance for purposes of Section 106(4) is defined by the Copyright Act in two clauses of Section 101. Under Section 101(1), the "public place" clause, a performance is public if it occurs:

> at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered.

Under Section 101(2), the "transmit" clause, a performance is public if someone:

> transmit[s] or otherwise communicate[s] a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process.

Under the transmit clause, a performance is public "whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." *Id.* Section 101 defines "transmitting" a performance to mean:

> to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

In this case, Defendants are violating Plaintiffs' exclusive right to publicly perform their Copyrighted Works by transmitting those Copyrighted Works to the public over the internet, without a license or Plaintiffs' permission, through the use of Defendants' Zediva service.

### 1. Defendants Are "Transmitting" Performances of Plaintiffs' Copyrighted Works.

Although Defendants are clearly transmitting performances of Plaintiffs' Copyrighted Works, Defendants argue that their service offers "DVD rentals" rather than transmissions of performances, which is similar to the unsuccessful argument made by the defendant in *On*

*Command Video Corporation v. Columbia Pictures Industries*, 777 F.Supp. 787 (N.D. Cal. 1991).[5]
In *On Command*, the court held:

> Plaintiff's argument that On Command's system involves not "transmissions" but "electronic rentals" similar to patrons' physical borrowing of videotapes is without merit.  On Command transmits movie performances directly under the language of the definition.  The system "communicates" the motion picture "images and sounds" by a "device or process" – the equipment and wiring network – from a central console in a hotel to individual guest rooms, where the images and sounds are received "beyond the place from which they are sent."  The fact that hotel guests initiate this transmission by turning on the television and choosing a video is immaterial.

*Id.* at 789-90 (citations omitted).

As in *On Command*, Defendants' Zediva service transmits performances of Plaintiffs' Copyrighted Works "directly under the language of the statute."  In this case, the Zediva service "communicates" the "images and sounds" of Plaintiffs' Copyrighted Works through the use of a "device or process" – the equipment, including various servers, and internet – from a central bank of DVD players to individual customer's computers, where the images and sounds are received "beyond the place from which they are sent."  *See, also, Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 160 (3d Cir. 1984) (in a case involving "in-store rentals" of video cassettes for viewing only on the stores own video cassette recorders, the Third Circuit held that the defendants "never disposed of the tapes in its showcasing operations, nor did the tapes ever leave the store.  At all times, [the defendants] maintained physical dominion and control over the tapes.  Its employees actually played the cassettes on its machines.  The charges or fees received for viewing the cassettes at [the defendants'] facilities are analytically indistinguishable from admission fees paid by patrons to gain admission to any public theater.  Plainly, in their showcasing operation, the appellants do not sell, rent, or otherwise dispose of the video cassette.").  As in *On Command*, the fact that Zediva's customers initiate the transmission by turning on their computers and choosing which of Plaintiffs' Copyrighted Works they wish to view is immaterial.  *On Command*, 777 F.Supp. at 790.

### 2. Defendants' Transmission Are "To The Public."

In addition, Defendants' transmissions are "to the public" for purposes of the transmission clause.  Customers watching one of Plaintiffs' Copyrighted Works on their computer through Zediva's system are not necessarily watching it in a "public place,"[6] but those customers are

---

[5]  In *On Command,* the plaintiff developed "a system for the electronic delivery of movie video tapes," which it sold to hotels.  *Id.* at 788.  The hub of the system was a bank of video cassette players, each containing a copy of a particular movie.  *Id.*  A hotel guest could select a movie via remote control from a list on the television located inside the hotel room.  *Id.*  The corresponding cassette player would start, and its output would be transmitted to that guest's room.  During this playback, the movie selected was unavailable to other guests.  *Id.*

[6]  Although with the prevalence of laptops, customers could be watching the transmission anywhere, from the privacy of their own homes to a public place, such as a bar, restaurant, coffee

nonetheless members of "the public."  *See Columbia Pictures Industries, Inc. v. Redd Horne*, 568 F.Supp. 494 (W.D.Pa.1983), *aff'd* 749 F.2d 154, 159 (3rd Cir.1984) ("the transmission of a performance to members of the public, even in private settings such as hotel rooms ... constitutes a public performance") (*citing* H.R.Rep. No. 1476, 94th Cong., 2d Sess. at 64 (1976) ["1976 House Report"] ); *ESPN, Inc. v. Edinburg Community Hotel, Inc.*, 735 F.Supp. 1334, 1340 (S.D.Tex.1986) ("The [1976] House Report ... on the Copyright Act makes explicit that performances to occupants of hotel rooms fall within the definition of a public performance").  Defendants' transmissions are "to the public" because the relationship between Defendants, as the transmitter of the performance, and the audience, which in this case consists of their customers, is a commercial, "public" relationship regardless of where the viewing takes place.  The non-public nature of the place of the performance has no bearing on whether or not those who enjoy the performance constitute "the public" under the transmit clause.

Moreover, it does not matter that Defendants' customers are viewing the transmissions at different times and in different places.  Section 101 of the Copyright Act explicitly states that a performance can still be public under the transmit clause "whether the members of the public ... receive it in the same place or in separate places and at the same time or at different times."  17 U.S.C. § 101.  A 1967 Report by the House of Representatives reveals that Congress added this language to the transmit clause to cover precisely the sort of single-viewer system developed by Defendants:

> [This language makes doubly clear that] a performance made available by transmission to the public at large is "public" even though the recipients are not gathered in a single place, and even if there is no direct proof that any of the potential recipients was operating his receiving apparatus at the time of the transmission.  The same principles apply whenever the potential recipients of the transmission represent a limited segment of the public, such as the occupants of hotel rooms....; they are also applicable where the transmission is capable of reaching different recipients at different times, as in the case of sounds or images stored in an information system and capable of being performed or displayed at the initiative of individual members of the public.

H.R.Rep. No. 83, 90th Cong., 1st Sess. at 29 (1967); *see, also, On Command*, 777 F.Supp. at 790 ("Thus, whether the number of hotel guests viewing an On Command transmission is one or one hundred, and whether these guests view the transmission simultaneously or sequentially, the transmission is still a public performance since it goes to members of the public."); *Redd Horne*, 749 F.2d at 159 (holding that transmissions of videos to private viewing booths occupied by one to four persons infringing under transmit clause).  Therefore, Defendants "publicly perform" Plaintiffs' Copyrighted Works within the meaning of the transmit clause.[7]

---

shop, or airport.

  [7]  Defendants argument that their performances are not "to the public" in light of *The Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*") is not persuasive.  Under the facts of that case, the Second Circuit found that the transmissions were not "to the public" because "each RS-DVR playback transmission is made to a single subscriber using a single unique copy produced by that subscriber."  *Id.* at 138. ("Given that each RS-DVR

Accordingly, the Court concludes that Plaintiffs have demonstrated a likelihood of success on the merits.

**B.     Plaintiffs Have Demonstrated A Likelihood of Irreparable Injury.**

The party seeking preliminary injunctive relief is required to "establish that he is likely to suffer irreparable harm in absence of preliminary relief." *Winter,* 555 U.S. 7, 129 S.Ct. at 374. In

---

transmission is made to a given subscriber using a copy made by that subscriber, we conclude that such a transmission is not 'to the public.'"). In this case, unlike *Cablevision*, Defendants' customers do not produce their own unique copy of Plaintiffs' Copyrighted Works. Instead, like *On Command* and *Red Horne*, the same DVD is used over and over again to transmit performances of Plaintiffs' Copyrighted Works. As the Second Circuit held in *Cablevision*, while "neither the *Red Horne* court nor Prof. Nimmer explicitly explains *why* the use of a distinct copy affects the transmit clause inquiry," its "independent analysis confirms the soundness of their intuition: the use of a unique copy may limit the potential audience of a transmission and is therefore relevant to whether that transmission is made 'to the public.'" *Id.* Thus, despite Defendants' argument to the contrary, the Second Circuit in *Cablevision* explicitly found that *Redd Horne* "supports our decision to accord significance to the existence and use of distinct copies in our transmit clause analysis." *Id.*

In addition, Defendants' argument that this Court should adopt the Second Circuit's volitional requirement in direct copyright infringement cases, such as this one, is unpersuasive. As Judge Feess stated in his April 1, 2011 Order Granting In Part and Denying In Part Plaintiff's Motion for Summary Judgment in *Arista Records LLC v. Myxer Inc., f/k/a Visible Technologies, Inc.*, Case No. CV 08-3935-GAF (JCx), "no Ninth Circuit case has adopted this volitional conduct requirement," and "in light of the fact that copyright infringement is a strict liability offense, the Court is not inclined to adopt a volitional conduct requirement without clear instruction from the Ninth Circuit, and so declines to apply the so-called volitional conduct requirement." This Court also declines to adopt the so-called volitional conduct requirement without clear instruction from the Ninth Circuit.

Moreover, Defendants' reliance on *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.*, 866 F.2d 278 (9th Cir. 1989) ("*PRE*") is misplaced. *PRE* involved a service provided by a hotel that rented videodiscs to its guests, who carried the discs to their rooms to watch them on in-room videodisc players. The Ninth Circuit found that because the performances at issue took place in a guest's hotel room (as opposed to a hotel conference room), the performances were not "in public." *Id.* at 281-82. The Ninth Circuit also found that the performances were not public under the transmit clause because even though the hotel provided guests with "the videodisc player, television screens, guest rooms, and makes videodiscs available in the lobby, we are not persuaded that any transmission of the kind contemplated by the statute occurs." *Id.* at 282. At the same time, the Ninth Circuit found that a closed circuit system similar to the one described in *On Command* and *Redd Horne* where movies are transmitted from a central location in a hotel to individual hotel rooms "falls squarely within the transmit clause of the Act." *Id.* at 282 n. 7. Thus, Defendants' arguments that *PRE* supports its position is unpersuasive because the Ninth Circuit in *PRE* reached the same conclusion as the Third Circuit in *Redd Horne* that systems such as Defendants' Zediva service violate the transmit clause.

this case, Plaintiffs have also demonstrated that they are likely to suffer irreparable harm in the absence of a preliminary injunction.[8]

As the copyright holders, Plaintiffs have the exclusive right to decide when, where, to whom, and for how much they will authorize transmission of their Copyrighted Works to the public. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 518 F.Supp. 2d 1197, 1218 (C.D. Cal. 2007). In exercising this right, Plaintiffs often negotiate agreements that grant licensees the exclusive right to perform a Copyrighted Work for a period of time. However, because Defendants operate in violation of Plaintiffs' copyrights and without any license, they have and will perform works during these negotiated exclusivity periods. Thus, Defendants interfere with Plaintiffs' grants of exclusivity to their licensees, Plaintiffs' ability to negotiate similar agreements in the future (because potential licensees will not be willing to pay a premium for a non-exclusive period), Plaintiffs' relationships, including the goodwill developed with their licensees, and Plaintiffs' overall ability to control the use and transmission of their Copyrighted Works. In addition, as part of their licensing agreements, Plaintiffs require licensees to provide a high quality movie-watching experience for their customers, and to have in place the necessary security measures to protect Plaintiffs' Copyrighted Works from piracy and other forms of illegal copying. Again, because Defendants operate their infringing service without the normal licensing restrictions imposed by Plaintiffs, they interfere with Plaintiffs' ability to control the use and transmission of their Copyrighted Works, thereby causing irreparable injury to Plaintiffs. *Grokster*, 518 F.Supp. 2d at 1217 (finding irreparable harm from loss of control of use of copyrighted works where the defendant had and continued to "induce far more infringement than it could ever possibly redress with damages" and the plaintiff's copyrighted works

---

[8] Until recently, a plaintiff alleging copyright infringement has been entitled to a presumption of irreparable harm. *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999); *Cadence Design Sys., Inc. v. Avanti! Corp.*, 125 F.3d 824, 826–27 (9th Cir. 1997) (holding that a presumption of irreparable harm arises where the plaintiff is able to show a likelihood of success on the merits of its copyright infringement claim). Although the Ninth Circuit has not yet settled the debate on the viability of the presumption of irreparable harm in intellectual property cases, a district court in a recent decision extensively analyzed the continued viability of the presumption of irreparable injury in light of *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 129 S.Ct. 365 (2008), and *eBay Inc. v. MercExchange*, *L.L.C.*, 547 U.S. 388 (2006), and concluded that there can be no presumption of irreparable harm in assessing the need for preliminary relief in a copyright case. *Aurora World, Inc. v. Ty Inc.*, 719 F.Supp. 2d 1115, 1166-69 (C.D. Cal. Dec. 15, 2009).

The Court agrees with *Aurora* and concludes that following *Winters* and *eBay*, irreparable injury cannot be presumed in copyright infringement cases. Rather, it is the plaintiff's burden to prove that he is likely to suffer irreparable harm in the absence of preliminary relief. Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.06 (2011) ("No longer applicable is the presumption of irreparable harm."); *Hologic, Inc. v. Senorx, Inc.*, 2008 WL 1860035, *15 (N.D.Cal. Apr. 25, 2008) (holding that it is "doubtful that the Supreme Court intended for the presumption to survive for purposes of preliminary injunctions"); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd. ("Grokster")*, 518 F. Supp.2d 1197, 1214 (C.D.Cal. 2007) ("The *eBay* Court held that it is Plaintiffs who 'must demonstrate' (meaning, have the burden of proof) that the traditional factors favor a permanent injunction.").

had been "rendered particularly vulnerable to continuing infringement on an enormous scale due to" the defendant's infringement).

Moreover, because Defendants are exploiting Plaintiffs' Copyrighted Works without paying the normal licensing fees, they deprive Plaintiffs of revenue, and even jeopardize the continued existence of Plaintiffs' licensees' businesses. A customer who views a movie through Defendants' service may forego watching the movie through authorized video on demand providers, or choose not to purchase a DVD or Blu-ray Disc. Satellite, internet, and mobile video on demand providers have licensing agreements which require that they pay Plaintiffs a percentage of the revenue received on each transaction. Therefore, if customers watch the Copyrighted Works through Defendants' service instead of the services of authorized licensees, it significantly decreases the amount of revenue received by Plaintiffs and their licensees. In addition, Defendants are able to offer their services at significantly lower prices than their competitors because Defendants pay no licensing fees to Plaintiffs and do not incur the costs necessary to comply with Plaintiffs' quality controls or security measures.[9] Because Defendants admit that the technology they use to provide their service is "scalable . . . to support millions of customers," the loss of revenue to Plaintiffs and their licensees, which is already significant, will continue to increase, and constitutes irreparable injury to Plaintiffs. *Ebay, Inc. v. Bidder's Edge, Inc.*, 100 F.Supp. 2d 1058, 1066 (N.D. Cal. 2000) ("Harm resulting from lost profits and lost customer goodwill is irreparable because it is neither easily calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief."); *Pearson Educ., Inc. v. Vergara*, 2010 WL 3744033 (Sept. 27, 2010) (holding that decline in sales of textbook as a result of greater access to infringing works is an injury difficult to quantify and which plaintiffs should not be expected to suffer).

Furthermore, Defendants' service threatens the development of a successful and lawful video on demand market and, in particular, the growing internet-based video on demand market. The presence of Defendants' service in this market threatens to confuse consumers about video on demand products, and to create incorrect but lasting impressions with consumers about what constitutes lawful video on demand exploitation of Plaintiffs' Copyrighted Works, including confusion or doubt regarding whether payment is required for access to the Copyrighted Works. *Grokster*, 545 U.S. at 929 (holding that "the indications are that the ease of copying songs or movies using software like Grokster's and Napster's is fostering disdain for copyright protection"); *A&M Records, Inc. v. Napster, Inc.*, 114 F.Supp. 2d 896, 910-11 (N.D. Cal. 2000) (holding that Napster "has contributed to a new attitude that digitally-downloaded songs ought to be free – an attitude that creates formidable hurdles for the establishment of a commercial downloading market"), *aff'd in relevant part*, 239 F.3d 1004 (9th Cir. 2001).

Defendants' service also threatens the development of a successful and lawful video on demand market by offering a sub-optimal customer experience and, thus, tarnishing customers' perception of video on demand as an attractive option for viewing Plaintiffs' Copyrighted Works. As discussed above, Plaintiffs require their licensees to provide a high quality movie-watching

---

[9] Defendants' competition with Plaintiffs' licensees is direct and intentional. In a recent letter to the FCC, Defendant Srinivasan stated that Zediva "may be perceived to directly compete with the Video-on-Demand service, PayPerView or other PayTV services offered by cable providers and, in some cases, the providers of fiber networks and wireless networks."

experience to their video on demand customers, including, for example, requiring licensees to transmit the Copyrighted Works at the highest level of quality. These quality controls are important in both developing the relatively new video on demand market, and allowing both Plaintiffs and their licensees to command a higher price for a high quality product. However, because they are not licensed to exploit Plaintiffs' Copyrighted Works, Defendants are not contractually obligated to meet any quality control standards, and, in fact, Defendants admit that they have received complaints about the quality of their service. Defendants also admit that "a lot" of times they are unable to make a particular Copyrighted Work available "on demand" to all of the customers requesting it, and customers have to be told that particular Copyrighted Work is "out of stock."[10] The message that a particular Copyrighted Work is unavailable or "out of stock" is totally inconsistent with the concept of "video on demand," which means it is always available, and creates a significant risk of damaging customer goodwill as customers become disillusioned, frustrated, and confused about the video on demand market in general. Loss of customer goodwill and damage to consumer perceptions about the video on demand market is the type of irreparable injury that Plaintiffs "should not be expected to suffer." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *MySpace, Inc. v. Wallace*, 498 F.Supp. 2d 1293, 1305-06 (C. D. Cal. 2007) (holding that the defendants' action "impacts the quality of MySpace.com users' experiences with Plaintiff's services" and finding that this contributed to a showing of irreparable injury.").

Accordingly, the Court concludes that Plaintiffs have demonstrated a likelihood of irreparable injury.

      **C.    The Balance of Hardships Weighs in Favor of Plaintiffs.**

An injunction may not issue unless the balance of hardships tips sharply in favor of the moving party. *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993). In this case, Plaintiffs have demonstrated that the balance of hardships tips sharply in their favor. Although Defendants claim, without any evidence, that an injunction would significantly harm, if not destroy, their business, the hardship suffered by Plaintiffs will be greater if Defendants are not enjoined from infringing or misappropriating Plaintiffs' Copyrighted Works. Indeed, Defendants "cannot complain of the harm that will befall [them] when properly forced to desist from [their] infringing activities." *Triad Systems Corp v. Southeastern Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995). *See also Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F. 3d 824, 830 (9th Cir. 1997) (quotations and citations omitted) ("[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration . . . .").

---

[10] Defendants' service is limited by the number of DVDs of a Copyrighted Work that Defendants decided to purchase and the DVD players available to transmit those DVDs. Thus, customers who want to view a particular Copyrighted Work "on demand" will undoubtedly be disappointed when they are advised that the Copyrighted Work they have selected is "out of stock."

Accordingly, the Court concludes that the balance of hardships tips sharply in favor of Plaintiffs.

### D. The Public Interest Supports the Issuance of a Preliminary Injunction.

The Court concludes that the public interest is served by issuance of a preliminary injunction, as "it is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work."  *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3rd Cir. 1983).

### IV. Conclusion

For all the foregoing reasons, Plaintiffs' Motion is **GRANTED**.  On or before August 8, 2011, the parties shall meet and confer and prepare a preliminary injunction consistent with this Order and lodge it with the Court by August 10, 2011.

In the unlikely event that the parties cannot agree on a preliminary injunction, Plaintiffs and Defendants shall, on or before August 10, 2011, file a proposed preliminary injunction along with a joint statement that includes a description of each specific provision in dispute between the parties, with a separate statement of the parties' positions with respect to each disputed provision.

In light of the concerns expressed by Defendants that the issuance of an injunction in this action may cause them severe financial hardship, the Court orders Plaintiffs to post a bond of $50,000, which is "an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  F.R.C.P. 65(c); *see, also, GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000).  The bond of $50,000 shall be posted within two business days of the Court signing the preliminary injunction.

IT IS SO ORDERED.